# Exhibit A

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

KRISHNA MOVVA, derivatively on behalf of
UNITY SOFTWARE INC.,

      Plaintiff,

      v.

JOHN S. RICCITIELLO, KIMBERLY JABAL,
LUIS FELIPE VISOSO, ROELOF BOTHA,
EGON DURBAN, DAVID HELGASON,
ALYSSA HENRY, BARRY SCHULER,
ROBYNNE SISCO, MARY SCHMIDT
CAMPBELL, and KEISHA SMITH JEREMIE,

      Defendants,

      and

UNITY SOFTWARE INC.,

      Nominal Defendant.

Case No.:

DEMAND FOR JURY TRIAL

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Verified Shareholder Derivative Complaint

**INTRODUCTION**

Plaintiff Krishna Movva ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Unity Software Inc. ("Unity" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants John S. Riccitiello ("Riccitiello"), Kimberly Jabal ("Jabal"), Luis Felipe Visoso ("Visoso"), Roelof Botha ("Botha"), Egon Durban ("Durban"), David Helgason ("Helgason"), Alyssa Henry ("Henry"), Barry Schuler ("Schuler"), Robynne Sisco ("Sisco"), Mary Schmidt Campbell ("Schmidt"), and Keisha Smith Jeremie ("Smith") (collectively, the "Individual Defendants," and together with Unity, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Unity, waste of corporate assets, unjust enrichment, against Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Riccitiello, Jabal, and Visoso for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Unity, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Unity's directors and officers from March 5, 2021 through May 10, 2022 (the "Relevant Period").

2. Unity is a San Francisco-based, video game software development company. The Company's platform, which is comprised of two distinct but synergistic segments—Create Solutions and Operate Solutions, was developed to create and operate real-time 2D and 3D content for multiple

platforms, including mobile phones, personal computers, consoles, and virtual reality devices. Content made on the Company's platform is interactive, allowing end-users to connect with the content and with each other, and real-time, allowing the content to adapt to end-user behavior and feedback.

3. The Create Solutions segment offers a set of tools for artists, designers, and developers across a range of industries to create, edit, run, and deploy high-definition, real-time 2D and 3D content. Although this business is driven by the gaming sector, business outside of gaming, such as from the aerospace, medical, and manufacturing industries, has also been growing. The Company offers Create Solutions primarily through monthly subscriptions, which in turn drive the adoption of Operate Solutions.

4. As many of the Company's customers develop games and applications ("app") with the intention of building a profitable business, the Company offers user acquisition products and monetization products through its Operate Solutions segment to allow customers to grow their user bases and to run and monetize their content as users engage over time with the content. The Company offers Operate Solutions primarily through a combination of revenue-share and consumption-based models. Revenue generated by Operate Solutions generally makes up most the Company's revenue.

5. Audience Pinpointer, one of the Company's purported user acquisition tools, uses machine learning to evaluate real-time in-app behavior at the moment of an ad request to help customers find the users most likely to provide value beyond the initial installation of the game or application. Audience Pinpointer experienced significant growth ever since Apple Inc.'s ("Apple") decision in 2021 to provide users with the choice to block the Identifier for Advertisers, a unique identifier assigned to a user's iOS device that is used to target and determine the effectiveness of advertising on a user level. The reason for the significant growth was that advertisers viewed Audience Pinpointer as a workaround to Apple's privacy changes since Audience Pinpointer did not rely on Apple's data.

6. Throughout the Relevant Period, the Individual Defendants made and/or caused the Company to make false and misleading statements and omissions of material fact that touted the Company's platform, including its user acquisition products, as well as the Company's business and prospects.

Verified Shareholder Derivative Complaint

7. Then, on February 3, 2022, the Company held an earnings call to discuss its financial results for the fourth quarter and fiscal year ended December 31, 2021. On the call, Defendant Riccitiello provided the following guidance for the full year ending December 31, 2022, in relevant part:

> We delivered another really strong quarter ending in December to close out '21 with great momentum. For the quarter, revenue grew 43% year over year to $316 million, and our non-GAAP operating margin was minus 3.8%, expanding 530 basis points from a year earlier.

*      *      *

> These results have been and will continue to be driven by excellence in execution by the Unity team.

> We have built our business on a strong foundation based on very healthy customer metrics and structural economics. We entered 2022 with momentum across both Create and Operate, which gives us confidence in our outlook. For the year, we expect to grow revenue to be between $1.485 billion and $1.505 billion, which represents growth between 34% and 36% from 2021.

8. The truth emerged on May 10, 2022, after markets closed, when the Company issued a press release announcing its first quarter 2022 financial results. The press release disclosed that the Company was lowering its guidance for the full year ending December 31, 2022, stating, in relevant part: "Unity is providing the following guidance for the second quarter and lowering guidance for the full year ending December 31, 2022 due to challenges with monetization products that we expect to impact 2022."

9. That same day, the Company held an earnings call to discuss its first quarter 2022 financial results. On the call, Defendant Riccitiello stated, in relevant part:

> Our report today is a tale of two cities.

> First, we experienced challenges in monetization of negatively affected revenue in February and March and more persists through the third quarter with minimal impact on the fourth. Second, we continue to perform very well in Create both with our gaming customers and with our non-game digital twins business where we saw meaningful growth, a trend we expect to continue. For the total company, revenue of $320 million was up 36% from a year earlier and came in at the top end of our guidance range. Upside to the forecast in Create was offset by challenges in Operate's monetization business.

> Non-GAAP operating margin of minus 7.2% improved 280 basis points from the first quarter of last year as we continued to invest in innovation to capture the very large opportunity in front of us, while improving non-GAAP operating margins.

3
Verified Shareholder Derivative Complaint

I'd like to address our Operate business first. Operate started the year strong in January, but then significantly slowed down in February and March. This resulted in first-quarter revenue of $184 million, an increase of 26% year on year. While there are external factors to consider, the Operate challenge is mostly caused by internal factors in Unity monetization in an otherwise healthy market. We see these challenges as temporary and not structural and do not expect them to impact future prospects of our business beyond 2022.

The most succinct framing for the challenges we are facing is that we built more for growth and less for resiliency. Following years of rapid growth and working through the challenges of Apple's privacy changes, we got hit hard by two issues.

The first was a fault in our platform that resulted in reduced accuracy for our Audience Pinpointer tool, a revenue expensive issue given that our Pinpointer tool experienced significant growth post the IDFA changes. The second is that we lost the value of a portion of our data, training data due in part to us ingesting bad data from a large customer. We estimate the impact to our business of approximately $110 million in 2022 with no carryover impact to 2023. Luis will provide a more granular update to our guidance in a few minutes.

10. On this news, the Company's share price plummeted $17.83 (or 37%) from a close of $48.13 per share on May 10, 2022 to a close of $30.30 per share on May 11, 2022.

11. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements and omissions regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) technical issues with the Company's monetization platform caused a data quality issue as well as problems with the accuracy of the Company's Audience Pinpointer tool; (2) the drop in the accuracy of the Audience Pinpointer tool led to a drop in the usage of the tool, impacting the Company's monetization business; (3) due to the foregoing, the Company's revenues were likely to be negatively affected; (4) accordingly, a reduction in the Company's guidance for the full year ending December 31, 2022 was to be expected; (5) as a result, the Company had overstated its prospects for 2022; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

12. The Individual Defendants failed to correct and/or caused the Company to fail to correct

Verified Shareholder Derivative Complaint

these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

13. The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

14. In yet further breach of their fiduciary duties, six of the Individual Defendants engaged in lucrative insider sales of Company common stock at artificially inflated prices, obtaining collective proceeds of approximately $734.8 million.

15. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its former and current Chief Financial Officers ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendant Riccitiello's, Defendant Jabal's, and Defendant Visoso's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Unity's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule

Verified Shareholder Derivative Complaint

14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Unity is headquartered in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Unity common stock. Plaintiff has continuously held Unity common stock at all relevant times.

### Nominal Defendant Unity

23.     Unity is a Delaware corporation with its principal executive offices located at 30 3rd Street, San Francisco, CA 94103-3104. Unity's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "U."

### Defendant Riccitiello

24.     Defendant Riccitiello has served as the Company's President and CEO since October 2014, as Executive Chairman of the Board since June 2014, and as a Company director since November 2013. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 20, 2022 (the "2022 Proxy Statement"), as of April 1, 2022, Defendant Riccitiello beneficially owned 8,364,921 shares of the Company's common stock, representing 2.8% of the Company's total outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on

April 1, 2022 was $98.92, Defendant Riccitiello beneficially owned approximately $827.5 million worth of Unity stock.

25. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Riccitiello received $12,501,471 in total compensation from the Company. This included $376,682 in salary, $5,478,006 in stock awards, $6,025,215 in option awards, and $621,568 in non-equity incentive plan compensation.

26. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Riccitiello made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| April 1, 2021 | 229,372 | $102.05 | $23,407,641 |
| June 1, 2021 | 229,372 | $94.21 | $21,608,677 |
| July 1, 2021 | 229,372 | $107.86 | $24,739,834 |
| August 2, 2021 | 229,372 | $106.64 | $24,460,688 |
| September 1, 2021 | 229,372 | $126.96 | $29,120,839 |
| October 1, 2021 | 229,372 | $125.82 | $28,859,355 |
| November 1, 2021 | 229,382 | $151.24 | $34,691,045 |
| December 1, 2021 | 216,824 | $164.24 | $35,611,824 |
| December 1, 2021 | 12,248 | $164.16 | $2,010,631 |
| January 3, 2022 | 229,192 | $140.14 | $32,118,737 |

Thus, in total, before the fraud was exposed, he sold 2,063,878 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $256.6 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

27. The 2022 Proxy Statement stated the following regarding Defendant Riccitiello:

Mr. Riccitiello has served as our President and Chief Executive Officer since October 2014, as Executive Chairman of our Board since June 2014, and as a member of our Board since November 2013. From April 2007 to February 2013, Mr. Riccitiello served as the Chief

7

Verified Shareholder Derivative Complaint

Executive Officer for Electronic Arts, Inc., a public video game developer and publisher, where he had previously served as President and Chief Operating Officer from October 1997 to April 2004. From May 2004 to March 2007, Mr. Riccitiello co-founded and served as a Managing Director of Elevation Partners, LLC, a private equity firm. Mr. Riccitiello holds a B.S. in business administration from the Haas School of Business at the University of California, Berkeley.

**Defendant Jabal**

28.     Defendant Jabal served as the Company's Senior Vice President and CFO from March 2019 until April 2021. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Jabal beneficially owned 39,250 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2022 was $98.92, Defendant Jabal beneficially owned approximately $3.9 million worth of Unity stock.

29.     For the 2021 Fiscal Year, Defendant Jabal received $13,086,010 in total compensation from the Company. This included $164,284 in salary, $662,906 in stock awards, $11,959,124 in option awards, and $299,696 in all other compensation.

30.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Jabal made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| March 15, 2021 | 10,050 | $108.10 | $1,086,425 |

Thus, in total, before the fraud was exposed, she sold 10,050 shares of Company common stock at artificially inflated prices on inside information, for which she received approximately $1.1 million. Her insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

31.     The Company's press release issued on February 14, 2019 stated the following about Defendant Jabal:

Jabal brings decades of experience in senior positions scaling businesses and navigating growth. She joins Unity from Weebly where she served as CFO, responsible for selling the company to Square in May 2018. Previous to Weebly, Jabal was the CFO at Path, Inc., and held senior leadership positions at Lytro, Inc. and Google -- where she helped lead the company from less than $1 billion to $36 billion in revenue.

Verified Shareholder Derivative Complaint

**Defendant Visoso**

32.     Defendant Visoso has served as the Company's Senior Vice President and CFO since April 2021. He also served as a Company director from September 2020 until April 2021. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Visoso beneficially owned 75,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2022 was $98.92, Defendant Visoso beneficially owned approximately $7.4 million worth of Unity stock.

33.     For the 2021 Fiscal Year, Defendant Visoso received $41,580,607 in total compensation from the Company. This included $260,041 in salary, $2,000,000 in bonus, $35,210,000 in stock awards, $3,765,720 in option awards, $334,444 in non-equity incentive plan compensation, and $10,402 in all other compensation.

34.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Visoso made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| May 26, 2021 | 24,487 | $96.46 | $2,362,089 |
| August 26, 2021 | 27,827 | $124.67 | $3,469,275 |

Thus, in total, before the fraud was exposed, he sold 52,314 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $5.8 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

35.     The 2022 Proxy Statement stated the following regarding Defendant Visoso:

Mr. Visoso has served as our Senior Vice President and Chief Financial Officer since April 2021. He previously served as a member of our board of directors from September 2020 to April 2021. From July 2020 through March 2021, Mr. Visoso served as Chief Financial Officer of Palo Alto Networks, Inc., a public cybersecurity company. From December 2018 to July 2020, Mr. Visoso served in various roles at Amazon.com, Inc., a public e-commerce marketplace company, including as Chief Financial Officer of Amazon Web Services. From February 2016 to December 2018, Mr. Visoso served as Senior Vice President of Business, Technology and Operations Finance at Cisco Systems, Inc., a public networking company. From January 1993 to February 2016, Mr. Visoso held various roles at The Procter & Gamble Company, a public consumer goods company, including Vice President

9

of Global Business Units-Finance and Accounting. Mr. Visoso also serves on the board of Splunk Inc., a public software company. Mr. Visoso holds a B.A. degree in international business and industrial engineering from Monterrey Institute of Technology and Higher Education.

### Defendant Botha

36. Defendant Botha has served as a Company director since September 2009. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Botha beneficially owned 1,442,349 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2022 was $98.92, Defendant Botha beneficially owned approximately $142.7 million worth of Unity stock.

37. For the 2021 Fiscal Year, Defendant Botha received $284,992 in stock awards, which was also his total compensation from the Company.

38. The 2022 Proxy Statement stated the following about Defendant Botha:

Since January 2003, Mr. Botha has served in various positions at Sequoia Capital, a venture capital firm, including as a Managing Member of Sequoia Capital Operations, LLC since 2007. From March 2000 to June 2003, Mr. Botha served in various positions at PayPal, Inc., a public online payments company, including as Chief Financial Officer. Mr. Botha currently serves on the boards of directors of 23andMe Holding Co., a personal genetics company, Bird Global, Inc., an electric vehicle ridesharing company, Eventbrite, Inc., a global platform for live experiences, Block, Inc., a provider of payment processing and financial and marketing services, MongoDB, Inc., a cross-platform database program, Natera, Inc., a genetic testing company, as well as a number of privately-held companies. Mr. Botha holds a B.S. in actuarial science, economics and statistics from the University of Cape Town and an M.B.A. from the Stanford University Graduate School of Business.

### Defendant Durban

39. Defendant Durban has served as a Company director since June 2017. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Durban beneficially owned 129,510 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2022 was $98.92, Defendant Durban beneficially owned approximately $12.8 million worth of Unity stock.

40. For the 2021 Fiscal Year, Defendant Durban received $259,962 in stock awards, which was also his total compensation from the Company.

41.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Durban made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| November 17, 2021 | 552,549 | $195.41 | $107,971,389 |
| November 18, 2021 | 305,653 | $205.29 | $62,746,587 |
| November 18, 2021 | 139,004 | $197.76 | $27,489,987 |
| November 19, 2021 | 244,263 | $194.88 | $47,601,973 |
| November 22, 2021 | 72,687 | $182.02 | $13,230,487 |
| November 22, 2021 | 110,645 | $189.98 | $21,019,894 |
| November 23, 2021 | 330,493 | $180.40 | $59,619,284 |
| November 24, 2021 | 50,000 | $180.95 | $9,047,700 |
| November 26, 2021 | 79,763 | $177.25 | $14,137,592 |

Thus, in total, before the fraud was exposed, he sold 1,885,057 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $362.9 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

42.     The 2022 Proxy Statement stated the following about Defendant Durban:

Mr. Durban joined Silver Lake, a global technology investment firm, in 1999 as a founding principal and has served as the firm's Co-Chief Executive Officer and Managing Partner since December 2019. He also serves on the board of directors of Endeavor Group Holdings, Inc., an entertainment, sports and media platform, Twitter, Inc., a social networking service, Dell Technologies Inc., an information technology company, Motorola Solutions, Inc., a multinational telecommunications company, Qualtrics International Inc., a customer experience management company, VMware, Inc., a software company, and several privately-held companies. Mr. Durban also served as a director at Pivotal Software, Inc., a software and services company, from 2016 until its acquisition in 2019, and at SecureWorks Corp., an information security services company, from 2015 to May 2020. Mr. Durban holds a B.S.B.A in Finance from Georgetown University.

**Defendant Helgason**

43. Defendant Helgason co-founded the Company in August 2004 and has served as a Company director since May 2015. He also served as the Company's President and CEO from August 2004 until October 2014 and as a Company director from August 2004 until June 2014. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Helgason beneficially owned 9,151,613 shares of the Company's common stock, representing 3.1% of the Company's total outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 1, 2022 was $98.92, Defendant Helgason beneficially owned approximately $905.3 million worth of Unity stock.

44. For the 2021 Fiscal Year, Defendant Helgason received $249,991 in stock awards, which was also his total compensation from the Company.

45. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Helgason made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| August 12, 2021 | 12,742 | $124.50 | $1,586,379 |
| November 22, 2021 | 50,000 | $180.07 | $9,003,500 |
| November 23, 2021 | 50,000 | $178.67 | $8,933,300 |
| November 24, 2021 | 67,554 | $178.52 | $12,059,875 |
| November 26, 2021 | 50,000 | $178.53 | $8,926,700 |
| November 29, 2021 | 50,000 | $169.70 | $8,484,900 |
| November 30, 2021 | 50,000 | $170.27 | $8,513,700 |
| December 1, 2021 | 50,000 | $164.09 | $8,204,600 |
| December 2, 2021 | 50,000 | $153.21 | $7,660,700 |
| December 3, 2021 | 50,000 | $146.50 | $7,325,199 |
| December 6, 2021 | 55,000 | $142.47 | $7,836,015 |
| December 7, 2021 | 50,000 | $152.30 | $7,615,000 |

Verified Shareholder Derivative Complaint

| December 8, 2021 | 5,000 | $154.50 | $772,500 |
| December 13, 2021 | 15,000 | $139.76 | $2,096,474 |
| March 2, 2022 | 83,333 | $101.49 | $8,457,466 |

Thus, in total, before the fraud was exposed, he sold 688,629 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $107.5 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

46. The 2022 Proxy Statement stated the following about Defendant Helgason:

Mr. Helgason co-founded our company in 2004. He served as a member of our board from July 2007 to June 2014, and was reappointed as a director in May 2015. From August 2004 to October 2014, Mr. Helgason served as our President and Chief Executive Officer. Mr. Helgason is a founding General Partner of Transition Global, a venture capital firm focused on solving the world's climate crisis, where he has served since October 2021. From July 2016 to March 2021, Mr. Helgason served as a Partner at Nordic Makers General Partners ApS, an early-stage venture capital firm. Mr. Helgason serves on the board of several privately-held companies. Mr. Helgason studied physics, Arabic, and psychology at the University of Copenhagen from 1997 to 2001.

**Defendant Henry**

47. Defendant Henry has served as a Company director since October 2018. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Henry beneficially owned 123,599 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2022 was $98.92, Defendant Henry beneficially owned approximately $12.2 million worth of Unity stock.

48. For the 2021 Fiscal Year, Defendant Henry received $274,917 in stock awards, which was also her total compensation from the Company.

49. The 2022 Proxy Statement stated the following about Defendant Henry:

Since May 2014, Ms. Henry has held several roles at Block, Inc. (formerly Square), a public financial services and payment processing company, currently serving as Square Lead and Block Infrastructure and Information Security Lead. From 2006 to 2014, Ms. Henry served in various positions for Amazon.com Inc., an e-commerce company, including as Vice President of Amazon Web Services Storage Services. Ms. Henry serves as a member of the board of directors of Intel Corporation, a semiconductor and technology company and

13

Verified Shareholder Derivative Complaint

Confluent, Inc., a data infrastructure company. Ms. Henry holds a B.S. in mathematics and applied science with a specialization in computing from the University of California, Los Angeles.

**Defendant Schuler**

50. Defendant Schuler has served as a Company director since April 2016. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Schuler beneficially owned 297,649 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2022 was $98.92, Defendant Schuler beneficially owned approximately $29.4 million worth of Unity stock.

51. For the 2021 Fiscal Year, Defendant Schuler received $274,917 in stock awards, which was also his total compensation from the Company.

52. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Schuler made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| May 19, 2021 | 10,000 | $87.60 | $876,000 |

Thus, in total, before the fraud was exposed, he sold 10,000 shares of Company common stock at artificially inflated prices on inside information, for which he received $876,000. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

53. The 2022 Proxy Statement stated the following about Defendant Schuler:

In 2006, Mr. Schuler co-founded the DFJ Growth Fund, where he currently serves as Managing Director and Partner. From 1995 to 2002, Mr. Schuler held various roles at America Online Inc., a web portal and online service provider, including Chairman and Chief Executive Officer. Mr. Schuler serves on the board of a number of privately-held companies. Mr. Schuler holds a B.A. in psychology from Rutgers University.

**Defendant Sisco**

54. Defendant Sisco has served as a Company director since July 2017. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Sisco beneficially owned 37,916 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on

April 1, 2022 was $98.92, Defendant Sisco beneficially owned approximately $3.8 million worth of Unity stock.

55.     For the 2021 Fiscal Year, Defendant Sisco received $274,917 in stock awards, which was also her total compensation from the Company.

56.     The 2022 Proxy Statement said the following about Defendant Sisco:

Since August 2012, Ms. Sisco has held various positions at Workday, Inc., a public human resources and financial management software company, including Co-President from February 2018, Chief Financial Officer from April 2016 to January 2022 and Senior Vice President and Chief Accounting Officer from August 2012 to April 2016. From June 2009 to August 2012, Ms. Sisco served as Chief Accounting Officer and Corporate Controller at VMware, Inc., a software company. Ms. Sisco also previously served as Senior Vice President and Chief Accounting Officer at VeriSign Inc., and held senior finance positions at Oracle Corporation, Visa Inc., GE Capital, and Ford Motor Company. Ms. Sisco holds a B.A. in economics and accounting from Claremont McKenna College and an M.B.A. in finance from Golden Gate University.

**Defendant Schmidt**

57.     Defendant Schmidt has served as a Company director since September 2020. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Schmidt beneficially owned 6,942 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2022 was $98.92, Defendant Schmidt beneficially owned approximately $686,703 worth of Unity stock.

58.     For the 2021 Fiscal Year, Defendant Schmidt received $259,962 in stock awards, which was also her total compensation from the Company.

59.     The 2022 Proxy Statement stated the following about Defendant Schmidt:

Since August 2015, Dr. Campbell has served as President of Spelman College, a liberal arts college and historically Black college for women. From October 1991 to May 2014, she served in various roles at New York University, a private research university, including as Dean of the Tisch School of the Arts and as Associate Provost for the Arts, and upon her retirement in 2014, she was appointed Dean Emerita. From October 2009 to October 2016, Dr. Campbell served as Vice-Chair of the President's Committee on the Arts and Humanities, a bi-partisan group of citizens appointed by the President of the United States to advise the Office of the White House on issues regarding arts and the humanities. Prior to her service at NYU, from 1987-1991, she was New York City's Cultural Affairs Commissioner, under Mayor Edward I. Koch and Mayor David Dinkins. From 1977 to 1987, she served as the director of the Studio Museum in Harlem, developing the first accredited Black fine arts museum in the United States. Dr. Campbell holds a B.A. degree

15

Verified Shareholder Derivative Complaint

in English literature from Swarthmore College and an M.A. in art history and Ph.D. in humanities from Syracuse University.

**Defendant Smith**

60. Defendant Smith has served as a Company director since August 2021. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Smith beneficially owned 934 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2022 was $98.92, Defendant Smith beneficially owned approximately $92,391 worth of Unity stock.

61. For the 2021 Fiscal Year, Defendant Smith received $399,966 in stock awards, which was also her total compensation from the Company.

62. The 2022 Proxy Statement said the following about Defendant Smith:

Since August 2018, Ms. Smith-Jeremie has served as the Chief People Officer of Tory Burch, an American fashion label. From January 2013 until August 2018, she served as Chief Human Resources Officer of News Corporation, a mass media and publishing company. From July 2001 to December 2012, she served in various roles, including as Global Co-Head of Talent Management, at Morgan Stanley, a multinational investment bank and financial services company. Ms. Smith-Jeremie holds a B.A. in International Relations from the University of Virginia.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

63. By reason of their positions as officers, directors, and/or fiduciaries of Unity and because of their ability to control the business and corporate affairs of Unity, the Individual Defendants owed Unity and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Unity in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Unity and its shareholders so as to benefit all shareholders equally.

64. Each director and officer of the Company owes to Unity and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Unity, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

Verified Shareholder Derivative Complaint

66.    To discharge their duties, the officers and directors of Unity were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Unity, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Unity's Board at all relevant times.

68.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

69.    To discharge their duties, the officers and directors of Unity were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Unity were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to

17

Verified Shareholder Derivative Complaint

Unity's own Global Code of Conduct and Ethics (the "Code of Conduct");

(b)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)  remain informed as to how Unity conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)  establish and maintain systematic and accurate records and reports of the business and internal affairs of Unity and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)  maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Unity's operations would comply with all applicable laws and Unity's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)  exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.  Each of the Individual Defendants further owed to Unity and the shareholders the duty of loyalty requiring that each favor Unity's interests and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Unity and were at all times acting within the course and scope of such agency.

72.     Because of their advisory, executive, managerial, and directorial positions with Unity, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

73.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Unity.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

76.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who was a director of Unity was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive

knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

78. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Unity and was at all times acting within the course and scope of such agency.

## UNITY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Code of Conduct*

79. The Code of Conduct's "Message from the CEO" instructs, in relevant part: "The way we conduct ourselves is how we put Unity's values into practice, which is built around the recognition that everything we do in connection with our work at Unity will be, and should be, measured against the highest possible standards of ethics and business conduct."

80. Under the heading "Business Records," the Code of Conduct instructs, in relevant part:

It is essential to Unity's business that we keep and maintain full, fair, accurate, timely, and understandable business records. This requirement applies to all types of business records, including but not limited to financial records or disclosures (such as those prepared under Unity's Global Travel, Gift and Entertainment Expense Policy). The integrity of our records and public disclosure depends upon the validity, accuracy, and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited (e.g., including submitting false expense claims, forging, falsifying, or tampering with company documents or records of any kind).

As a Unity employee or representative, you must:

- Refrain from taking any action to intentionally cause inaccuracies in a business record;
- Ensure records you create are complete and do not misrepresent any material facts;
- Follow Unity policies and procedures on financial reporting where applicable;
- Never commit Unity to legal obligations that exceed the scope of your authority;
- Ensure that your expenses are reasonable, legitimate, and properly recorded; and
- Submit accurate certification statements about matters under your purview when requested by Legal Compliance.

Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees, and others. We also rely upon our accounting and other business and corporate records in preparing publicly-filed reports. Securities laws require that these reports provide full, fair, accurate, timely, and understandable disclosure, and fairly present our financial condition and results of

Verified Shareholder Derivative Complaint

operations. Employees who contribute in any way in preparing or verifying these reports should take all reasonable efforts to ensure that our financial disclosure is complete, accurate, and transparent.

*Audit Committee Charter*

81. The Charter of the Audit Committee of the Board (the "Audit Committee Charter") also entrusts the Individual Defendants on the Audit Committee with additional responsibilities.

82. Per the Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in overseeing:

- the Company's accounting and financial reporting processes and internal controls as well as the audit and integrity of the Company's financial statements;
- the qualifications, independence and performance of the Company's independent auditor;
- the design and implementation of the Company's internal audit function;
- the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements); and
- risk assessment and risk management pertaining to the financial, accounting, tax, and data privacy and cybersecurity matters of the Company.

83. Under the heading "Responsibilities," the Audit Committee Charter instructs the following, in relevant part:

5. **Review Financial Statements.** The Audit Committee shall review and discuss the following with management and the independent auditor, as applicable:

- the scope and timing of the annual audit of the Company's financial statements;
- the Company's annual audited and quarterly financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations";
- the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the annual financial statements;
- the applicable reports and certifications regarding internal control over financial reporting and disclosure controls and procedures;
- major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;
- analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements;
- the effect of regulatory and accounting initiatives on the Company's financial statements;
- any significant changes required or taken in the audit plan as a result of any material control deficiency;

21

- any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response; and
- any significant disagreements between management and the independent auditor.

6. **Audited Financial Information; Audit Committee Report.** The Audit Committee shall recommend that the audited financial statements be included in the Company's annual reports on Form 10-K and shall prepare the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement.

\*              \*              \*

8. **Earnings Press Releases and Earnings Guidance.** The Audit Committee shall review earnings press releases, as well as financial information and earnings guidance provided to the public, analysts and ratings agencies. To the extent practicable, the Audit Committee will review in advance the script for any earnings or finance-related conference calls to be held for the benefit of the public, analysts and ratings agencies.

9. **Internal Controls.** The Audit Committee shall review and discuss with management and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor or management, any special audit steps adopted in light of significant control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

10. **Disclosure Controls and Procedures.** The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

\*              \*              \*

12. **Legal and Regulatory Compliance.** The Audit Committee shall review and discuss with management and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with the Foreign Corrupt Practices Act and foreign anticorruption laws, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs, in each case to the extent such programs, laws or regulations pertain to financial, accounting and/or tax matters of the Company. The Audit Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies. The Audit Committee shall

22

Verified Shareholder Derivative Complaint

discuss with the Company's general counsel legal matters that may have a material impact on the financial statements or the Company's compliance procedures that pertain to financial, accounting, investment or tax matters of the Company.

\*                  \*                  \*

**14. Risks.** The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to: financial, accounting, investment, tax matters, data privacy and cybersecurity matters, and anti-fraud measures. In addition, the Audit Committee will review the Company's risk management framework and programs, overall risk profile and risk exposures with the Board.

84. In violation of the Code of Conduct and the Company's corporate governance documents, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain full, fair, and accurate business records, ensure the complete, accurate, and transparent disclosure of the Company's financial condition, and conduct affairs in accordance with the highest possible standards of ethics and business conduct. In violation of the Audit Committee Charter, the Individual Defendants on the Audit Committee failed to fulfill their responsibilities in overseeing, *inter alia*, the Company's financial reporting processes and internal controls, the Company's compliance with applicable law, including U.S. federal securities laws and other legal and regulatory requirements, and risk assessment and risk management pertaining to the financial matters of the Company.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

85. Unity is a San Francisco-based, video game software development company. Through the Company's Create Solutions and Operate Solutions segments, customers are given the tools to create, run, and monetize their content across a variety of platforms.

86. Audience Pinpointer, one of the Company's purported user acquisition tools, generates a real-time valuation of each user at the moment of an ad request, enabling customers to monetize ads by targeting the right audience for their games or applications. After Apple implemented changes to its privacy controls in 2021, Audience Pinpointer experienced a surge in growth due to advertisers viewing the tool as a workaround to such changes.

87. Although the Company has experienced rapid growth in recent years, reporting $1.1 billion, $772.4 million, and $541.8 million in the years ended December 31, 2021, 2020, and 2019, respectively, the Company saw its stock plummet 37% following its May 10, 2022 disclosure of its first quarter 2022 financial results as well as the existence of two technical issues affecting Operate Solutions' business.

88. In light of these issues, which were estimated to result in $110 million in losses to the Company in 2022, the Company lowered its guidance for the full year ending December 31, 2022.

**False and Misleading Statements**

*March 5, 2021 Annual Report*

89. On March 5, 2021, the Company filed its annual report for the fiscal year ended December 31, 2020 with the SEC on Form 10-K (the "2020 10-K"). It was signed by Defendants Riccitiello, Jabal, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Visoso and contained certifications signed by Defendants Riccitiello and Jabal pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

90. Under the heading "Overview," the 2020 10-K stated the following, in relevant part:

Unity is the world's leading platform for creating and operating interactive, real-time 3D content. We believe the world is a better place with more creators in it. Creators, ranging from game developers to artists, architects, automotive designers, filmmakers, and others, use Unity to make their imaginations come to life.

Our platform provides a comprehensive set of software solutions to create, run and monetize interactive, real-time 2D and 3D content for mobile phones, tablets, PCs, consoles, and augmented and virtual reality devices. In the fourth quarter of 2020, we had,

24

Verified Shareholder Derivative Complaint

on average, approximately 2.7 billion monthly active end users who consumed content created or operated with our solutions. The applications developed by these creators were downloaded, on average, five billion times per month in 2020.

Content built on the Unity platform offers end-users a fundamentally more engaging and immersive experience than traditional static content. Content made with Unity is interactive, allowing end-users to connect with the content and with one another. Content made with Unity is real-time, allowing it to instantly adapt to end-user behavior and feedback. Content made with Unity allows graphics to be expressed with 3D shape and depth, permitting multiple viewing angles, and enabling augmented and virtual reality.

Real-time is not just a part of the end-user experience. Building content on Unity offers creators significant advantages in development compared to traditional content creation tools. Creators can visualize and iterate on their 2D and 3D creations in real-time and collaborate with each other to edit content simultaneously.

*                    *                    *

Unity has built its reputation in gaming, and our scale and reach in this industry are significant. We estimate that in the fourth quarter of 2020, 71% of the top 1,000 mobile games were made with Unity. Unity's platform helps game developers—from the largest publishers in the world with teams of hundreds, to mid-sized, small and independent publishers, to individual creators—build and operate high quality games, rapidly and efficiently. Unity games can be built once and deployed and operated across more than 20 platforms, including Windows, Mac, iOS, Android, PlayStation, Xbox, Nintendo Switch, and the leading augmented and virtual reality platforms, among others. As gaming has proliferated, the business models for content have evolved beyond one-time purchases to include advertising and in-app purchases. Unity enables these new business models by providing creators with the solutions they need to easily run and monetize their content.

*                    *                    *

Our platform consists of two distinct, but connected and synergistic, sets of solutions. Our Create Solutions are used by content creators—developers, artists, designers, engineers, and architects—to create interactive, real-time 2D and 3D content. Our Operate Solutions offer customers the ability to grow and engage their end-user base, as well as run and monetize their content with the goal of optimizing end-user acquisition and operational costs while increasing the lifetime value of their end-users.

*                    *                    *

We have experienced rapid growth. Our revenue for the years ended December 31, 2020, 2019, and 2018 was $772.4 million, $541.8 million, and $380.8 million, respectively, representing year-over-year growth of 43% and 42%, respectively.

91.     Under the heading "Our Solution," the 2020 10-K stated the following:

25

Unity is the world's leading platform for creating and operating interactive, real-time 3D content. Our platform includes our Create Solutions and Operate Solutions, which complement each other and together provide a comprehensive set of solutions that enable our customers to create, run and monetize their content across a broad range of third-party content distribution platforms.

Our Create Solutions are used to create, edit, run and deploy real-time 2D, as well as high definition, real-time 3D content. Content can be created once and deployed to more than 20 platforms, including Windows, Mac, iOS, Android, PlayStation, Xbox, Nintendo Switch, and the leading augmented and virtual reality platforms, among others. Our products include custom scripting tools and a high-definition render pipeline for developers; graphics, animation and audio tools for artists; and navigation, networking and user interface tools for designers. Delivered as a modular application architecture, creators can leverage our products to easily create, edit, and iterate interactive, real-time 3D content.

Our Operate Solutions offer customers the ability to grow and engage their user bases, and to run and monetize their content—from 2D puzzle games to multiplayer, multi-platform games, or other 3D interactive content—irrespective of whether the content was created in Unity. Our monetization products, Unity Ads and Unity IAP (In-App Purchases), help developers to maximize the revenue potential of their content. We help our customers to maximize the lifetime value of their end users, while optimizing their end-user acquisition and operational costs. Our end-user engagement products, such as deltaDNA, provide developers with the capability to perform deep analytics to optimize end-user engagement and behavior. Finally, we also offer solutions to simplify the delivery of content and provide back-end management, such as Multiplay for multiplayer hosting in games, or Vivox to enable player-to-player communications in games.

92.     Under the heading "Our Competitive Strengths," the 2020 10-K stated the following about the Company's platform, in relevant part:

Our core competitive is the breadth and depth of our platform. We offer a comprehensive set of solutions to create, run and monetize real-time 3D games and applications. Creators can onboard through any of our solutions and leverage our platform to serve their needs at every stage of growth. To help our creators succeed, we provide access to comprehensive learning resources and guided onboarding to our extensive community. As a result of the strength of our platform, in the fourth quarter of 2020, we had, on average, approximately 2.7 billion monthly active end users who consumed content created or operated with our solutions on over 20 platforms, up 63% from a year earlier. We saw an average of more than 13,000 new projects each day in 2020.

93.     Under the heading "Our Products," the 2020 10-K stated the following about Operate Solutions, in relevant part:

Our user acquisition products enable advertisers to efficiently acquire new end-users at scale. They operate within our monetization ecosystem, which reached over 2.6 billion monthly active end users as of December 31, 2020, making it one of the largest global user bases for advertisers. Our focus and strength are in pay-for-performance end-user

26

Verified Shareholder Derivative Complaint

acquisition, where advertisers pay us based on a tangible outcome or set goal, such as an install, rather than on a cost per impression basis. As a result, a large number of our advertisers have open spending limits with us as they can clearly measure the positive return on their spend.

*April 28, 2021 Proxy Statement*

94. On April 28, 2021, the Company filed a proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, and Sisco solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

95. The 2021 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Riccitiello, Botha, and Helgason to the Board; and (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2021.

96. Under the heading "Role of the Board in Risk Oversight," the 2021 Proxy Statement stated the following:

> One of the Board's key functions is informed oversight of our risk management process. Our Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various Board standing committees that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company. Our Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Our Audit Committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our Audit Committee responsibilities also include oversight of cybersecurity risk management, and, to that end, the committee typically meets quarterly with both IT and business personnel responsible for cybersecurity risk management and receives periodic reports from the head of cybersecurity risk management, as well as incidental reports as matters arise. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. Our Compensation

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Verified Shareholder Derivative Complaint

Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

97. The 2021 Proxy Statement also detailed the principal functions of the Audit Committee, which at that time consisted of Defendants Botha and Sisco. These functions included the following:

- helping the Board oversee the Company's corporate accounting and financial reporting processes;

- managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the Company's independent registered public accounting firm to audit the Company's financial statements and the effectiveness of its internal control over financial reporting, when required;

- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, the Company's interim and year end operating results;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- reviewing related party transactions;

- approving or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm; and

- preparing the Audit Committee report that the SEC requires in the Company's annual proxy statement.

98. With respect to the Company's Code of Conduct, the 2021 Proxy Statement stated:

We have adopted the Unity Software Inc. Global Code of Conduct and Ethics that applies to all officers, directors and employees. The Global Code of Conduct and Ethics is available on our website at investors.unity.com. If we make any substantive amendments to the Global Code of Conduct and Ethics or grant any waiver from a provision of it to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website.

99. The above statements in the 2021 Proxy Statement were false and misleading because they failed to disclose that: (1) contrary to the 2021 Proxy Statement's description of the Board's risk oversight function, the Board failed in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties; (2) contrary to the 2021 Proxy Statement's description of the Audit Committee's responsibilities, the Audit Committee was not adequately exercising these functions, was causing or permitting Unity to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary

28

Verified Shareholder Derivative Complaint

duties; and (3) although the Company claimed the Code of Conduct applied to all officers and directors and that it would disclose any waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed.

100. The above statements in the 2021 Proxy Statement were false and misleading because they also failed to disclose, *inter alia*, that: (1) technical issues with the Company's monetization platform caused a data quality issue as well as problems with the accuracy of the Company's Audience Pinpointer tool; (2) the drop in the accuracy of the Audience Pinpointer tool led to a drop in the usage of the tool, impacting the Company's monetization business; (3) due to the foregoing, the Company's revenues were likely to be negatively affected; (4) accordingly, a reduction in the Company's guidance for the full year ending December 31, 2022 was to be expected; (5) as a result, the Company had overstated its prospects for 2022; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

101. As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders voted, *inter alia*, to elect Defendants Riccitiello, Botha, and Helgason to the Board, which allowed them to continue breaching their fiduciary duties to the Company.

### *May 11, 2021 Press Release and Earnings Call*

102. On May 11, 2021, the Company issued a press release announcing its first quarter 2021 financial results. The press release contained the following quote from Defendant Riccitiello:

> Our first quarter results are reflective of the powerful transition from linear 2D to real-time 3D, which is one of the most important changes in how people interact with technology . . . . We believe that real-time 3D will continue to grow at an accelerated pace and achieve massive scale.

103. The May 11, 2021 press release also contained the following quote from Defendant Visoso:

> Execution in the first quarter was very strong with revenue of $234.8 million, an increase of 41% from last year. We are encouraged by the growth of our customers contributing more than $100K of trailing twelve-month revenue and the healthy dollar-based net expansion rate during the first quarter . . . . We continue to invest strategically in R&D and vertical expansion to enable Unity to lead the transition to real-time 3D.

104. That same day, the Company held an earnings call to discuss its first quarter 2021 financial results. On the call, Defendant Riccitiello stated, in relevant part:

At Unity, we remain focused on our North Star, our guiding principle, which is that we believe the world is a better place with more creators. Our focus, as always, is to enable these creators and to help them succeed.

Our financial results reflect the power of this theme. In Q1, we grew revenue 41% year over year to $235 million. This is the tenth consecutive quarter of 30%-plus revenue growth. We believe the transition from linear 2D to real-time 3D is a transformative theme and one of the most important changes on how creators will tell their stories and bring their visions to life.

It's also one of the most important changes in how people interact with technology in many years. We support our customers on many platforms and in numerous geographies, and today are the only high-scale solution for creating and operating real-time 3D globally. We believe it's inevitable that a large portion of the world's creators will, over time, become primarily real-time 3D creators. The role of interactivity through 3D in real time is so much greater than with alternative forms of media.

*         *         *

Now what do I mean when I say scale with a creator throughout their career? Well, we believe that our commitment to R&D competitively differentiates us from less sophisticated platforms that aspire to catch up with us in terms of technology or market share. For example, with Unity, you only write once and you can publish anywhere. We build our editors so a full range of users, from creators to advanced developers, can build real-time 3D applications. This means you could start with visual scripting, move to C# programming, and for more advanced developers, they can work directly with Unity's source code, if needed.

With these on-ramps to Unity, we enable creators to develop and operate many application types from games, to car configurators who run high-scale AI simulation. It's not easy to make the complexity of this easy.

105. Also on the call, in response to a question from an analyst regarding emerging competitive marketing or digital advertising marketplaces, Defendant Riccitiello stated, in relevant part:

It's on the basis of being competitive in the marketplace that we're going to succeed. When I was answering the last question, I said we increase our take rate by increasing the value we add. We're constantly focused on that.

Short term, we can always maybe eke out a few dollars by messing around with pricing or messing around with other things that are hard to lap. Value add is easy to scale. And that's what we're investing in. And I'm highly confident in our monetization platform as part of Operate is going to continue to win.

30

Verified Shareholder Derivative Complaint

*August 10, 2021 Press Release and Earnings Call*

106.    On August 10, 2021, the Company issued a press release announcing its second quarter 2021 financial results. The press release contained the following quote from Defendant Riccitiello:

At Unity, our goal is to provide creators with the best tools to succeed as RT3D creators . . . . Unity is designed to enable creators to build anything digital and to instantly deploy their work across dozens of platform types and devices, which is to make participating in building the metaverse accessible to all creators.

107.    The press release also contained the following quote from Defendant Visoso:

We had another consecutive strong quarter, with revenue for the quarter at $273.6 million, up 48% year-on-year as we added new customers and expanded our business with existing customers . . . . While our strong performance is broad based, we are particularly proud of the performance from our Operate Solutions group that expanded market share in a tough environment. Our strong performance gives us confidence to raise guidance for the year, again.

108.    That same day, the Company held an earnings call to discuss its second quarter 2021 financial results. On the call, Defendant Riccitiello stated, in relevant part:

Unity reported a 48% year-over-year increase in revenue to $274 million for the quarter. This quarter was the first in Unity's history as we crossed a $1 billion revenue run rate. We also raised our revenue guidance for the year by another $45 million to a range between $1.045 billion and $1.060 billion.

We generated strong growth across all our product lines and geographies with important growth in both Operate and Create. Within Operate, both monetization and multiplay services posted strong growth. And within Create, we saw strong growth both in games and non-game verticals.

*                    *                    *

Our Operations Solutions help developers solve this vision. We offer an end-to-end platform for content creators to deliver the best player experience and build robust and profitable businesses. We provide a growing suite of services that content creators can use to acquire new users, optimize user engagement and LTV by our monetization platform.

*November 9, 2021 Press Release and Earnings Call*

109.    On November 9, 2021, the Company issued a press release announcing its third quarter 2021 financial results. The press release disclosed "third quarter 2021 revenue of $286.3 million, which

31

Verified Shareholder Derivative Complaint

is up 43% from the same period in 2020 and ahead of guidance. The company is increasing full year revenue guidance."

110.    The November 9, 2021 press release also contained the following quote from Defendant Riccitiello:

> Unity's strong performance this quarter was driven by innovation in data science, vertical growth and making significant strides in bringing RT3D technologies and tools to as many creators and artists as possible . . . . And today we are proud to announce our intentions to acquire Weta Digital as we aim to bring their dozens of tools and assets to creators around the world. This sends a powerful message: all types of creators and digital artists can turn to Unity to create rich, interactive content and build experiences regardless of industry.

111.    The press release further contained the following quote from Defendant Visoso:

> We delivered another strong quarter in Q3 2021 with $286 million in revenue, continuing to add new customers and expanding our business within existing customers. The strong momentum gives us the confidence to raise our revenue growth guidance to 40% for the full year . . . . Bringing Weta Digital into the Unity family will materially advance our relevance with artists, and increase our addressable market, setting us up well for our long term growth prospects.

112.    That same day, the Company held an earnings call to discuss its third quarter 2021 financial results. On the call, Defendant Riccitiello stated, in relevant part:

> We are really happy with our third quarter results, and we have great news to share. We reported another strong quarter with results well above our expectations. We delivered 43% revenue growth as revenue had a record $286 million in the quarter.

> We continue to invest to drive future growth, resulting in a non-GAAP operating margin of a negative 4%, flat to the same quarter last year. Since we went public in September of last year, our revenue growth has averaged 45%. We're encouraged by the execution across all of our business lines and geographies. And as you'll hear later from Luis, we are raising our revenue guidance again this quarter.

113.    Also on the call, in response to a question from an analyst regarding the "slight uptick" in sequential growth in third quarter 2021, Defendant Riccitiello stated, in relevant part:

> So on the Operate side and particularly monetization, I'd be remiss if I didn't point out that outside of monetization, the rest of our Operate stack is working extremely well. So it's across the board right, inside of our Operate portfolio. So we're gaining scale everywhere. So we feel really good about our business there.

> But specifically to Operate, I think topical right now and challenging for investors is you see a lot of quarterly results and some companies pop up as a winner and some companies

32

Verified Shareholder Derivative Complaint

haven't popped up as a winner post the roll-through of the IDFA changes introduced by Apple. Something I've been saying for a very long time is that Unity benefits from a very unique data set, driven by over 3 billion people, MAUs in our analytics platform and hundreds of millions on our IAP platform. So I'm going to introduce something that I think probably most of you think is pretty obvious, but I'm going to emphasize it again. Most ad networks, their business is based on the identity, the specific identity of the user interacting with the application.

### February 3, 2022 Press Release and Earnings Call

114. On February 3, 2022, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2021. The press release stated the following, in relevant part:

Unity . . . . today announced fourth quarter 2021 revenue of $315.9 million, which is up 43% from the same period in 2020 and ahead of guidance. Additionally, the company announced full-year 2021 revenue of $1.1 billion, a growth of 44% year-over-year.

\* \* \*

Since becoming a public company in September 2020, Unity has averaged 43% revenue growth. Customers contributing $100,000 or more in revenue in the trailing 12 months increased 33%, from 793 as of December 31, 2020 to 1,052 as of December 31, 2021.

115. The February 3, 2022 press release also contained the following quote from Defendant Riccitiello:

Unity's strong fourth-quarter and full-year results were driven by exceptional execution and innovation by the Unity teams . . . . We believe that the transition from linear 2D to interactive real-time 3D, presents a massive growth opportunity for the next decades. These are strong tailwinds that help us drive growth for years to come.

116. The press release further contained the following quote from Defendant Visoso:

We are encouraged by our performance in 2021 with strong results across Create and Operate Solutions . . . . The business momentum coupled with the quality of our innovation plans gives us confidence to guide to a revenue growth range of 34% to 36% in 2022 as we continue to improve margins.

117. That same day, the Company held an earnings call to discuss its financial results for the fourth quarter and fiscal year ended December 31, 2021. On the call, Defendant Riccitiello stated, in relevant part:

We delivered another really strong quarter ending in December to close out '21 with great momentum. For the quarter, revenue grew 43% year over year to $316 million, and our

non-GAAP operating margin was minus 3.8%, expanding 530 basis points from a year earlier.

* * *

These results have been and will continue to be driven by excellence in execution by the Unity team.

We have built our business on a strong foundation based on very healthy customer metrics and structural economics. We entered 2022 with momentum across both Create and Operate, which gives us confidence in our outlook. For the year, we expect to grow revenue to be between $1.485 billion and $1.505 billion, which represents growth between 34% and 36% from 2021.

* * *

The Unity platform is designed to help creators through the entire life cycle runtime application from ideation to launch to monetization, hosting an ongoing analytics to drive growth. So point number two, we think our leadership position is strong and we're growing it, and we continue to do that.

* * *

We believe that we have a unique platform that will endure the test of time. And as I've said earlier, the process of building our platform is at the very center of our strategic process, where we add value to our platform while increasing our total addressable market.

* * *

Unity is an innovation machine.

Monetization is a great example. We entered this business in 2014 and have not stopped innovating ever since. We hire the best and brightest product leaders, engineers, data scientists and focus on improving player experience. We operate with the developers' interest in mind and ensure our products contribute to their long-term success.

* * *

Now I'm proud of what we've achieved so far at Unity, and I'm excited about the future that we can and will create. We are executing with excellence in a large and growing market that we are strategically expanding through internal innovation and acquisition.

We have a defensible platform that has significant value to our customers and keeps on getting better.

118. Also on the call, Defendant Visoso stated the following, in relevant part:

34

Verified Shareholder Derivative Complaint

We also saw strong performance from our sophisticated analytics tools and products, such as Audience Pinpointer, that deliver strong return on investment to our customers without manual guesswork.

To win in a highly competitive market, we're constantly innovating, optimizing our machine learning models, improving our campaign and performance models, and generating actionable insights for our customers' campaigns and enabling them to make informed decisions. As a result, we estimate that our monetization business has been over each of the last five years, including 2021, consistently growing about twice as fast as the market. In addition, we're focused on providing infrastructure for synchronous multiplayer experiences and community service for vibrant social interactions.

### *February 22, 2022 Annual Report*

119. On February 22, 2022, the Company filed its annual report for the fiscal year ended December 31, 2021 with the SEC on Form 10-K (the "2021 10-K"). It was signed by Defendants Riccitiello, Visoso, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith and contained certifications signed by Defendants Riccitiello and Visoso pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX attesting to the accuracy of the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2021 10-K's descriptions of the Company's business and operations were substantially similar to the 2020 10-K's descriptions set forth in ¶¶ 95-98.

120. The statements referenced in ¶¶ 89-93 and ¶¶ 102–119 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) technical issues with the Company's monetization platform caused a data quality issue as well as problems with the accuracy of the Company's Audience Pinpointer tool; (2) the drop in the accuracy of the Audience Pinpointer tool led to a drop in the usage of the tool, impacting the Company's monetization business; (3) due to the foregoing, the Company's revenues were likely to be negatively affected; (4) accordingly, a reduction in the Company's guidance for the full year ending December 31, 2022 was to be expected; (5) as a result, the Company had overstated its prospects for 2022; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

Verified Shareholder Derivative Complaint

*April 20, 2022 Proxy Statement*

121. On April 20, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith and nonparty Michelle K. Lee ("Lee") solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

122. The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Durban, Schuler, and Sisco to the Board; (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

123. Under the heading "Role of the Board in Risk Oversight," the 2022 Proxy Statement stated the following:

> One of the Board's key functions is informed oversight of our risk management process. Our Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various Board standing committees that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company. Our Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Our Audit Committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our Audit Committee responsibilities also include oversight of cybersecurity risk management, and, to that end, the committee typically meets quarterly with both IT and business personnel responsible for cybersecurity risk management and receives periodic reports from the head of cybersecurity risk management, as well as incidental reports as matters arise. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. Our Nominating and Corporate Governance Committee also monitors our environmental and social impact

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

initiatives. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

124. The 2022 Proxy Statement also detailed the principal functions of the Audit Committee, which at that time consisted of Defendants Botha and Sisco and nonparty Lee. These functions included the following:

- Helping the Board oversee the Company's corporate accounting and financial reporting processes;

- Managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the Company's independent registered public accounting firm to audit the Company's financial statements and the effectiveness of its internal control over financial reporting, when required;

- Discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, the Company's interim and year end operating results;

- Developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- Reviewing related party transactions;

- Approving or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm; and

- Preparing the Audit Committee report that the SEC requires in the Company's annual proxy statement.

125. With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated:

We have adopted the Unity Software Inc. Global Code of Conduct and Ethics that applies to all officers, directors and employees. The Global Code of Conduct and Ethics is available on our website at investors.unity.com. If we make any substantive amendments to the Global Code of Conduct and Ethics or grant any waiver from a provision of it to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website.

126. The above statements in the 2022 Proxy Statement were false and misleading because they failed to disclose that: (1) contrary to the 2022 Proxy Statement's description of the Board's risk oversight function, the Board failed in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties; (2) contrary to the 2022 Proxy Statement's description of the Audit Committee's responsibilities, the Audit Committee was not adequately exercising these functions, was causing or permitting Unity to issue false and misleading statements, and the

Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary duties; and (3) although the Company claimed the Code of Conduct applied to all officers and directors and that it would disclose any waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed.

127. The above statements in the 2022 Proxy Statement were false and misleading because they also failed to disclose, *inter alia*, that: (1) technical issues with the Company's monetization platform caused a data quality issue as well as problems with the accuracy of the Company's Audience Pinpointer tool; (2) the drop in the accuracy of the Audience Pinpointer tool led to a drop in the usage of the tool, impacting the Company's monetization business; (3) due to the foregoing, the Company's revenues were likely to be negatively affected; (4) accordingly, a reduction in the Company's guidance for the full year ending December 31, 2022 was to be expected; (5) as a result, the Company had overstated its prospects for 2022; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

128. As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) elect Defendants Durban, Schuler, and Sisco to the Board, which allowed them to continue breaching their fiduciary duties to the Company; and (2) approve, on an advisory basis, the compensation of the Company's named executive officers, including Defendants Riccitiello and Visoso, who were breaching their fiduciary duties to the Company.

### The Truth Emerges

#### *May 10, 2022 Press Release and Earnings Call*

129. On May 10, 2022, after markets closed, the truth emerged when the Company issued a press release announcing its first quarter 2022 financial results. The press release disclosed that the Company was lowering its guidance for the full year ending December 31, 2022, stating, in relevant part: "Unity is providing the following guidance for the second quarter and lowering guidance for the full year ending December 31, 2022 due to challenges with monetization products that we expect to impact 2022."

130. That same day, the Company held an earnings call to discuss its first quarter 2022 financial results. On the call, Defendant Riccitiello stated, in relevant part:

Our report today is a tale of two cities.

First, we experienced challenges in monetization of negatively affected revenue in February and March and more persists through the third quarter with minimal impact on the fourth. Second, we continue to perform very well in Create both with our gaming customers and with our non-game digital twins business where we saw meaningful growth, a trend we expect to continue. For the total company, revenue of $320 million was up 36% from a year earlier and came in at the top end of our guidance range. Upside to the forecast in Create was offset by challenges in Operate's monetization business.

Non-GAAP operating margin of minus 7.2% improved 280 basis points from the first quarter of last year as we continued to invest in innovation to capture the very large opportunity in front of us, while improving non-GAAP operating margins.

I'd like to address our Operate business first. Operate started the year strong in January, but then significantly slowed down in February and March. This resulted in first-quarter revenue of $184 million, an increase of 26% year on year. While there are external factors to consider, the Operate challenge is mostly caused by internal factors in Unity monetization in an otherwise healthy market. We see these challenges as temporary and not structural and do not expect them to impact future prospects of our business beyond 2022.

The most succinct framing for the challenges we are facing is that we built more for growth and less for resiliency. Following years of rapid growth and working through the challenges of Apple's privacy changes, we got hit hard by two issues.

The first was a fault in our platform that resulted in reduced accuracy for our Audience Pinpointer tool, a revenue expensive issue given that our Pinpointer tool experienced significant growth post the IDFA changes. The second is that we lost the value of a portion of our data, training data due in part to us ingesting bad data from a large customer. We estimate the impact to our business of approximately $110 million in 2022 with no carryover impact to 2023. Luis will provide a more granular update to our guidance in a few minutes.

131. On this news, the Company's share price plummeted $17.83 (or 37%) from a close of $48.13 per share on May 10, 2022 to a close of $30.30 per share on May 11, 2022.

## **DAMAGES TO UNITY**

132. As a direct and proximate result of the Individual Defendants' misconduct, Unity has lost and expended, and will lose and expend, many millions of dollars.

133. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers and directors, any

39

Verified Shareholder Derivative Complaint

governmental investigations, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

134. Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

135. As a direct and proximate result of the Individual Defendants' conduct, Unity has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and other violations of law.

## DERIVATIVE ALLEGATIONS

136. Plaintiff brings this action derivatively and for the benefit of Unity to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Unity, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

137. Unity is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

138. Plaintiff is, and has continuously been at all relevant times, a shareholder of Unity. Plaintiff will adequately and fairly represent the interests of Unity in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

139. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

140. A pre-suit demand on the Board of Unity is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following thirteen individuals: Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schuler, Sisco, Schmidt, Smith (the "Director-Defendants") and nonparties

Lee, Tomer Bar-Zeev, Shlomo Dovrat, and David Kostman (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to seven of these thirteen Directors.

141.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

142.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

143.    Additional reasons that demand on Defendant Riccitiello is futile follow. Defendant Riccitiello has served as the Company's President and CEO since October 2014, as Executive Chairman of the Board since June 2014, and as a Company director since November 2013. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Riccitiello with his principal occupation for which he receives handsome compensation as detailed above. As President, CEO, and Executive Chairman of the Board, Defendant Riccitiello was ultimately responsible for the many false and misleading statements and omissions that were made, including those contained in the 2020 10-K and 2021 10-K, both of which he personally signed and signed SOX certifications for. He benefited from the 2021 Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. In addition, he solicited the 2022 Proxy Statement, containing false and misleading statements, which contributed to shareholders approving, on an advisory basis, his unjust compensation. Moreover, Defendant Riccitiello engaged in insider trading, selling 2,063,878 shares of Unity common stock for proceeds of approximately $256.6 million while the

Verified Shareholder Derivative Complaint

share price of Unity's common stock was artificially inflated. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Riccitiello is a defendant in the Securities Class Action. For these reasons, Defendant Riccitiello breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144. Additional reasons that demand on Defendant Botha is futile follow. Defendant Botha has served as a Company director since September 2009. He has received and continues to receive substantial compensation for his role as a director as described above. Defendant Botha personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. He benefited from the 2021 Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Botha breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145. Additional reasons that demand on Defendant Durban is futile follow. Defendant Durban has served as a Company director since June 2017. He has received and continues to receive substantial compensation for his role as a director as described above. Defendant Durban personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. He benefited from the 2022 Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. Moreover, Defendant Durban engaged in insider trading, selling 1,885,057 shares of Unity common stock for proceeds of approximately $362.9 million while the share price of Unity's common stock was artificially inflated. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Durban breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146. Additional reasons that demand on Defendant Helgason is futile follow. Defendant Helgason co-founded the Company in August 2004 and has served as a Company director since May 2015. As the Company admits, he is a non-independent director. Defendant Helgason has received and continues to receive substantial compensation for his role as a director as described above. He personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. He benefited from the 2021 Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. Moreover, Defendant Helgason engaged in insider trading, selling 688,629 shares of Unity common stock for proceeds of approximately $107.5 million while the share price of Unity's common stock was artificially inflated. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Helgason breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147. Additional reasons that demand on Defendant Henry is futile follow. Defendant Henry has served as a Company director since October 2018. She has received and continues to receive substantial compensation for her role as a director as described above. Defendant Henry personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Henry breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

43

Verified Shareholder Derivative Complaint

148. Additional reasons that demand on Defendant Schuler is futile follow. Defendant Schuler has served as a Company director since April 2016. He has received and continues to receive substantial compensation for his role as a director as described above. Defendant Schuler personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. He benefited from the 2022 Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. Moreover, Defendant Schuler engaged in insider trading, selling 10,000 shares of Unity common stock for proceeds of $876,000 while the share price of Unity's common stock was artificially inflated. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Schuler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149. Additional reasons that demand on Defendant Sisco is futile follow. Defendant Sisco has served as a Company director since July 2017. She has received and continues to receive substantial compensation for her role as a director as described above. Defendant Sisco personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. She benefited from the 2022 Proxy Statement, containing false and misleading statements, which led to her election to the Board and allowed her to breach her fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Sisco breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

150. Additional reasons that demand on Defendant Schmidt is futile follow. Defendant Schmidt has served as a Company director since September 2020. She has received and continues to receive substantial compensation for her role as a director as described above. Defendant Schmidt personally

44

Verified Shareholder Derivative Complaint

signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Schmidt breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

151. Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since August 2021. She has received and continues to receive substantial compensation for her role as a director as described above. Defendant Smith personally signed the 2021 10-K, which contained false and misleading statements and omissions. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Smith breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

152. Defendants Sisco (as Chair), Botha, and Schuler (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, *inter alia*, the Company's financial reporting processes and internal controls, the Company's compliance with applicable law, including U.S. federal securities laws and other legal and regulatory requirements, and risk assessment and risk management pertaining to the financial matters of the Company. The Audit Committee Defendants failed to fulfill these obligations, as they are charged to do under the Audit Committee Charter, allowing the Company to issue materially false and misleading statements to the public during the Relevant Period and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

153. Demand in this case is further excused because the Director-Defendants are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each

other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Botha and Henry are both affiliated with Block, Inc., where Defendant Botha serves on the board of directors and Defendant Henry serves as Square Lead and Block Infrastructure and Information Security Lead. Additionally, as disclosed by the 2021 Proxy Statement, a trust affiliated with Defendant Botha issued to Defendant Riccitiello a personal loan which has since been repaid. Furthermore, since February 2018, Defendant Sisco has served as Co-President of Workday, Inc., which the Company purchases products and services from in the ordinary course of business. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

154. In violation of the Code of Conduct and the Audit Committee Charter, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting, and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, violations of the Exchange Act, contribution under Sections 10(b) and 21D of the Exchange Act, and the claims alleged in the Securities Class Action. In violation of the Code of Conduct and the Audit Committee Charter, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

155. Unity has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Director-Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Unity any part of the damages Unity suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

156. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

157. The acts complained of herein constitute violations of fiduciary duties owed by Unity's officers and directors, and these acts are incapable of ratification.

158. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Unity. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Unity, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

159. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Unity to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

Verified Shareholder Derivative Complaint

160.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM

**Against Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith for Violations of Section 14(a) of the Exchange Act**

161.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

163.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

164.    Under the direction and watch of Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, and Sisco, the 2021 Proxy Statement failed to disclose, *inter alia*, that: (1) contrary to the 2021 Proxy Statement's description of the Board's risk oversight function, the Board failed in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties; (2) contrary to the 2021 Proxy Statement's description of the Audit Committee's responsibilities, the Audit Committee was not adequately exercising these functions, was causing or permitting Unity to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary duties; and (3) although the Company claimed the Code of Conduct applied to all officers and directors and that it would disclose

any waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed.

165. Furthermore, under the direction of Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, and Sisco, the 2021 Proxy Statement failed to disclose, *inter alia*, that: (1) technical issues with the Company's monetization platform caused a data quality issue as well as problems with the accuracy of the Company's Audience Pinpointer tool; (2) the drop in the accuracy of the Audience Pinpointer tool led to a drop in the usage of the tool, impacting the Company's monetization business; (3) due to the foregoing, the Company's revenues were likely to be negatively affected; (4) accordingly, a reduction in the Company's guidance for the full year ending December 31, 2022 was to be expected; (5) as a result, the Company had overstated its prospects for 2022; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

166. In the exercise of reasonable care, Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, and Sisco should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of directors.

167. The false and misleading elements of the 2021 Proxy Statement led Company shareholders, *inter alia*, to elect Defendants Riccitiello, Botha, and Helgason to the Board, allowing them to continue breaching their fiduciary duties to the Company.

168. The Company was damaged as a result of Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, and Sisco's material misrepresentations and omissions in the 2021 Proxy Statement.

169. Moreover, under the direction and watch of Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith, the 2022 Proxy Statement failed to disclose, *inter alia*, that: (1) contrary to the 2022 Proxy Statement's description of the Board's risk oversight function,

Verified Shareholder Derivative Complaint

the Board failed in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties; (2) contrary to the 2022 Proxy Statement's description of the Audit Committee's responsibilities, the Audit Committee was not adequately exercising these functions, was causing or permitting Unity to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary duties; and (3) although the Company claimed the Code of Conduct applied to all officers and directors and that it would disclose any waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed.

170. Furthermore, under the direction of Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith, the 2022 Proxy Statement failed to disclose, *inter alia*, that: (1) technical issues with the Company's monetization platform caused a data quality issue as well as problems with the accuracy of the Company's Audience Pinpointer tool; (2) the drop in the accuracy of the Audience Pinpointer tool led to a drop in the usage of the tool, impacting the Company's monetization business; (3) due to the foregoing, the Company's revenues were likely to be negatively affected; (4) accordingly, a reduction in the Company's guidance for the full year ending December 31, 2022 was to be expected; (5) as a result, the Company had overstated its prospects for 2022; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

171. In the exercise of reasonable care, Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of directors.

172. The false and misleading elements of the 2022 Proxy Statement led Company shareholders, *inter alia*, to: (1) elect Defendants Durban, Schuler, and Sisco to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, on an advisory basis, the compensation

of the Company's named executive officers, including Defendants Riccitiello and Visoso, who were breaching their fiduciary duties to the Company.

173. The Company was damaged as a result of Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith's material misrepresentations and omissions in the 2022 Proxy Statement.

174. Plaintiff on behalf of Unity has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

175. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Unity's business and affairs.

177. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

178. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Unity.

179. In breach of their fiduciary duties owed to Unity, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) technical issues with the Company's monetization platform caused a data quality issue as well as problems with the accuracy of the Company's Audience Pinpointer tool; (2) the drop in the accuracy of the Audience Pinpointer tool led to a drop in the usage of the tool, impacting the Company's monetization business; (3) due to the foregoing, the Company's revenues were likely to be negatively affected; (4) accordingly, a reduction in the Company's guidance for the full year ending December 31, 2022 was to be expected; (5) as a result, the Company had overstated

51
Verified Shareholder Derivative Complaint

its prospects for 2022; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

180. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

181. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

182. In yet further breach of their fiduciary duties, during the Relevant Period, six of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $734.8 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

183. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

184. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

185. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Unity has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiff on behalf of Unity has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Waste of Corporate Assets

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.    As a further result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

189.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

190.    Plaintiff on behalf of Unity has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Unity.

193.    The Individual Defendants either benefited financially from the improper conduct and their lucrative insider sales, or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Unity that was tied to the performance or artificially inflated valuation of Unity, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

194.    Plaintiff, as a shareholder and representative of Unity, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales,

benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

195. Plaintiff on behalf of Unity has no adequate remedy at law.

### FIFTH CLAIM

**Against Defendants Riccitiello, Jabal, and Visoso for Contribution Under Sections 10(b) and 21D of the Exchange Act**

196. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197. Defendants Riccitiello, Jabal, and Visoso are each named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Riccitiello, Jabal, and Visoso's willful and/or reckless violations of their obligations as officers and/or directors of Unity.

198. Defendants Riccitiello, Jabal, and Visoso, because of their positions of control and authority as officers and/or directors of Unity, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Unity, including the wrongful acts complained of herein and in the Securities Class Action.

199. Accordingly, Defendants Riccitiello, Jabal, and Visoso are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

200. As such, Unity is entitled to receive all appropriate contribution or indemnification from Defendants Riccitiello, Jabal, and Visoso.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Unity, and that

Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Unity;

(c)     Determining and awarding to Unity the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Unity and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Unity and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Unity to nominate at least seven candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Unity restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Verified Shareholder Derivative Complaint

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 22, 2022                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

# <u>VERIFICATION</u>

I, Krishna Movva am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2022.

DocuSigned by:

*Krishna Movva*

43GFC5372B3344F...

Krishna Movva