# Exhibit B

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TOM DUONG, derivatively on behalf of UNITY SOFTWARE INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN S. RICCITIELLO, KIMBERLY JABAL, LUIS FELIPE VISOSO, ROELOF BOTHA, EGON DURBAN, DAVID HELGASON, ALYSSA HENRY, BARRY SCHULER, ROBYNNE SISCO, MARY SCHMIDT CAMPBELL, and KEISHA SMITH JEREMIE, <br><br> Defendants, <br><br> and <br><br> UNITY SOFTWARE INC., <br><br> Nominal Defendant. | Case No.: <br><br> DEMAND FOR JURY TRIAL |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

**INTRODUCTION**

Plaintiff Tom Duong ("Plaintiff"), by and through his undersigned attorneys, derivatively, and on behalf of nominal defendant Unity Software Inc. ("Unity" or the "Company"), brings this derivative action against defendants John S. Riccitiello, Kimberly Jabal, Luis Felipe Visoso, Roelof Botha, Egon Durban, David Helgason, Alyssa Henry, Barry Schuler, Robynne Sisco, Mary Schmidt Campbell, and Keisha Smith Jeremie (collectively, the "Individual Defendants," and together with Unity, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Unity, against Defendants John S. Riccitiello, Roelof Botha, Egon Durban, David Helgason, Aylssa Henry, Mary Schmidt Campell, Barry Schuler, Robynne Sisco, and Keisha Smith Jeremie for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon his attorneys' investigation, including, *inter alia*, an evaluation of: (i) Unity's publicly available documents; (ii) Unity's conference calls and press releases; (iii) United States Securities and Exchange Commission ("SEC") filings; (iv) legal filings; (v) news publications; (vi) analyst reports pertaining to Unity; and (vii) information readily obtainable on the Internet.

**NATURE OF ACTION**

1. This is a shareholder derivative action brought on behalf of Unity against the Individual Defendants for wrongdoing committed between March 5, 2021 and May 10, 2022 (the "Relevant Period").

2. Unity is based in San Francisco, California and focuses on video game software development. The Company is divided into two different but interlocking divisions—Create Solutions and Operate Solutions. These divisions design and run real-time 2D and 3D content across a variety of platforms, such as smartphones, personal computers, gaming consoles, and virtual reality devices. Content created on Unity's software platform is interactive, providing end-users the ability to connect in real-time with other users and the content simultaneously.

3. The Create Solutions division, mostly through monthly subscriptions, provides artists, designers, and developers in multiple industries with the ability to design and control high-definition, real-

1

time 2D and 3D content. The Create Solutions division receives most of its business from the gaming sector. However, many other industries, including aerospace, medical, and manufacturing industries, have begun using Create Solutions.

4.     Since many of Unity's clients use the platform to create games and applications ("app") for the purpose of launching their own business, the Company offers user acquisition products and monetization products through its Operate Solutions division, allowing clients to grow their users and monetize their content over time. Unity monetizes its Operate Solutions division, which constitutes most of Unity's revenue, mostly by revenue-share and consumption-based models.

5.     One of the increasingly most-lucrative user acquisition products offered through the Operate Solutions division is Audience Pinpointer, a technology that employs artificial intelligence to monitor user real-time in-app behavior at the moment of an ad request, thereby aiding clients in finding users most likely to provide value beyond the initial installation of the game or app.

6.     Recently, Audience Pinpointer's importance as a marketing tool increased dramatically due to Apple Inc.'s ("Apple") decision in 2021 to allow users to block Identifier for Advertisers, a unique identifier assigned to a user's iOS device that is used to measure the efficacy of advertising on a personal level. Consequently, Audience Pinpointer is viewed as a way to circumvent Apple's recent privacy initiatives because Audience Pinpointer does not require Apple's data.

7.     During the Relevant Period, the Individual Defendants made and/or caused the Company to make false and misleading statements and omissions of material fact that disguised deficiencies in Unity's platform, including its user acquisition products, as well as the Company's business and prospects.

8.     On February 3, 2022, Unity held an earnings call to discuss its financial results for the fourth quarter and fiscal year ended December 31, 2021 ("FY2021"). During the call, Defendant John S. Riccitiello provided guidance for the upcoming year, in relevant part:

> We delivered another really strong quarter ending in December to close out '21 with great momentum. For the quarter, revenue grew 43% year over year to $316 million, and our non-GAAP operating margin was minus 3.8%, expanding 530 basis points from a year earlier.

\*          \*          \*

2

Verified Shareholder Derivative Complaint

These results have been and will continue to be driven by excellence in execution by the Unity team.

We have built our business on a strong foundation based on very healthy customer metrics and structural economics. We entered 2022 with momentum across both Create and Operate, which gives us confidence in our outlook. For the year, we expect to grow revenue to be between $1.485 billion and $1.505 billion, which represents growth between 34% and 36% from 2021.

9. On May 10, 2022, after markets closed, the truth emerged when Unity announced, through a press release, its first quarter 2022 financial results. The press release revealed that Unity reduced its guidance for the full year ending December 31, 2022, stating, in relevant part: "Unity is providing the following guidance for the second quarter and lowering guidance for the full year ending December 31, 2022 due to challenges with monetization products that we expect to impact 2022."

10. That same day, the Company held an earnings call to discuss its first quarter 2022 financial results. During the call, Defendant Riccitiello stated, in relevant part:

Our report today is a tale of two cities.

First, we experienced challenges in monetization of negatively affected revenue in February and March and more persists through the third quarter with minimal impact on the fourth. Second, we continue to perform very well in Create both with our gaming customers and with our non-game digital twins business where we saw meaningful growth, a trend we expect to continue. For the total company, revenue of $320 million was up 36% from a year earlier and came in at the top end of our guidance range. Upside to the forecast in Create was offset by challenges in Operate's monetization business.

Non-GAAP operating margin of minus 7.2% improved 280 basis points from the first quarter of last year as we continued to invest in innovation to capture the very large opportunity in front of us, while improving non-GAAP operating margins.

I'd like to address our Operate business first. Operate started the year strong in January, but then significantly slowed down in February and March. This resulted in first-quarter revenue of $184 million, an increase of 26% year on year. While there are external factors to consider, the Operate challenge is mostly caused by internal factors in Unity monetization in an otherwise healthy market. We see these challenges as temporary and not structural and do not expect them to impact future prospects of our business beyond 2022.

3

Verified Shareholder Derivative Complaint

> The most succinct framing for the challenges we are facing is that we built more for growth and less for resiliency. Following years of rapid growth and working through the challenges of Apple's privacy changes, we got hit hard by two issues.
>
> The first was a fault in our platform that resulted in reduced accuracy for our Audience Pinpointer tool, a revenue expensive issue given that our Pinpointer tool experienced significant growth post the IDFA changes. The second is that we lost the value of a portion of our data, training data due in part to us ingesting bad data from a large customer. We estimate the impact to our business of approximately $110 million in 2022 with no carryover impact to 2023. Luis will provide a more granular update to our guidance in a few minutes.

11. On this news, the price of Unity's securities fell $17.83 per share, or 37%, from $48.13 per share at the close of trading on May 10, 2022 to $30.30 per share at the close of trading on May 11, 2022.

12. Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties to Unity by making and/or causing the Company to make to the investing public a series of materially false and misleading statements and omissions about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused Unity to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) problems with Unity's product platform caused a data quality issue, damaging the accuracy of Audience Pinpointer; (ii) the damaged accuracy of Audience Pinpointer caused a dip in usage of the tool, wounding Unity's monetization business; (iii) in result, Unity's revenues would likely decrease; (iv) due to the foregoing, Unity's revenue guidance for the full year ending December 31, 2022 would have to be cut; (v) as a result, Unity overstated its prospects for 2022; and (vi) Unity failed to maintain internal controls. Consequently, Unity's public statements were materially false and misleading at all relevant times.

13. The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14. Egregiously, six of the Individual Defendants further breached their fiduciary duties by engaging in lucrative insider trading of Unity common stock at artificially inflated rates. The six Individual Defendants' insider trading netted them profits in excess of $734.8 million.

4

Verified Shareholder Derivative Complaint

15. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and its former and current Chief Financial Officers ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Class Action"), the need to undertake internal investigations, and the need to implement adequate internal controls over its financial reporting,—Unity will have to expend many millions of dollars.

16. Demand is excused as Unity's Board of Directors (the "Board") cannot consider a demand to initiate litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence required. In light of the Individual Defendants', most of whom are Unity's current directors, breaches of fiduciary duty, their collective participation in fraud, the substantial likelihood of their liability in this derivative action and Defendant Riccitiello's, Defendant Jabal's, and Defendant Visoso's liability in the Class Action, the Individual Defendants being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9).

18. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District,

Verified Shareholder Derivative Complaint

Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Unity is headquartered in this District.

## THE PARTIES

**Plaintiff Duong**

22. Plaintiff Duong is a Unity stockholder who has continuously held Unity common stock at all relevant times.

**Defendant Riccitiello**

23. Defendant John S. Riccitiello ("Riccitiello") has served as the Company's President and CEO since October 2014, as Executive Chairman of the Board since June 2014, and as a Company director since November 2013. As of April 1, 2022, Defendant Riccitiello owned 8,364,921 shares of Unity common stock. At the close of trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Riccitiello owned approximately $827.5 million worth of Unity stock as of that date.

24. Defendant Riccitiello's compensation for FY 2021 was $12,501,471, of which $376,682 was in salary, $5,478,006 was in stock awards, $6,025,215 was in option awards, and $621,568 was in non-equity incentive plan compensation.

25. Defendant Riccitiello also sold 2,063,878 shares of Unity stock at artificially inflated prices while in possession of inside information. Riccitiello received approximately $256.6 million in proceeds from his insider sales, thereby exposing his motive for taking part in the misconduct.

**Defendant Jabal**

26. Defendant Kimberly Jabal ("Jabal") served as the Company's Senior Vice President and CFO from March 2019 until April 2021. As of April 1, 2022, Defendant Jabal owned 39,250 shares of Unity common stock. At the close of trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Jabal owned approximately $3.9 million worth of Unity stock as of that date.

27. Defendant Jabal's compensation for FY2021 was $13,086,010, of which $164,284 was in salary, $662,906 was in stock awards, $11,959,124 was in option awards, and $299,696 was in all other compensation.

28. Defendant Jabal also sold 10,050 shares of Unity stock at artificially inflated prices while in possession of inside information. Jabal received approximately $1.1 million in proceeds from her insider sales, thereby exposing her motive for taking part in the misconduct.

**Defendant Visoso**

29. Defendant Luis Felipe Visoso ("Visoso") has served as the Company's Senior Vice President and CFO since April 2021. He also served as a Company director from September 2020 until April 2021. As of April 1, 2022, Defendant Visoso owned 75,000 shares of Unity common stock. At the close of trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Visoso owned approximately $7.4 million worth of Unity stock as of that date.

30. Defendant Visoso's compensation for FY2021 was $41,580,607, of which $260,041 was in salary, $2,000,000 was in bonus, $35,210,000 was in stock awards, $3,765,720 was in option awards, $334,444 was in non-equity incentive plan compensation, and $10,402 was in all other compensation.

31. Defendant Visoso also sold 52,314 shares of Unity stock at artificially inflated prices while in possession of inside information. Visoso received approximately $5.8 million in proceeds from her insider sales, thereby exposing her motive for taking part in the misconduct.

**Defendant Botha**

32. Defendant Roelof Botha ("Botha") has served as a Company director since September 2009. As of April 1, 2022, Defendant Botha owned 1,442,349 shares of Unity common stock. At the close of trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Botha owned approximately $142.7 million worth of Unity stock as of that date.

33. Defendant Botha's compensation for FY2021 was $284,992, all of which was in stock awards.

**Defendant Durban**

34. Defendant Egon Durban ("Durban") has served as a Company director since June 2017. As of April 1, 2022, Defendant Durban owned 129,510 shares of Unity common stock. At the close of trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Durban owned approximately $12.8 million worth of Unity stock as of that date.

7

Verified Shareholder Derivative Complaint

35.     Defendant Durban's compensation for FY2021 was $259,962, all of which was in stock awards.

36.     Defendant Durban also sold 1,885,057 shares of Unity stock at artificially inflated prices while in possession of inside information. Durban received approximately $362.9 million in proceeds from his insider sales, thereby exposing his motive for taking part in the misconduct.

**Defendant Helgason**

37.     Defendant David Helgason ("Helgason") co-founded Unity in August 2004 and has served as a Company director since May 2015. He also served as Unity's President and CEO from August 2004 until October 2014 and as a Company director from August 2004 until June 2014. As of April 1, 2022, Defendant Helgason owned 9,151,613 shares of Unity common stock. At the close of trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Helgason owned approximately $905.3 million worth of Unity stock as of that date.

38.     Defendant Helgason's compensation for FY2021 was $249,991, all of which was in stock awards.

39.     Defendant Helgason also sold 688,629 shares of Unity stock at artificially inflated prices while in possession of inside information. Durban received approximately $107.5 million in proceeds from his insider sales, thereby exposing his motive for taking part in the misconduct.

**Defendant Henry**

40.     Defendant Alyssa Henry ("Henry") has served as a Company director since October 2018. As of April 1, 2022, Defendant Henry owned 123,599 shares of Unity common stock. At the close of trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Henry owned approximately $12.2 million worth of Unity stock as of that date.

41.     Defendant Henry's compensation for FY2021 was $274,917, all of which was in stock awards.

**Defendant Schuler**

42.     Defendant Barry Schuler ("Schuler") has served as a Company director since April 2016. As of April 1, 2022, Defendant Schuler owned 297,649 shares of Unity common stock. At the close of

trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Schuler owned approximately $29.4 million worth of Unity stock as of that date.

43. Defendant Schuler's compensation for FY2021 was $274,917, all of which was in stock awards.

44. Defendant Schuler also sold 10,000 shares of Unity stock at artificially inflated prices while in possession of inside information. Schuler received approximately $876,000 in proceeds from his insider sales, thereby exposing his motive for taking part in the misconduct.

**Defendant Sisco**

45. Defendant Robynne Sisco ("Sisco") has served as a Company director since July 2017. As of April 1, 2022, Defendant Sisco owned 37,916 shares of Unity common stock. At the close of trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Sisco owned approximately $3.8 million worth of Unity stock as of that date.

46. Defendant Sisco's compensation for FY2021 was $274,917, all of which was in stock awards.

**Defendant Schmidt**

47. Defendant Mary Schmidt Campell ("Schmidt") has served as a Company director since September 2020. As of April 1, 2022, Defendant Schmidt owned 6,942 shares of Unity common stock. At the close of trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Schmidt owned approximately $686,703 worth of Unity stock as of that date.

48. Defendant Schmidt's compensation for FY2021 was $259,962, all of which was in stock awards.

**Defendant Smith**

49. Defendant Smith has served as a Company director since August 2021. As of April 1, 2022, Defendant Smith owned 934 shares of the Company's common stock. At the close of trading on April 1, 2022, Unity's stock price was $98.92 per share, thus, Defendant Smith owned approximately $92,391 worth of Unity stock as of that date.

50. For the 2021 Fiscal Year, Defendant Smith received $399,966 in stock awards, which was also her total compensation from the Company.

**Nominal Defendant**

51. Nominal Defendant Unity is a Delaware corporation headquartered in California at 30 3rd Street, San Francisco, CA 94103-3104.

**MISCONDUCT OF THE INDIVIDUAL DEFENDANTS**

**Company Overview**

52. Unity is based in San Francisco, California and focuses on video game software development. Through Unity's Create Solutions and Operate Solutions divisions, clients receive the capability to design, operate, and monetize their content across platforms.

53. Audience Pinpointer, one of Unity's user acquisition products, produces real-time valuations of users instantaneously upon an ad request, allowing clients to monetize ads by pinpointing the optimal audience for games and apps. Since Apple altered its privacy controls in 2021, Audience Pinpointer has enjoyed dramatic growth due to advertisers viewing Audience Pinpointer as a vehicle to circumvent Apple's stringent new privacy policies.

54. Partly because of Audience Pinpointer, Unity has enjoyed significant growth recently; for the year ended December 31, 2021, Unity reported $1.1 billion; for the year ended December 31, 2020, Unity reported $772.4 million; and for the year ended December 31, 2019, Unity reported $541.8 million.

55. However, Unity's securities dropped 37% following the Company's May 10, 2022 disclosure of its first quarter 2022 financial results alongside the existence of two technical issues affecting the Operate Solutions division. Unity subsequently revealed that these issues were projected to cause $110 million in losses to Unity in 2022, and that as a result, Unity would have to cut its guidance for the full year ending December 31, 2022.

**False and Misleading Statements**

**March 5, 2021 Form 10-K**

56. On March 5, 2021, Unity filed its annual report on Form 10-K with the SEC for the year ended December 31, 2020 (the "2020 10-K"). Defendants Riccitiello, Jabal, Botha, Durban, Helgason,

10

Verified Shareholder Derivative Complaint

Henry, Schmidt, Schuler, Sisco, and Visoso signed the 2020 10-K. The 2020 10-K contained Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Riccitiello and Jabal attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

57. The "Overview" section of the 2020 10-K provided, in relevant part:

Unity is the world's leading platform for creating and operating interactive, real-time 3D content. We believe the world is a better place with more creators in it. Creators, ranging from game developers to artists, architects, automotive designers, filmmakers, and others, use Unity to make their imaginations come to life.

Our platform provides a comprehensive set of software solutions to create, run and monetize interactive, real-time 2D and 3D content for mobile phones, tablets, PCs, consoles, and augmented and virtual reality devices. In the fourth quarter of 2020, we had, on average, approximately 2.7 billion monthly active end users who consumed content created or operated with our solutions. The applications developed by these creators were downloaded, on average, five billion times per month in 2020.

Content built on the Unity platform offers end-users a fundamentally more engaging and immersive experience than traditional static content. Content made with Unity is interactive, allowing end-users to connect with the content and with one another. Content made with Unity is real-time, allowing it to instantly adapt to end-user behavior and feedback. Content made with Unity allows graphics to be expressed with 3D shape and depth, permitting multiple viewing angles, and enabling augmented and virtual reality.

Real-time is not just a part of the end-user experience. Building content on Unity offers creators significant advantages in development compared to traditional content creation tools. Creators can visualize and iterate on their 2D and 3D creations in real-time and collaborate with each other to edit content simultaneously.

\*　　　　　\*　　　　　\*

Unity has built its reputation in gaming, and our scale and reach in this industry are significant. We estimate that in the fourth quarter of 2020, 71% of the top 1,000 mobile games were made with Unity. Unity's platform helps game developers—from the largest publishers in the world with teams of hundreds, to mid-sized, small and independent publishers, to individual

11

Verified Shareholder Derivative Complaint

creators—build and operate high quality games, rapidly and efficiently. Unity games can be built once and deployed and operated across more than 20 platforms, including Windows, Mac, iOS, Android, PlayStation, Xbox, Nintendo Switch, and the leading augmented and virtual reality platforms, among others. As gaming has proliferated, the business models for content have evolved beyond one-time purchases to include advertising and in-app purchases. Unity enables these new business models by providing creators with the solutions they need to easily run and monetize their content.

\* \* \*

Our platform consists of two distinct, but connected and synergistic, sets of solutions. Our Create Solutions are used by content creators—developers, artists, designers, engineers, and architects—to create interactive, real-time 2D and 3D content. Our Operate Solutions offer customers the ability to grow and engage their end-user base, as well as run and monetize their content with the goal of optimizing end-user acquisition and operational costs while increasing the lifetime value of their end-users.

\* \* \*

We have experienced rapid growth. Our revenue for the years ended December 31, 2020, 2019, and 2018 was $772.4 million, $541.8 million, and $380.8 million, respectively, representing year-over-year growth of 43% and 42%, respectively.

58. The "Our Solution" section of the 2020 10-K provided:

Unity is the world's leading platform for creating and operating interactive, real-time 3D content. Our platform includes our Create Solutions and Operate Solutions, which complement each other and together provide a comprehensive set of solutions that enable our customers to create, run and monetize their content across a broad range of third-party content distribution platforms.

Our Create Solutions are used to create, edit, run and deploy real-time 2D, as well as high definition, real-time 3D content. Content can be created once and deployed to more than 20 platforms, including Windows, Mac, iOS, Android, PlayStation, Xbox, Nintendo Switch, and the leading augmented and virtual reality platforms, among others. Our products include custom scripting tools and a high-definition render pipeline for developers; graphics, animation and audio tools for artists; and navigation, networking and user interface tools for designers. Delivered as a modular application architecture, creators can leverage our products to easily create, edit, and iterate interactive, real-time 3D content.

Our Operate Solutions offer customers the ability to grow and engage their user bases, and to run and monetize their content—from 2D puzzle games

12

to multiplayer, multi-platform games, or other 3D interactive content—irrespective of whether the content was created in Unity. Our monetization products, Unity Ads and Unity IAP (In-App Purchases), help developers to maximize the revenue potential of their content. We help our customers to maximize the lifetime value of their end users, while optimizing their end-user acquisition and operational costs. Our end-user engagement products, such as deltaDNA, provide developers with the capability to perform deep analytics to optimize end-user engagement and behavior. Finally, we also offer solutions to simplify the delivery of content and provide back-end management, such as Multiplay for multiplayer hosting in games, or Vivox to enable player-to-player communications in games.

59. The "Our Competitive Strengths" section of the 2020 10-K provided the following regarding Unity's platform, in relevant part:

Our core competitive is the breadth and depth of our platform. We offer a comprehensive set of solutions to create, run and monetize real-time 3D games and applications. Creators can onboard through any of our solutions and leverage our platform to serve their needs at every stage of growth. To help our creators succeed, we provide access to comprehensive learning resources and guided onboarding to our extensive community. As a result of the strength of our platform, in the fourth quarter of 2020, we had, on average, approximately 2.7 billion monthly active end users who consumed content created or operated with our solutions on over 20 platforms, up 63% from a year earlier. We saw an average of more than 13,000 new projects each day in 2020.

60. The "Our Products" section of the 2020 10-K provided the following about Operate Solutions, in relevant part:

Our user acquisition products enable advertisers to efficiently acquire new end-users at scale. They operate within our monetization ecosystem, which reached over 2.6 billion monthly active end users as of December 31, 2020, making it one of the largest global user bases for advertisers. Our focus and strength are in pay-for-performance end-user acquisition, where advertisers pay us based on a tangible outcome or set goal, such as an install, rather than on a cost per impression basis. As a result, a large number of our advertisers have open spending limits with us as they can clearly measure the positive return on their spend.

**April 28, 2021 Proxy Statement**

61. On April 28, 2021, Unity filed a proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, and Sisco solicited the 2021 Proxy Statement, which contained material misstatements and omissions.

Verified Shareholder Derivative Complaint

62. The 2021 Proxy Statement asked Unity stockholders to vote to, *inter alia*: (1) elect Defendants Riccitiello, Botha, and Helgason to the Board; and (2) ratify the appointment of Ernst & Young LLP as Unity's independent registered public accounting firm for FY2021.

63. The "Role of the Board in Risk Oversight" section of the 2021 Proxy Statement provided:

> One of the Board's key functions is informed oversight of our risk management process. Our Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various Board standing committees that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company. Our Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Our Audit Committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our Audit Committee responsibilities also include oversight of cybersecurity risk management, and, to that end, the committee typically meets quarterly with both IT and business personnel responsible for cybersecurity risk management and receives periodic reports from the head of cybersecurity risk management, as well as incidental reports as matters arise. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

64. The 2021 Proxy Statement also outlined the primary responsibilities of the Audit Committee, which at that time consisted of Defendants Botha and Sisco. These responsibilities included the following:

- helping the Board oversee the Company's corporate accounting and financial reporting processes;

- managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the Company's independent registered public accounting firm to audit the Company's financial statements and the effectiveness of its internal control over financial reporting, when required;

- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the

14

Verified Shareholder Derivative Complaint

independent accountants, the Company's interim and year end operating results;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- reviewing related party transactions;

- approving or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm; and

- preparing the Audit Committee report that the SEC requires in the Company's annual proxy statement.

65. With respect to Unity's Code of Conduct, the 2021 Proxy Statement provided:

We have adopted the Unity Software Inc. Global Code of Conduct and Ethics that applies to all officers, directors and employees. The Global Code of Conduct and Ethics is available on our website at investors.unity.com. If we make any substantive amendments to the Global Code of Conduct and Ethics or grant any waiver from a provision of it to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website.

66. The 2021 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by numerous false and misleading statements alleged herein and by the Individual Defendants' failures to report violations of the Code of Conduct.

67. The Individual Defendants caused the 2021 Proxy Statement to be false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) problems with Unity's product platform caused a data quality issue, thereby damaging the accuracy of Audience Pinpointer; (ii) the damaged accuracy of Audience Pinpointer caused a dip in usage of the tool, wounding Unity's monetization business; (iii) in result, Unity's revenues would likely decrease; (iv) due to the foregoing, Unity's revenue guidance for the full year ending December 31, 2022 would have to be cut; (v) as a result, Unity overstated its prospects for 2022; and (vi) Unity failed to maintain internal controls. Consequently, Unity's public statements were materially false and misleading

at all relevant times. As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Unity stockholders voted, *inter alia*, to reelect Defendants Riccitiello, Botha, and Helgason to the Board, which allowed them to continue breaching their fiduciary duties to Unity.

**May 11, 2021 Press Release and Earnings Call**

68. On May 11, 2021, Unity announced, through a press release, its first quarter 2021 financial results. The press release provided a statement from Defendant Riccitiello:

> Our first quarter results are reflective of the powerful transition from linear 2D to real-time 3D, which is one of the most important changes in how people interact with technology . . . . We believe that real-time 3D will continue to grow at an accelerated pace and achieve massive scale.

69. The May 11, 2021 press release also provided a statement from Defendant Visoso:

> Execution in the first quarter was very strong with revenue of $234.8 million, an increase of 41% from last year. We are encouraged by the growth of our customers contributing more than $100K of trailing twelve-month revenue and the healthy dollar-based net expansion rate during the first quarter . . . . We continue to invest strategically in R&D and vertical expansion to enable Unity to lead the transition to real-time 3D.

70. That same day, Unity held an earnings call to discuss its first quarter 2021 financial results. During the call, Defendant Riccitiello stated, in relevant part:

> At Unity, we remain focused on our North Star, our guiding principle, which is that we believe the world is a better place with more creators. Our focus, as always, is to enable these creators and to help them succeed.

> Our financial results reflect the power of this theme. In Q1, we grew revenue 41% year over year to $235 million. This is the tenth consecutive quarter of 30%-plus revenue growth. We believe the transition from linear 2D to real-time 3D is a transformative theme and one of the most important changes on how creators will tell their stories and bring their visions to life.

> It's also one of the most important changes in how people interact with technology in many years. We support our customers on many platforms and in numerous geographies, and today are the only high-scale solution for creating and operating real-time 3D globally. We believe it's inevitable that a large portion of the world's creators will, over time, become primarily real-time 3D creators. The role of interactivity through 3D in real time is so much greater than with alternative forms of media.

> \*       \*       \*

16

Verified Shareholder Derivative Complaint

Now what do I mean when I say scale with a creator throughout their career? Well, we believe that our commitment to R&D competitively differentiates us from less sophisticated platforms that aspire to catch up with us in terms of technology or market share. For example, with Unity, you only write once and you can publish anywhere. We build our editors so a full range of users, from creators to advanced developers, can build real-time 3D applications. This means you could start with visual scripting, move to C# programming, and for more advanced developers, they can work directly with Unity's source code, if needed.

With these on-ramps to Unity, we enable creators to develop and operate many application types from games, to car configurators who run high-scale AI simulation. It's not easy to make the complexity of this easy.

71. On the same call, Defendant Riccitiello responded to a question from an analyst pertaining to emerging competitive marketing or digital advertising marketplaces by saying, in relevant part:

It's on the basis of being competitive in the marketplace that we're going to succeed. When I was answering the last question, I said we increase our take rate by increasing the value we add. We're constantly focused on that.

Short term, we can always maybe eke out a few dollars by messing around with pricing or messing around with other things that are hard to lap. Value add is easy to scale. And that's what we're investing in. And I'm highly confident in our monetization platform as part of Operate is going to continue to win.

**August 10, 2021 Press Release and Earnings Call**

72. On August 10, 2021, Unity announced, through a press release, its second quarter 2021 financial results. The press release provided a statement from Defendant Riccitiello:

At Unity, our goal is to provide creators with the best tools to succeed as RT3D creators . . . . Unity is designed to enable creators to build anything digital and to instantly deploy their work across dozens of platform types and devices, which is to make participating in building the metaverse accessible to all creators.

73. The August 10, 2021 press release also provided a statement from Defendant Visoso:

We had another consecutive strong quarter, with revenue for the quarter at $273.6 million, up 48% year-on-year as we added new customers and expanded our business with existing customers . . . . While our strong performance is broad based, we are particularly proud of the performance from our Operate Solutions group that expanded market share in a tough environment. Our strong performance gives us confidence to raise guidance for the year, again.

17

Verified Shareholder Derivative Complaint

74.   That same day, Unity held an earnings call to discuss its second quarter 2021 financial results. During the call, Defendant Riccitiello stated, in relevant part:

> Unity reported a 48% year-over-year increase in revenue to $274 million for the quarter. This quarter was the first in Unity's history as we crossed a $1 billion revenue run rate. We also raised our revenue guidance for the year by another $45 million to a range between $1.045 billion and $1.060 billion.
>
> We generated strong growth across all our product lines and geographies with important growth in both Operate and Create. Within Operate, both monetization and multiplay services posted strong growth. And within Create, we saw strong growth both in games and non-game verticals.

> *               *               *

> Our Operations Solutions help developers solve this vision. We offer an end-to-end platform for content creators to deliver the best player experience and build robust and profitable businesses. We provide a growing suite of services that content creators can use to acquire new users, optimize user engagement and LTV by our monetization platform.

**November 9, 2021 Press Release and Earnings Call**

75.   On November 9, 2021, Unity announced, through a press release, its third quarter 2021 financial results. The press release revealed "third quarter 2021 revenue of $286.3 million, which is up 43% from the same period in 2020 and ahead of guidance. The company is increasing full year revenue guidance."

76.   The November 9, 2021 press release also provided a statement from Defendant Riccitiello:

> Unity's strong performance this quarter was driven by innovation in data science, vertical growth and making significant strides in bringing RT3D technologies and tools to as many creators and artists as possible . . . . And today we are proud to announce our intentions to acquire Weta Digital as we aim to bring their dozens of tools and assets to creators around the world. This sends a powerful message: all types of creators and digital artists can turn to Unity to create rich, interactive content and build experiences regardless of industry.

77.   The press release further provided a statement from Defendant Visoso:

> We delivered another strong quarter in Q3 2021 with $286 million in revenue, continuing to add new customers and expanding our business within existing customers. The strong momentum gives us the confidence

18

Verified Shareholder Derivative Complaint

to raise our revenue growth guidance to 40% for the full year . . . . Bringing Weta Digital into the Unity family will materially advance our relevance with artists, and increase our addressable market, setting us up well for our long term growth prospects.

78. That same day, Unity held an earnings call to discuss its third quarter 2021 financial results. During the call, Defendant Riccitiello stated, in relevant part:

We are really happy with our third quarter results, and we have great news to share. We reported another strong quarter with results well above our expectations. We delivered 43% revenue growth as revenue had a record $286 million in the quarter.

We continue to invest to drive future growth, resulting in a non-GAAP operating margin of a negative 4%, flat to the same quarter last year. Since we went public in September of last year, our revenue growth has averaged 45%. We're encouraged by the execution across all of our business lines and geographies. And as you'll hear later from Luis, we are raising our revenue guidance again this quarter.

79. On the same call, Defendant Riccitiello responded to a question from an analyst pertaining to the "slight uptick" in sequential growth in third quarter 2021 by saying, in relevant part:

So on the Operate side and particularly monetization, I'd be remiss if I didn't point out that outside of monetization, the rest of our Operate stack is working extremely well. So it's across the board right, inside of our Operate portfolio. So we're gaining scale everywhere. So we feel really good about our business there.

But specifically to Operate, I think topical right now and challenging for investors is you see a lot of quarterly results and some companies pop up as a winner and some companies haven't popped up as a winner post the roll-through of the IDFA changes introduced by Apple. Something I've been saying for a very long time is that Unity benefits from a very unique data set, driven by over 3 billion people, MAUs in our analytics platform and hundreds of millions on our IAP platform. So I'm going to introduce something that I think probably most of you think is pretty obvious, but I'm going to emphasize it again. Most ad networks, their business is based on the identity, the specific identity of the user interacting with the application.

**February 3, 2022 Press Release and Earnings Call**

80. On February 3, 2022, Unity announced, through a press release, its financial results for the fourth quarter and fiscal year ended December 31, 2021. The press release stated the following, in relevant part:

19

Unity . . . . today announced fourth quarter 2021 revenue of $315.9 million, which is up 43% from the same period in 2020 and ahead of guidance. Additionally, the company announced full-year 2021 revenue of $1.1 billion, a growth of 44% year-over-year.

*          *          *

Since becoming a public company in September 2020, Unity has averaged 43% revenue growth. Customers contributing $100,000 or more in revenue in the trailing 12 months increased 33%, from 793 as of December 31, 2020 to 1,052 as of December 31, 2021.

81.     The February 3, 2022 press release also provided a statement from Defendant Riccitiello:

Unity's strong fourth-quarter and full-year results were driven by exceptional execution and innovation by the Unity teams . . . . We believe that the transition from linear 2D to interactive real-time 3D, presents a massive growth opportunity for the next decades. These are strong tailwinds that help us drive growth for years to come.

82.     The press release further provided a statement from Defendant Visoso:

We are encouraged by our performance in 2021 with strong results across Create and Operate Solutions . . . . The business momentum coupled with the quality of our innovation plans gives us confidence to guide to a revenue growth range of 34% to 36% in 2022 as we continue to improve margins.

83.     That same day, Unity held an earnings call to discuss its financial results for the fourth quarter and fiscal year ended December 31, 2021. During the call, Defendant Riccitiello stated, in relevant part:

We delivered another really strong quarter ending in December to close out '21 with great momentum. For the quarter, revenue grew 43% year over year to $316 million, and our non-GAAP operating margin was minus 3.8%, expanding 530 basis points from a year earlier.

*          *          *

These results have been and will continue to be driven by excellence in execution by the Unity team.

We have built our business on a strong foundation based on very healthy customer metrics and structural economics. We entered 2022 with momentum across both Create and Operate, which gives us confidence in our outlook. For the year, we expect to grow revenue to be between $1.485 billion and $1.505 billion, which represents growth between 34% and 36% from 2021.

20

Verified Shareholder Derivative Complaint

\* \* \*

The Unity platform is designed to help creators through the entire life cycle runtime application from ideation to launch to monetization, hosting an ongoing analytics to drive growth. So point number two, we think our leadership position is strong and we're growing it, and we continue to do that.

\* \* \*

We believe that we have a unique platform that will endure the test of time. And as I've said earlier, the process of building our platform is at the very center of our strategic process, where we add value to our platform while increasing our total addressable market.

\* \* \*

Unity is an innovation machine.

Monetization is a great example. We entered this business in 2014 and have not stopped innovating ever since. We hire the best and brightest product leaders, engineers, data scientists and focus on improving player experience. We operate with the developers' interest in mind and ensure our products contribute to their long-term success.

\* \* \*

Now I'm proud of what we've achieved so far at Unity, and I'm excited about the future that we can and will create. We are executing with excellence in a large and growing market that we are strategically expanding through internal innovation and acquisition.

We have a defensible platform that has significant value to our customers and keeps on getting better.

84. Also on the call, Defendant Visoso stated, in relevant part:

We also saw strong performance from our sophisticated analytics tools and products, such as Audience Pinpointer, that deliver strong return on investment to our customers without manual guesswork.

To win in a highly competitive market, we're constantly innovating, optimizing our machine learning models, improving our campaign and performance models, and generating actionable insights for our customers' campaigns and enabling them to make informed decisions. As a result, we estimate that our monetization business has been over each of the last five years, including 2021, consistently growing about twice as fast as the

21

Verified Shareholder Derivative Complaint

market. In addition, we're focused on providing infrastructure for synchronous multiplayer experiences and community service for vibrant social interactions.

**February 22, 2022 Form 10-K**

85.     On February 22, 2022, Unity filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2021(the "2021 10-K"). Defendants Riccitiello, Visoso, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith  signed the 2021 10-K. The 2021 10-K contained SOX certifications signed by Defendants Riccitiello and Visoso attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2021 10-K's descriptions of Unity's business and operations were substantially similar to the 2020 10-K's descriptions as set forth in ¶¶ 56-60.

86.     The statements referenced in ¶¶ 56-65 and ¶¶ 68–85 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i)  problems with Unity's product platform caused a data quality issue, damaging the accuracy of Audience Pinpointer; (ii) the damaged accuracy of Audience Pinpointer caused a dip in usage of the tool, wounding Unity's monetization business; (iii) in result, Unity's revenues would likely decrease; (iv) due to the foregoing, Unity's revenue guidance for the full year ending December 31, 2022 would have to be cut; (v) as a result, Unity overstated its prospects for 2022; and (vi) Unity failed to maintain internal controls. Consequently, Unity's public statements were materially false and misleading at all relevant times.

**April 20, 2022 Proxy Statement**

87.     On April 20, 2022, Unity filed the 2022 Proxy Statement with the SEC. Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith and nonparty Michelle K. Lee ("Lee") solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

88. The 2022 Proxy Statement asked stockholders to vote to, *inter alia*: (1) elect Defendants Durban, Schuler, and Sisco to the Board; (2) ratify the appointment of Ernst & Young LLP as Unity's independent registered public accounting firm for the fiscal year ending December 31, 2022; and (3) approve, on an advisory basis, the compensation of Unity's named executive officers.

89. The "Role of the Board in Risk Oversight" section of the 2022 Proxy Statement provided:

> One of the Board's key functions is informed oversight of our risk management process. Our Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various Board standing committees that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company. Our Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Our Audit Committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our Audit Committee responsibilities also include oversight of cybersecurity risk management, and, to that end, the committee typically meets quarterly with both IT and business personnel responsible for cybersecurity risk management and receives periodic reports from the head of cybersecurity risk management, as well as incidental reports as matters arise. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. Our Nominating and Corporate Governance Committee also monitors our environmental and social impact initiatives. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

90. The 2022 Proxy Statement also outlined the primary responsibilities of the Audit Committee, which at that time consisted of Defendants Botha and Sisco and nonparty Lee. These responsibilities included the following:

- Helping the Board oversee the Company's corporate accounting and financial reporting processes;

- Managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the Company's independent registered public accounting firm to audit the Company's financial

23

Verified Shareholder Derivative Complaint

statements and the effectiveness of its internal control over financial reporting, when required;

- Discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, the Company's interim and year end operating results;

- Developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- Reviewing related party transactions;

- Approving or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm; and

- Preparing the Audit Committee report that the SEC requires in the Company's annual proxy statement.

91. With respect to Unity's Code of Conduct, the 2022 Proxy Statement provided:

We have adopted the Unity Software Inc. Global Code of Conduct and Ethics that applies to all officers, directors and employees. The Global Code of Conduct and Ethics is available on our website at investors.unity.com. If we make any substantive amendments to the Global Code of Conduct and Ethics or grant any waiver from a provision of it to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website.

92. The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by numerous false and misleading statements alleged herein and by the Individual Defendants' failures to report violations of the Code of Conduct.

93. The Individual Defendants caused the 2022 Proxy Statement to be false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) problems with Unity's product platform caused a data quality issue, damaging the accuracy of Audience Pinpointer; (ii) the damaged accuracy of Audience Pinpointer caused a dip in usage of the tool, wounding Unity's monetization business; (iii) in result, Unity's revenues would likely decrease; (iv) due to the foregoing, Unity's revenue guidance for the full year ending December 31, 2022 would have to be

24

cut; (v) as a result, Unity overstated its prospects for 2022; and (vi) Unity failed to maintain internal controls. Consequently, Unity's public statements were materially false and misleading at all relevant times. As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Unity stockholders voted, *inter alia*, to reelect Defendants Riccitiello, Botha, and Helgason to the Board, which allowed them to continue breaching their fiduciary duties to Unity.

**The Truth Emerges**

**May 10, 2022 Press Release and Earnings Call**

94. On May 10, 2022, after the market closed, the truth emerged when Unity announced, through a press release, its first quarter 2022 financial results. The press release revealed that Unity was reducing its guidance for the full year ending December 31, 2022, providing, in relevant part: "Unity is providing the following guidance for the second quarter and lowering guidance for the full year ending December 31, 2022 due to challenges with monetization products that we expect to impact 2022."

95. That same day, Unity held an earnings call to discuss its first quarter 2022 financial results. During the call, Defendant Riccitiello stated, in relevant part:

> Our report today is a tale of two cities.
>
> First, we experienced challenges in monetization of negatively affected revenue in February and March and more persists through the third quarter with minimal impact on the fourth. Second, we continue to perform very well in Create both with our gaming customers and with our non-game digital twins business where we saw meaningful growth, a trend we expect to continue. For the total company, revenue of $320 million was up 36% from a year earlier and came in at the top end of our guidance range. Upside to the forecast in Create was offset by challenges in Operate's monetization business.
>
> Non-GAAP operating margin of minus 7.2% improved 280 basis points from the first quarter of last year as we continued to invest in innovation to capture the very large opportunity in front of us, while improving non-GAAP operating margins.
>
> I'd like to address our Operate business first. Operate started the year strong in January, but then significantly slowed down in February and March. This resulted in first-quarter revenue of $184 million, an increase of 26% year on year. While there are external factors to consider, the Operate challenge is mostly caused by internal factors in Unity monetization in an otherwise

healthy market. We see these challenges as temporary and not structural and do not expect them to impact future prospects of our business beyond 2022.

The most succinct framing for the challenges we are facing is that we built more for growth and less for resiliency. Following years of rapid growth and working through the challenges of Apple's privacy changes, we got hit hard by two issues.

The first was a fault in our platform that resulted in reduced accuracy for our Audience Pinpointer tool, a revenue expensive issue given that our Pinpointer tool experienced significant growth post the IDFA changes. The second is that we lost the value of a portion of our data, training data due in part to us ingesting bad data from a large customer. We estimate the impact to our business of approximately $110 million in 2022 with no carryover impact to 2023. Luis will provide a more granular update to our guidance in a few minutes.

96.     On this news, the price of Unity's securities fell $17.83, or 37%, from $48.13 per share at the close of trading on May 10, 2022 to close at $30.30 per share at the close of trading on May 11, 2022.

## DAMAGES TO UNITY

97.     As a direct and proximate result of the Individual Defendants' misconduct, Unity has been seriously harmed and will continue to be harmed. The Company will be subject to vast expenditures including, but not limited to:

(a) Legal fees incurred in connection with the Class Action filed against Unity and three of the Individual Defendants;

(b) Costs incurred from the compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties Unity;

(c) Costs incurred from remedying the material weaknesses in the Company's financial reporting controls.

98.     Additionally, Unity's business, goodwill, and reputation with its industry partners, regulators, and stockholders have been gravely tarnished. For the foreseeable future, the Company will suffer from a "liar's discount" from the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

99.     Plaintiff brings this action derivatively for the benefit of Unity to redress injuries Unity suffered and will suffer as a direct result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Unity and violations of the Exchange Act, as well as the aiding and abetting thereof. Unity is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

100.    Plaintiff has continuously been a stockholder of Unity at all relevant times. Plaintiff will adequately and fairly represent the interests of Unity in enforcing and prosecuting its rights.

## DEMAND IS EXCUSED AS FUTILE

101.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

102.    When this action was filed, Unity's Board consisted of thirteen individuals: Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schuler, Sisco, Schmidt, Smith (the "Director-Defendants") and nonparties Lee, Tomer Bar-Zeev, Shlomo Dovrat, and David Kostman (collectively with the Director-Defendants, the "Directors"). Plaintiff did not make a demand on the Board to institute this action because such a demand would be futile. Plaintiff needs only to allege demand futility as to seven of thirteen Directors that were on the Board at the time this action was filed.

103.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause or permit the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

104.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Unity to make the materially false and misleading statements alleged herein. Specifically, the Director-Defendants caused Unity to issue false and misleading statements which were intended to make Unity more profitable and attractive to investors. As a result of the foregoing,

demand would be futile, and thus excused, as the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

105. **Defendant Riccitiello** - Defendant Riccitiello has served as Unity's President and CEO since October 2014, as Executive Chairman of the Board since June 2014, and as a Unity director since November 2013. Therefore, as Unity admits, he is a non-independent director. The Company provides Defendant Riccitiello with his principal occupation for which he receives handsome compensation as detailed above.

106. As President, CEO, and Executive Chairman of the Board, Defendant Riccitiello was ultimately responsible for the many false and misleading statements and omissions that were made, including those contained in the 2020 10-K and 2021 10-K, both of which he personally signed and signed SOX certifications for. He benefited from the 2021 Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. In addition, he solicited the 2022 Proxy Statement, containing false and misleading statements, which contributed to shareholders approving, on an advisory basis, his unjust compensation. Defendant Riccitiello transacted numerous insider sales before the misconduct was revealed, netting approximately $256.6 million in proceeds from his insider sales, exposing his motive for taking part in the misconduct. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Riccitiello is a defendant in the Class Action. As a result, Defendant Riccitiello breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Riccitiello is futile and excused.

107. **Defendant Botha** - Defendant Botha has served as a Unity director since September 2009. The Company provides Defendant Durban with handsome compensation for his role as a director as described above.

108. Defendant Botha personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. He benefited from the 2021 Proxy Statement, containing false

Verified Shareholder Derivative Complaint

and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Botha breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Botha is futile and excused.

109. **Defendant Durban** - Defendant Durban has served as a Company director since June 2017. The Company provides Defendant Durban with handsome compensation for his role as a director as described above.

110. Defendant Durban personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. He benefited from the 2022 Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. Defendant Durban transacted numerous insider sales before the misconduct was revealed, netting approximately $362.9 million in proceeds from his insider sales, exposing his motive for taking part in the misconduct. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Durban breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

111. **Defendant Helgason** - Defendant Helgason co-founded Unity in August 2004 and has served as a Unity director since May 2015. As Unity admits, he is a non-independent director. The Company provides Defendant Helgason with his principal occupation for which he receives handsome compensation.

112. Defendant Helgason personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. He benefited from the 2021 Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his

Verified Shareholder Derivative Complaint

fiduciary duties to the Company. Defendant Helgason transacted numerous insider sales before the misconduct was revealed, netting approximately $107.5 million in proceeds from his insider sales, exposing his motive for taking part in the misconduct. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Helgason breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Helgason is futile and excused.

113. **Defendant Henry** - Defendant Henry has served as a Unity director since October 2018. The Company provides Defendant Henry with her principal occupation for which she receives handsome compensation.

114. Defendant Henry personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Henry breached her fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and excused.

115. **Defendant Schuler** - Defendant Schuler has served as a Company director since April 2016. The Company provides Defendant Schuler with his principal occupation for which he receives handsome compensation.

116. Defendant Schuler personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. He benefited from the 2022 Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. Defendant Schuler transacted numerous insider sales before the misconduct was revealed, netting approximately $876,000 in proceeds from his insider sales, exposing his motive for taking part in the misconduct. As a trusted Company director, he conducted little, if any, oversight of the

scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Schuler breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

117. **Defendant Sisco** - Defendant Sisco has served as a Company director since July 2017. The Company provides Defendant Sisco with her principal occupation for which she receives handsome compensation.

118. Defendant Sisco personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. She benefited from the 2022 Proxy Statement, containing false and misleading statements, which led to her election to the Board and allowed her to breach her fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Sisco breached her fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and excused.

119. **Defendant Schmidt** - Defendant Schmidt has served as a Company director since September 2020. The Company provides Defendant Schmidt with her principal occupation for which she receives handsome compensation.

120. Defendant Schmidt personally signed the 2020 10-K and 2021 10-K, which contained false and misleading statements and omissions. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Schmidt breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and excused.

Verified Shareholder Derivative Complaint

121. **Defendant Smith** - Defendant Smith has served as a Company director since August 2021. The Company provides Defendant Smith with her principal occupation for which she receives handsome compensation.

122. Defendant Smith personally signed the 2021 10-K, which contained false and misleading statements and omissions. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Smith breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and excused.

123. **Audit Committee Defendants** - Defendants Sisco (Chair), Botha, and Schuler (collectively, the "Audit Committee Defendants") served on Unity's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by releasing materially false and misleading statements to the investing public, and by facilitating the Individual Defendants' violations of law, including breaches of fiduciary duty.

124. Further, the Audit Committee Defendants violated the Audit Committee Charter by failing to ensure the integrity of Unity's financial disclosures and failing to abide by legal and regulatory requirements. Thus, the Audit Committee Defendants breached their fiduciary duties and are not disinterested. Therefore, demand is excused and futile as to the Audit Committee Defendants.

125. Demand is also excused because the Director-Defendants are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of Unity and the stockholders.

126. For example, Defendants Botha and Henry are both linked to Block, Inc., where Defendant Botha serves on the board of directors and Defendant Henry serves as Square Lead and Block Infrastructure and Information Security Lead. Moreover, as disclosed by the 2021 Proxy Statement, a trust affiliated with Defendant Botha issued Defendant Riccitiello a personal loan, which has since been repaid. Additionally, since February 2018, Defendant Sisco has served as Co-President of Workday, Inc., which

Verified Shareholder Derivative Complaint

Unity regularly purchases products and services. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

127. Unity has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Director-Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Unity any part of the damages Unity suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

128. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

129. The acts complained of herein constitute violations of fiduciary duties owed by Unity's officers and directors, and these acts are incapable of ratification.

130. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

131. By reason of their positions as officers, directors, and/or fiduciaries of the Company, each of the Individual Defendants owed and owe Unity and its stockholders fiduciary obligations of care, good faith, and loyalty, and were and are required to use their utmost ability to control and manage Unity in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in

furtherance of Unity's best interests and not in furtherance of their own personal interest or benefit. Each director and officer of the Company owes to Unity and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

132. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Unity, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of Unity were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company. By virtue of such duties, the officers and directors of Unity were required to, among other things:

(a) conduct the affairs of the Company in an efficient, business-like manner in a fashion that complies with all state and federal laws.

(b) remain informed as to how Unity conducts its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, such as issuing false and misleading statements, make reasonable inquiry therewith, and take steps to correct such conditions or practice and make disclosures as necessary to comply with applicable laws;

(c) keep accurate records and reports of the business and internal affairs of Unity and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(d) manage internal legal, financial, and management controls, such that Unity's operations comply with all applicable laws and Unity's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's stockholders would be accurate;

(e) ensure public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to publish are truthful and accurate;

(f) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company and its stockholders.

Verified Shareholder Derivative Complaint

## FIRST CLAIM

**Against Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith for Violations of Section 14(a) of the Exchange Act**

133. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

135. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

136. Under the direction and watch of Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, and Sisco, the 2021 Proxy Statement failed to disclose, *inter alia*, that: (i) problems with Unity's product platform caused a data quality issue, damaging the accuracy of Audience Pinpointer; (ii) the damaged accuracy of Audience Pinpointer caused a dip in usage of the tool, wounding Unity's monetization business; (iii) in result, Unity's revenues would likely decrease; (iv) due to the foregoing, Unity's revenue guidance for the full year ending December 31, 2022 would have to be cut; (v) as a result, Unity overstated its prospects for 2022; and (vi) Unity failed to maintain internal controls. Consequently, Unity's public statements were materially false and misleading at all relevant times.

137. In the exercise of reasonable care, Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, and Sisco should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set

forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of directors.

138. As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Unity stockholders voted, inter alia, to reelect Defendants Riccitiello, Botha, and Helgason to the Board, which allowed them to continue breaching their fiduciary duties to Unity.

139. The Company was damaged as a result of Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, and Sisco's material misrepresentations and omissions in the 2021 Proxy Statement.

140. Moreover, under the direction and watch of Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith, the 2022 Proxy Statement failed to disclose, *inter alia*, that: (i) problems with Unity's product platform caused a data quality issue, damaging the accuracy of Audience Pinpointer; (ii) the damaged accuracy of Audience Pinpointer caused a dip in usage of the tool, wounding Unity's monetization business; (iii) in result, Unity's revenues would likely decrease; (iv) due to the foregoing, Unity's revenue guidance for the full year ending December 31, 2022 would have to be cut; (v) as a result, Unity overstated its prospects for 2022; and (vi) Unity failed to maintain internal controls. Consequently, Unity's public statements were materially false and misleading at all relevant times.

141. In the exercise of reasonable care, Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of directors.

142. As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Unity stockholders voted, inter alia, to reelect Defendants Riccitiello, Botha, and Helgason to the Board, which allowed them to continue breaching their fiduciary duties to Unity.

Verified Shareholder Derivative Complaint

143. The false and misleading elements of the 2022 Proxy Statement led Company shareholders, *inter alia*, to: (1) elect Defendants Durban, Schuler, and Sisco to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, on an advisory basis, the compensation of the Company's named executive officers, including Defendants Riccitiello and Visoso, who were breaching their fiduciary duties to the Company.

144. The Company was damaged as a result of Defendants Riccitiello, Botha, Durban, Helgason, Henry, Schmidt, Schuler, Sisco, and Smith's material misrepresentations and omissions in the 2022 Proxy Statement.

145. Plaintiff on behalf of Unity has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

146. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Unity's business and affairs.

148. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

149. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Unity.

150. In breach of their fiduciary duties owed to Unity, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that:: (i) problems with Unity's product platform caused a data quality issue, damaging the accuracy of Audience Pinpointer; (ii) the damaged accuracy of Audience Pinpointer caused a dip in usage of the tool, wounding Unity's monetization business; (iii) in result, Unity's revenues would likely decrease; (iv) due to the foregoing, Unity's revenue guidance for the full

year ending December 31, 2022 would have to be cut; (v) as a result, Unity overstated its prospects for 2022; and (vi) Unity failed to maintain internal controls. Consequently, Unity's public statements were materially false and misleading at all relevant times.

151. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

152. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

153. In yet further breach of their fiduciary duties, during the Relevant Period, six of the Individual Defendants executed multiple insider sales, netting proceeds of approximately $734.8 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

154. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

155. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

156. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Unity has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

157. Plaintiff on behalf of Unity has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Unity, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Unity;

(c) Determining and awarding to Unity the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Unity and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Unity and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Unity to nominate at least seven candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Unity restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 16, 2022                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

DocuSign Envelope ID: A8472851-8D79-4222-8907-FED4A8DB8FFD

**VERIFICATION**

I, Tom Duong am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2022.

12/13/2022

Tom Duong