**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (Bar. No. 139304)
Lucas E. Gilmore (Bar No. 250893)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Liaison Counsel for the Class*

**LABATON SUCHAROW LLP**
Christine M. Fox (*pro hac vice*)
James M. Fee (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cfox@labaton.com
jfee@labaton.com

*Lead Counsel for Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System and Indiana Public Retirement System and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE UNITY SOFTWARE INC. SECURITIES LITIGATION | Case No. 5:22-cv-03962-EJD<br><br>**<u>CLASS ACTION</u>**<br><br>**LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Date:      October 12, 2023<br>Time:     9:00 a.m.<br>Judge:    Hon. Edward J. Davila<br>Dept.:    Courtroom 4 – 5th Floor<br><br>Amended Complaint Filed: March 24, 2023<br>Trial Date: Not yet set |

**TABLE OF CONTENTS**

STATEMENT OF ISSUES TO BE DECIDED.................................................................................1

I.      INTRODUCTION .................................................................................................................1

II.     FACTS .................................................................................................................................5

        A.      Unity's Structure and Advertising Business.............................................................5

        B.      Apple's Privacy Changes Upend Advertising Monetization for Companies
                Such As Unity Which Were Reliant on Tracking Data for Ad Placement.................6

        C.      Unity Declares Loss of IDFA Data a "Competitive Advantage" for the
                Company....................................................................................................................7

        D.      The Loss of IDFA Data Led to Reliance by Unity on Audience Pinpointer
                Which Was Rolled Out Before It Was Ready ...........................................................7

        E.      Unity Is Unable to Fix Audience Pinpointer In the Face of Widespread
                Customer Complaints .................................................................................................8

        F.      Audience Pinpointer's Repeated Failures Cause Unity to Lose Customers and
                Revenues in Its Operate Segment...............................................................................8

        G.      To Mask Falling Operate Revenues During the Class Period, Unity Goes on
                an Acquisition Spree...................................................................................................9

        H.      The Truth Emerges and Unity's Stock Price Plummets 37%...................................10

        I.      Unity Acquires Its Competitor ironSource, Rather Than Revamp Audience
                Pinpointer.................................................................................................................10

III.    ARGUMENT.....................................................................................................................11

        A.      Plaintiffs Have Adequately Alleged Falsity ...........................................................12

                1.      Defendants' Statements During the Class Period About Audience
                        Pinpointer Were Materially False and Misleading Because They
                        Omitted to Disclose That Audience Pinpointer Was Experiencing
                        Serious Technical Flaws, Reducing Its Accuracy Throughout the
                        Class Period...................................................................................................13

                2.      Defendants Had a Duty to Disclose Information About Audience
                        Pinpointer's Flaws That Led to Reduced Accuracy When Defendants
                        Spoke About the Features and Effectiveness of Audience Pinpointer ..........15

                3.      Defendants' Boilerplate Arguments That Many Of The Alleged
                        Misstatements Are Puffery, Vague, or Aspirational Fail.............................18

i

4.      Defendants' Revenue Guidance Statements Are Actionable ........................ 20

5.      Contemporaneous Analyst Reports Confirm Plaintiffs' Interpretation of Defendants' Statements ........................................................................... 22

B.  Plaintiffs Have Adequately Alleged a Strong Inference of Scienter ......................... 23

1.      Defendants Had Access to Information That Rendered Their Public Statements Misleading ................................................................................... 23

2.      The Specificity of Defendants' False Statements Supports Scienter ............. 25

3.      The Complaint's CW Allegations Plead a Strong Inference of Scienter ....... 26

4.      The Importance of Audience Pinpointer to Unity's Ad Monetization Business After Apple's IDFA Changes Supports Scienter ........................... 28

5.      Defendants' Suspicious and Unusually Timed Insider Sales Support Scienter ........................................................................................................ 29

6.      The Complaint Pleads Corporate Scienter ..................................................... 34

7.      Viewing Plaintiffs' Allegations Holistically, Defendants' Opposing Inference of Scienter Is Not Compelling ...................................................... 35

C.  Plaintiffs Adequately Plead Control Person Claims ................................................. 35

1.      The Complaint Pleads Section 20(a) Claims Against the Individual Defendants, Who Do Not Meaningfully Contest Those Claims .................. 37

2.      The Complaint Pleads Section 20(a) Claims Against the Sequoia Defendants and Silver Lake ........................................................................ 38

D.  Plaintiffs Request Leave to Replead If the Court Is Inclined to Grant Defendants' Motions ................................................................................................. 41

IV.     CONCLUSION .................................................................................................................. 41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allstate Life Ins. Co. Litig.*,
   2013 WL 789106 (D. Ariz. Mar. 1, 2013) .................................................................................. 39

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ................................................................................... 15, 20, 21, 34

*In re Am. Apparel, Inc. S'hareholder Litig.*,
   2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) .................................................................... 39, 41

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal Aug. 4, 2014) .......................................................... 23, 27, 35

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ................................................................................ 39

*Arthur Child.'s Tr. v. Keim*,
   994 F.2d 1390 (9th Cir. 1993) ............................................................................................... 36

*In re Atossa Genetics Inc Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ............................................................................................ 16-17

*Azar v. Yelp, Inc*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ................................................................... 31, 32

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ................................................................................. 37

*Baker v. SeaWorld Ent., Inc.*,
   423 F. Supp. 3d 878 (S.D. Cal. 2019) ............................................................................... 39-40

*Bao v. SolarCity Corp.*,
   2015 WL 1906105 (N.D. Cal. Apr. 27, 2015) ...................................................................... 40

*Batwin v. Occam Networks, Inc.*,
   2008 WL 2676364 (C.D. Cal. July 1, 2008) ......................................................................... 31

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ............................................................................................ 12, 28

*Bielousov v. GoPro, Inc.*,
   2017 WL 3168522 (N.D. Cal. July 26, 2017) ....................................................................... 25

*In re BioMarin Pharms. Sec. Litig.*,
   2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ...................................................................*passim*

iii

*In re Bofi Holding, Inc. Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ................................................................. 18

*In re BofI Holding, Inc. Sec. Litig.*,
2017 WL 2257980 (S.D. Cal. May 23, 2017) ..................................................... 35, 36, 37

*In re BofI Holding, Inc. S'holder Litig.*,
848 F. App'x 234 (9th Cir. 2021) .................................................................................. 41

*Brodsky v. Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) .......................................................................... 20

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) ........................................................ 24-25, 31

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
2013 WL 6441843 (N.D. Cal. Dec. 9, 2013) .................................................................. 30

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) .......................................................................... 17

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) .......................................................................................... 12

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......................................................................... 33

*Crews v. Rivian Auto., Inc.*,
2023 WL 4361098 (C.D. Cal. July 3, 2023) ............................................................. 12, 16

*In re Cylink Sec. Litig.*,
178 F. Supp. 2d 1077 (N.D. Cal. 2001) .......................................................................... 37

*In re CytRx Corp. Sec. Litig.*,
2015 WL 5031232 (C.D. Cal. July 13, 2015) .................................................................. 36

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ........................................................................................ 16

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ........................................................................................ 41

*In re Facebook, Inc. Sec. Litig.*,
477 F. Supp. 3d 980 (N.D. Cal. 2020) (Davila, J.) ........................................................ 41

*Ferris v. Wynn Resorts Ltd.*,
2021 WL 3216462 (D. Nev. July 28, 2021) .................................................................... 34

*In re Finisar Corp. Sec. Litig.*,
2017 WL 1549485 (N.D. Cal. May 1, 2017) .............................................................. 24, 26

iv

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004) ........................................................................ 40

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008)............................................................................... 11-12

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023)...................................................................................... 17

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008).................................................................................... 34

*In re Gupta Corp. Sec. Litig.*,
    900 F. Supp. 1217 (N.D. Cal. 1994) ......................................................................... 40

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) ...................................................................... 28

*Hayley v. Parker*,
    2002 WL 925322 (C.D. Cal. Mar. 15, 2002) ............................................................ 39

*Hollinger v. Titan Cap. Corp.*,
    914 F.2d 1564 (9th Cir. 1990).................................................................................. 35

*Homyk v. ChemoCentryx, Inc.*,
    2023 WL 3579440 (N.D. Cal. Feb. 23, 2023)....................................................*passim*

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000)................................................................................... 37

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005).................................................................26, 36

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...................................................................................... 26

*In re Intuitive Surgical Sec. Litig.*,
    2014 WL 7146215 (N.D. Cal. Dec. 15, 2014) .......................................................... 24

*In re Invision Techs., Inc. Sec. Litig.*,
    2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ........................................................ 13-14

*Johnson v. Aljian*,
    394 F. Supp. 2d 1184 (C.D. Cal. 2004) .................................................................... 31

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018).................................................................................... 13

*Kovtun v. VIVUS, Inc.*,
    2012 WL 4477647 (N.D. Cal. Sep. 27, 2012).......................................................... 28

v

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

*Lamartina v. VMware, Inc.*,
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) (Davila, J.) .................................................. 32

*Laperrier v. Vesta Ins. Grp., Inc.*,
    526 F.3d 715 (11th Cir. 2008) .......................................................................................... 35

*McCasland v. FormFactor Inc.*,
    2009 WL 2086168 (N.D. Cal. July 14, 2009) .................................................................... 31

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........................................................................ 11-12

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) ......................................................................... 38

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ......................................................................... 30-31

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ............................................................................................ 12

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................... 18, 19, 29

*In re Network Assocs., Inc., Sec. Litig.*,
    2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) ................................................................... 23

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ......................................................................... 37-38

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ...................................................................................... 12, 36

*In re Novatel Wireless Sec. Litig.*,
    830 F. Supp. 2d 996 (S.D. Cal. 2011) ............................................................................... 30

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .................................................................................... 24, 31

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
    2017 WL 3187688 (C.D. Cal. Jan. 17, 2017) .................................................................... 36

*Oh v. Hanmi Fin. Corp.*,
    621 F. Supp. 3d 1075 (C.D. Cal. 2022) ............................................................................ 34

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ................................................................................ 27, 28

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) .............................................................................. 23, 24-25

vi

*Orshan v. Apple Inc.*,
   2023 WL 3568079 (N.D. Cal. Mar. 31, 2023) (Davila, J.) ..................................................... 4

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
   96 F.3d 1151 (9th Cir. 1996) .................................................................................. 40

*Pensions & Death Benefits v. CSK Auto Corp.*,
   525 F. Supp. 2d 1116 (D. Ariz. 2007) .................................................................... 27

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................................................ 29

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ................................................................................ 31

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ..........................................................................*passim*

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022) ....................................................... 11, 21, 23

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) .......................................................... 32

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) .......................................................................25, 28, 29

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ................................................................................ 20

*Robb v. Fitbit Inc.*,
   2017 WL 219673 (N.D. Cal. Jan. 19, 2017) .....................................................24, 27

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ..................................................27, 28

*Rodriguez v. Gigamon Inc.*,
   325 F. Supp. 3d 1041 (N.D. Cal. 2018) (Davila, J.) .............................................. 18

*S. Ferry LP, #2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) .......................................................................23, 28, 29

*S.F. Baykeeper v. City of Sunnyvale*,
   627 F. Supp. 3d 1102 (N.D. Cal. 2022) (Davila, J.) ................................................ 4

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ....................................................... 22

*Scheller v. Nutanix*,
   2020 WL 5500422 (N.D. Cal. Sept. 11, 2020) ...................................................... 35

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016)........................................................................12, 16-17, 23

*Shenwick v. Twitter*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017)......................................................24, 25, 28

*Shepherd v. S3 Partners, LLC*,
2011 WL 4831194 (N.D. Cal. Oct. 12, 2011)................................................... 40

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
2000 WL 1727405 (N.D. Cal. Sept. 29. 2000)................................................. 40

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ............................................................ 19

*In re STEC Inc. Sec. Litig.*,
2011 WL 2669217 (C.D. Cal. June 17, 2011)...........................................13, 22

*Stocke v. Shuffle Master, Inc.*,
615 F. Supp. 2d 1180 (D. Nev. 2009).............................................................. 32

*In re Sunbeam Sec. Litig.*,
89 F. Supp. 2d 1326 (S.D. Fla. 1999) .............................................................. 26

*Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
690 F. Supp. 2d 959 (D. Ariz. 2010) ............................................................... 39

*Tellabs Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)...........................................................................*passim*

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016).....................................................29, 39, 41

*Turocy v. El Pollo Loco Holdings, Inc.*,
2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)...............................................13, 16

*In re Twitter, Inc. Sec. Litig.*,
506 F. Supp. 3d 867 (N.D. Cal. 2010)........................................................... 17-18

*In re U.S. Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002).......................................................... 13

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009)......................................................24, 32, 39, 41

*In re Vaxart, Inc. Sec. Litig.*,
576 F. Supp. 3d 663 (N.D. Cal. 2021).........................................................12, 13

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012)....................................................................23, 25

viii

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    195 F. Supp. 3d 528 (S.D.N.Y. 2016) .................................................................. 39

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020) .................................................................. 39

*Weston v. DocuSign, Inc.*,
    2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) ...................................... 29-30, 31

*Wool v. Tandem Computs. Inc.*,
    818 F.2d 1433 (9th Cir. 1987) ............................................................................ 36

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ......................................................... 19-20

**Statutes and Rules**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ............................. 11-12, 23

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5 ................................. 20, 21

Securities Exchange Act of 1934 §10(b), 15 U.S.C. §78j(b) ................................................ *passim*

Securities Exchange Act of 1934 §20(a), 15 U.S.C. §78t(a) ................................................ *passim*

SEC Rule 10b-5, 17 C.F.R. §240.10b-5 ..................................................... 1, 12, 23, 34

U.S.D.C. Northern District of California Local Rules 7-2 and 7-3 ............................................. 4

**Other Authorities**

Allan Horwich, *The Origin, Application, Validity, and Potential Misuse of Rule
    10b5-1,* 62 Bus. Law. 913 (2007) ...................................................................... 32

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Complaint alleges facts that, considered holistically, state claims under §10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and §20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a).

**I.    INTRODUCTION**

This case arises from Defendants' misstatements and omissions regarding: (i) Unity's Audience Pinpointer ad monetization tool; and (ii) Unity's ability to effectively serve its ad customers following Apple, Inc.'s ("Apple") changes to its privacy settings in April 2021.[1]  Throughout the Class Period, Defendants assured investors that Unity was well-prepared for the upheaval that Apple's privacy setting precipitated in the mobile advertising industry.  Yet, these assurances were not true. Unity was experiencing ongoing and serious problems with Audience Pinpointer throughout the Class Period, in part because the product was not ready and was hastily rushed to the market around the time Apple's privacy changes went into effect, as detailed by five (5) confidential witnesses ("CWs") who witnessed these problems and their impacts firsthand, as well as customer complaints regarding problems with Unity's advertising products.

The truth was finally revealed on May 10, 2022, when, in connection with the announcement of Unity's financial results for Q1 2022, the Company disclosed that its revenue shortfall in Q1 2022, and expected revenue shortfall for the rest of 2022 (nine (9) additional months), was due to two major

---

[1] Defendants are Unity Software, Inc. ("Unity" or the "Company"); Unity CEO and Executive Chairman of the Board John S. Riccitiello ("Riccitiello); Unity CFO Luis Felipe Visoso ("Visoso"); Unity SVP, Operate Segment Ingrid Lestiyo ("Lestiyo" and together with Riccitiello and Visoso, the "Individual Defendants" and with Unity, the "Unity Defendants"); Sequoia Capital Operations, LLC and SC US SSF 2013 (TTGP), LLC (together, the "Sequoia Defendants"); and Silver Lake Group, L.L.C. ("Silver Lake" and together with the Sequoia Defendants, the "Private Equity Defendants"). Plaintiffs are in the process of attempting to serve Defendant OTEE 2020 ApS ("OTEE") or its successor entities, all of which require compliance with the Hague Convention.

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

challenges that hit the Company "hard."  ¶194. [2]  According to Defendant Riccitiello, "[t]he first was a fault in our platform that resulted in reduced accuracy for our Audience Pinpointer tool, a revenue expensive issue given that our Pinpointer tool experienced significant growth post the IDFA changes. The second is that we lost the value of a portion of our data[,] training data due in part to us ingesting bad data from a large customer." *Id.*  This news caused Unity's stock price to lose 37% of its value in one day, causing significant injury to Unity's shareholders.

In order to address the massive problems with Audience Pinpointer's targeting capabilities, post-Class Period, the Company was forced to deploy at least eight (8) different task forces (moved from other revenue generating activities), which still were unable to solve all the Audience Pinpointer problems.   The Company ultimately acquired one of its biggest competitors, ironSource Ltd. ("ironSource"), with a working ad targeting product, in a $4.4 billion all-stock transaction in November 2022, having begun discussions before coming clean to the market about Audience Pinpointer's failings.  ¶¶203-09, 211.

In response to the Complaint's well-pled allegations, Defendants try to downplay the serious technical flaws in Audience Pinpointer and their impact on Unity's ability to generate ad revenue—an essential and significant source of revenue for the Company at the start of the Class Period.  The Unity Defendants challenge the Complaint's falsity and scienter allegations.  However, each of the challenges Defendants launch fails.

---

[2] The Unity Defendants' brief (ECF No. 103) is cited as (DB at __).  All references to "¶__" are in reference to the Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws (ECF No. 71).  Unless stated otherwise, all emphasis is added and all internal quotations and citations are omitted.

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

The Complaint pleads falsity for the forty (40) statements and omissions.[3]  The Complaint contains well-pled allegations of numerous technical flaws with Audience Pinpointer from the start of the Class Period.[4]  As shown through the CW allegations, the technical flaws were so serious and rampant that they gutted the effectiveness of Audience Pinpointer.  Moreover, Plaintiffs allege facts demonstrating that Defendants knew or recklessly disregarded the technical flaws plaguing Audience Pinpointer.  For example, Defendants attended meetings and received reports detailing: (i) the myriad of technical flaws wreaking havoc on Audience Pinpointer's effectiveness; (ii) rafts of complaints from customers experiencing declining returns on their ad spend after the Apple privacy changes in April 2021; and (iii) ad hoc fixes for complaining customers that utterly failed to address the source of the problems with Audience Pinpointer's algorithms and accuracy issues.

Plaintiffs allege Defendants omitted information that would have been material to investors deciding whether to invest in Unity or not.  Namely, the decision to invest would most likely be altered if investors had known: (i) that Audience Pinpointer, one of Unity's top ad monetization products, was riddled with technical flaws, including non-working algorithms causing inaccurate ad targeting; and (ii) that there were complaints from ad customers who were reducing ad spending with Unity or outright leaving for other ad competitors, including ironSource and Facebook.  ¶232.  As a result, profits were declining for Unity's ad solutions.

The Complaint also adequately pleads facts supporting a strong inference of scienter including: (i) Defendants' access to information and reports documenting the technical flaws with Audience Pinpointer and customer complaints regarding the tool, as corroborated by the CWs; (ii) Defendants' repeated specific statements that Unity was well-prepared for the IDFA changes due to its Audience Pinpointer tool; (iii) the importance of Audience Pinpointer to Unity's revenue

---

[3] Both Plaintiffs and the Unity Defendants have submitted a chart of the forty (40) false and misleading statements and omissions for the Court's convenience.  *See* Fox Decl., Appendix A and ECF No. 103-19.

[4] The Class Period runs from May 11, 2021 through May 10, 2022, inclusive.

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

generation in mobile advertising; (iv) highly suspicious and unusually timed stock sales by the Individual Defendants; and (v) the sudden decline in quarter-over-quarter revenue in the Company's Operate segment, beginning no later than a few months into the Class Period.

The Complaint also adequately pleads control person claims against the Private Equity Defendants based on allegations of, among other things: (i) large stock holdings; (ii) designated representatives on Unity's board of directors; and (iii) those designees' signature on financial statements alleged to be false and misleading.  This is sufficient to allege control at the motion to dismiss stage under Ninth Circuit law.  Moreover, control person claims are "intensely" factual and not appropriate for dismissal at this stage of the case.[5]

---

[5] Plaintiffs respectfully point out that the Unity Defendants' briefing appears to circumvent page limits in Local Rules 7-2 and 7-3 and this Court's Standing Order (¶IV.A.4) by using single-spaced footnotes in both its brief and the chart attached to the brief as Exhibit A.  *See S.F. Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1102, 1107 n.1 (N.D. Cal. 2022) (Davila, J.) ("The parties' briefs do not comply with the Court's Standing Order for Civil Cases ("Standing Order") in that all of the numerous footnotes, some of which exceed a paragraph in length, are single instead of double-spaced. See Standing Order, ¶ IV.A.4 ("Footnotes shall be ... double-spaced.").  The parties are advised that the Court will strike any future filings that do not comply with the Standing Order."); *see also Orshan v. Apple Inc.*, 2023 WL 3568079, at *1 n.2 (N.D. Cal. Mar. 31, 2023) (Davila, J.) ("The Court is disappointed that Apple's opposition to class certification and its two evidentiary briefs contain over 100 single-spaced footnotes, many of which are substantive and significant in length . . . Footnotes are not a tool for circumventing page limits. Apple is admonished that in future briefing, the Court expects it to exercise better judgment regarding footnotes and to adhere to the Court's Standing Order requiring footnotes to be double-spaced.").

4

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

## II.     FACTS

### A.     Unity's Structure and Advertising Business

On September 18, 2020, Unity conducted its initial public offering ("IPO") with a $13.7 billion valuation, selling 25 million shares of common stock at $52 per share. ¶37. Unity provides software developers with a platform to create and monetize their video games for mobile phones, computers, and game consoles, with a significant number of Unity-developed games operating on Apple's "iOS" operating system. ¶36. Unity focuses on providing real-time 3D development tools and services for creating and growing 2D, 3D, augmented and virtual reality experiences. *Id.*

During the Class Period, Unity derived its revenues primarily from two business segments: Create Solutions ("Create") and Operate Solutions ("Operate");[6] though, notably, Unity has reported financial losses every year since its founding in 2004. ¶¶35, 39-40. Unity has reported that, during the Class Period, it generated approximately 30% of its revenue from Create through subscription fees while Operate generated around 65% of Unity's revenue through ad placement within developers' games and revenue-sharing contracts with the developers. ¶42.

To generate revenue through ad placements, Unity relied upon its Unified Auction and Audience Pinpointer tools. ¶43. In brief, the Unified Auction allows advertisers to submit competing bids for placement on games developed on Unity's platform and, once the highest bidder's ad is placed, Unity splits the advertising fee with the developer whose game displayed the ad. ¶44. CW-2 stated that Unity was "tracking every penny from the ads business and would have been aware of declining revenue in that business" since there was no delay between the time of the transaction and the revenue split with the game developer. *Id.* Audience Pinpointer complemented the Unified Auction by allowing developers to acquire players based on a target return on their ad spend. ¶46. To achieve this return, Unity stated that Audience Pinpointer tracked users' activity through a machine-learning algorithm, analyzed their user data, and assigned a real-time lifetime value ("LTV") at the time of an ad request, which informed advertisers on how much to bid through the Unified Auction. *Id.* Put simply, if Audience Pinpointer assigned a user with a high LTV, which meant that

---

[6] In 2023, Unity renamed Operate as "Grow Solutions." *See* ¶40 n. 18.

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

user had a higher probability of engaging with the ad, the bid in Unified Auction would need to be higher than for a user with a lower LTV. *Id.*

For all advertisers, the most important metric is a high return on investment, or "ROI." ¶45. Thus, the advertisers on Unity's platforms expected that they would achieve a high ROI when using the Unified Auction, as informed by Audience Pinpointer. *Id.* Unity's ability to accurately track users' activity on their Apple phones and other devices was critical, so that the advertiser paid economically sensible prices for the ads they sent to users. *Id.* If Audience Pinpointer failed to assign an accurate LTV, the advertisers' ROI would fall, impacting Unity's share of the ad revenue too. ¶47. During the Class Period, advertisers saw declining ROI and scaled back their spending on Unity's platforms, as Audience Pinpointer failed to deliver for Unity's ad customers. *Id.*

**B.      Apple's Privacy Changes Upend Advertising Monetization for Companies Such As Unity Which Were Reliant on Tracking Data for Ad Placement**

In June 2020, Apple announced that new data privacy features would be included in a version of iOS in 2021, which would allow Apple device users to prohibit companies like Unity from tracking their data that had previously been obtained through Apple's Identifier for Advertisers ("IDFA"). ¶52. Introduced in 2012, IDFA assigns a unique, anonymous identifier to each mobile device to provide data to advertisers to use when placing ads by analyzing in-app events, showing whether users are responsive to ads or not. ¶¶48-49. Without IDFA, companies were forced to develop alternative tools to target users to preserve the ability to monetize through personalized advertising. ¶53. For instance, in 2020, Facebook announced that advertisers would lose approximately 50% of their revenue without personalized targeting and optimization. ¶54. The IDFA changes meant that publishers would have very little demographic data about the users who opted out of tracking and reduced visibility into key metrics that showed how ads drive conversions (like app installs and sales). ¶59. Accordingly, these changes kept publishers from receiving the data they needed to serve targeted ads, negatively impacting monetization. ¶60.

Recognizing that Apple's privacy changes would be "a major change" and "upend[] the mobile advertising industry[,]" Unity assembled an internal team in 2019, including Defendant Visoso, to prepare for the loss of IDFA data. ¶55. These preparations purportedly led to the

6

development of a contextual ad model—*i.e.*, one that tracked and analyzed users' behavior rather than their clicks—that did not rely on IDFA and ultimately became known as Audience Pinpointer. ¶57.

**C.    Unity Declares Loss of IDFA Data a "Competitive Advantage" for the Company**

Unity boasted that Apple's privacy change was a "competitive advantage" for the Company, because its Audience Pinpointer tool provided it with "true" and "positive [ROI]." ¶64. Unity's former CFO, Kimberly Jabal, declared on February 4, 2021, just before the Apple privacy changes went into effect, that Unity had, "honestly for years, [] been preparing for this." ¶66. Jabal added, "We knew that this risk -- that this was a risk and that this moment could come." *Id.* Unity implemented Audience Pinpointer throughout its platform once the Apple IDFA changes went into effect in April 2021, even though the tool had been in beta testing with only a few customers using it. ¶¶57-58. As CW-2 explained, Audience Pinpointer was "absolutely rushed" to market and that the rush to market prevented Unity from being able to "pressure test" Audience Pinpointer. ¶107.

**D.    The Loss of IDFA Data Led to Reliance by Unity on Audience Pinpointer Which Was Rolled Out Before It Was Ready**

CWs reveal that Unity was struggling to grapple with the loss of IDFA. CW-3 recalled that in February 2021 Audience Pinpointer had problems, which were discussed during biweekly meetings led by Operate's Senior Vice President of Engineering, Jeff Collins. ¶103. CW-3 said that Collins collaborated closely with Defendant Lestiyo and communicated frequently with Defendant Riccitiello. ¶104. Then, once the IDFA changes went into effect in April 2021, CW-4 confirmed that Apple's privacy changes had a "huge impact" on the industry, forcing it to "completely rethink" how to handle advertising since the loss of IDFA data meant they no longer had visibility to administer personalized ads. ¶94. Similarly, CW-3 recalled that the loss of IDFA data was recognized within Unity as being "terrible" and caused "panic." ¶95.

CW-2 stated that, with respect to customer complaints, there was a "tonal shift" following the broader use of Audience Pinpointer. ¶106. According to CW-2, customer feedback previously contained a combination of positive and negative sentiment, but after Audience Pinpointer was launched more broadly customer feedback was exclusively negative. *Id.* CW-2 recalled customers of all sizes were complaining following the broader use of Audience Pinpointer and that there was a

7

"massive," "fivefold" increase in complaints. *Id.* CW-2's team prepared monthly reports, as well as ad hoc reports, detailing customer complaints that were sent to Defendant Lestiyo and other members of management. ¶109. During his tenure, CW-2 attended weekly or biweekly, hour-long meetings with Defendant Lestiyo and Jules ("Julie") Shumaker that focused exclusively on the ads business. ¶108. Yet, despite this focus, CW-2 says complaints about Audience Pinpointer were "sent into the abyss." ¶109.

Similarly, CW-1 recounted that his team created a "sentiment analysis" for customers that showed "significant" low customer sentiment beginning in May/June 2021. ¶¶111-12. CW-1 explained that some of the issues detailed in complaints from customers involved things not working within Operate, algorithms not performing as intended or not matching up, and the system itself not working properly. ¶112.

**E.    Unity Is Unable to Fix Audience Pinpointer In the Face of Widespread Customer Complaints**

Despite receiving customer complaints following implementation of the IDFA changes and Audience Pinpointer's failures, CW-1 explained that nobody at Unity "synthesized" the data and instead teams focused narrowly on their respective customers' problems. ¶116. When CW-1 and his team compiled all the customer complaint data and prepared a monthly report titled "Monthly Customer Insights," they sent those monthly reports to Defendant Lestiyo and Felix The (then-VP Product Management – Operate Solutions) also received the reports. ¶¶118-19.

CW-1 relayed that in September/October 2021 the algorithms responsible for showcasing ads on games had "backfired" and the algorithms "stopped working." ¶113. Regarding individual complaints, CW-3 recalled that there was a structure for accountability on these customer complaint projects, attended to by site reliability engineers ("SREs"). ¶¶121-22. Part of this structure included reports with a white, yellow, red, and green color scheme for upper management, including Defendant Lestiyo to review. ¶123.

**F.    Audience Pinpointer's Repeated Failures Cause Unity to Lose Customers and Revenues in Its Operate Segment**

According to CW-1, the failure of Audience Pinpointer to adequately address the post-IDFA landscape for ad placement led to "a lot" of Unity clients migrating to competitors, including

8

ironSource and Facebook. ¶124. CW-2 relayed that it was "impossible" that Unity was not aware of declining revenue growth in Operate during the Class Period because the Company was "tracking every penny," that Defendant Lestiyo was aware due to the meetings she attended and reports she received, and that Unity could have informed "the street" (*i.e.*, investors) about the ad placement problems as it was occurring but chose not to do so. ¶125.

Indeed, no later than July 2021, Unity's quarter-over-quarter revenue plunged from 25% to 1%, eventually becoming negative in the first quarter of 2022. ¶221. This slowdown continued throughout the rest of the Class Period with revenue growth turning negative in Q1 2022:

| Fiscal Quarter | Operate Revenue | Growth from prior Q |
|---|---|---|
| Q4 2020 (Oct. 2020 to Dec. 2020) | $134.2M | 12% |
| Q1 2021 (Jan. 2021 to Mar. 2021) | $146.6M | 9% |
| Q2 2021 (Apr. 2021 to June 2021) | $182.9M | 25% |
| Q3 2021 (July 2021 to Sep. 2021) | $185.0M | 1% |
| Q4 2021 (Oct. 2021 to Dec. 2021) | $194.6M | 5% |
| Q1 2022 (Jan. 2022 to Mar. 2022) | $184.0M | -5% |
| Q2 2022 (Apr. 2022 to June 2022) | $158.5M | -14% |

**G.    To Mask Falling Operate Revenues During the Class Period, Unity Goes on an Acquisition Spree**

As Apple's changes to IDFA roiled the mobile advertising market, including at Unity, the Company went on an acquisition spree to acquire revenue to mask the problems created by Audience Pinpointer's ongoing failings and poor accuracy. ¶¶133-40. During the Class Period, Unity acquired at least seven companies for both its Create and Operate segments. *Id*. Yet, even insiders at the Company knew that these acquisitions were nothing more than show, as CW-1 related that a "proper effort" was not made to integrate these acquisitions, as data was siloed at Unity following these acquisitions. ¶¶126-27. CW-1 viewed the acquisitions as geared to "get our [Unity's] share [price] up" while they "shunned" internal problems. ¶127.

## H.    The Truth Emerges and Unity's Stock Price Plummets 37%

On May 10, 2022, in a press release for its Q1 2022 earnings, Unity revealed the truth about Audience Pinpointer's failures when it disclosed weakening Operate trends that the Company expected to last through the remainder of 2022.  ¶193.  During the Q1 2022 earnings call that same day, Defendant Riccitiello stated that Audience Pinpointer's problems were related to two independent issues: (1) a "revenue expensive" coding issue caused by "a fault in our platform"; and (2) the ingestion of "bad data from a large customer."  ¶194.  Later during the call, Riccitiello revealed that Defendants had "spent a fairly substantial amount of time" addressing the Audience Pinpointer problems and disclosed that "one of the early signals [of trouble] we saw was we saw less revenue."  ¶195.  Defendant Lestiyo then added further detail, stating that "it's a combination of different things that reduced the accuracy for our Audience Pinpointer" and that "we experienced []several incidents that impacted our data set," with "one specific example of that – exactly, is that we set a large amount of that data from a customer."  ¶196.

Analysts reacted negatively and many cut their one-year price target for Unity on account of the revelation of the failings of Audience Pinpointer and its deleterious impact on Unity's Operate business.  ¶199.  Oppenheimer deemed the Audience Pinpointer failings "unforced errors," while Wedbush characterized it as a "self-inflicted wound" causing "unacceptable error levels."  ¶199(a)-(b).  Barclays cautioned that the "issues around the accuracy of the Audience Pinpointer tool" was among the "[n]egative [i]tems [t]o [m]onitor" at Unity.  ¶199(c).  As a result of the news that Audience Pinpointer failed to assist Unity to provide high ROI to its customers following the IDFA changes, Unity's stock price plummeted $17.83 per share, down a massive 37%, from a close of $48.13 per share on May 10, 2022, to $30.30 per share on May 11, 2022.  ¶201.

## I.    Unity Acquires Its Competitor ironSource, Rather Than Revamp Audience Pinpointer

Before Defendants' announcement in May 2022 regarding Audience Pinpointer's failures revealed the truth of the struggles Unity faced following the implementation of Apple's IDFA changes, executives from Unity, including Defendant Lestiyo, began merger talks with one of Unity's largest competitors in the mobile advertising market, ironSource Ltd.  ¶¶141-42. Throughout the

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

weeks surrounding the May 10, 2022, disclosure, Unity management met with ironSource executives and entered into a mutual nondisclosure and confidentiality agreement on May 17, 2022, mere days after revealing that Audience Pinpointer was not working properly and Unity would not recover (from a revenue standpoint) for the remainder of 2022.  ¶¶143-44.  Ultimately, Unity agreed to merge with ironSource, announcing a $4.4 billion all-stock agreement on July 13, 2022.  ¶146.  The deal closed on or about November 7, 2022.  ¶146.

The market viewed Unity's merger with Unity as a remedial measure to improve Unity's ad targeting capabilities following the failures of Audience Pinpointer. For example, upon the deal's announcement, Benchmark analyst Michael Hickey dubbed the Unity-ironSource tie-up a "classic coverup deal" whereby Unity "acquire[s] a company that does much of the same thing and change[s] the narrative."  ¶16.  Meanwhile, Bloomberg analyst Eileen Segall noted that "IronSource may improve Unity's capabilities in advertising technology — a bigger contributor to revenue than the core tools-subscriptions business . . . amid pressure on walled gardens due to Apple's recent changes to Identifier for Advertisers, which give advertisers fewer signals for targeting."  ¶204.

Indeed, even within Unity, the ironSource merger was viewed as a white flag that Audience Pinpointer had failed.  CW-2 explained that following the Audience Pinpointer issues, the acquisition of ironSource was a "wag the dog" and a "bait and switch," stating that the Company purchased another ads business so that they could "sunset" or bury their screw-up product (Audience Pinpointer), rather than try to fix it and instead could rely on ironSource's ads products.  ¶132.  CW-2 stated that the ironSource merger was all about getting the ads business back on track.  *Id.*

## III.    ARGUMENT

On a "motion to dismiss a § 10(b) action, courts must . . . consider the complaint ***in its entirety***."  *Tellabs Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  The Court must "accept[] the plaintiff's allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 729 (N.D. Cal. 2022) "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings[.]"  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).  "Even under the [PSLRA], plaintiffs are only required to plead

11

facts, not to produce admissible evidence." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). Dismissal is inappropriate "unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

### A. Plaintiffs Have Adequately Alleged Falsity

Section 10(b) and Rule 10b-5 make it "unlawful . . . [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). Further, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). "[O]nce defendants cho[o]se to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

Statements are evaluated through a fisheye, not a telescope. *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021). "Words, after all, cannot be viewed in complete isolation" but must instead be "read in light of all the information then available to the market" to decide if they "conveyed a false or misleading impression." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991). Indeed, a statement may not "ignor[e] the proverbial elephant in the room." *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *11 (C.D. Cal. July 3, 2023). Accordingly, statements "literally true on their face may nonetheless be misleading when considered in context." *Miller*, 519 F.3d at 886. Therefore, circumstance, setting, and even manner of presentation all matter. *Vaxart*, 576 F. Supp. 3d at 670 (citing *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)).

12

"[W]hether a public statement is misleading . . . is a mixed question to be decided by the trier of fact," *In re STEC Inc. Securities Litigation*, 2011 WL 2669217, at *9 (C.D. Cal. June 17, 2011), and may not be resolved as a matter of law unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ," *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018). Otherwise, "at the motion to dismiss stage the Court draws a reasonable inference that Plaintiffs' interpretation of [a statement] is correct." *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 n.2 (C.D. Cal. Aug. 4, 2017). The Complaint meets these standards.

> **1.  Defendants' Statements During the Class Period About Audience Pinpointer Were Materially False and Misleading Because They Omitted to Disclose That Audience Pinpointer Was Experiencing Serious Technical Flaws, Reducing Its Accuracy Throughout the Class Period**

The Complaint adequately pleads that Defendants made materially false statements and omissions during the Class Period regarding Audience Pinpointer's effectiveness because they omitted to disclose the ongoing technical flaws plaguing Audience Pinpointer's performance and threatening a main source of Unity's revenues. In their Motion, the Unity Defendants misstate Plaintiffs' case theory to fit a narrative that favors them through two principal fabrications. First, Defendants argue that during the Class Period they did not know about the two exact problems with Audience Pinpointer that they revealed to market on May 10, 2022. DB at 9. Second, Defendants contend that none of the CWs claim that Unity was "experiencing significant challenges with Audience Pinpointer during the Class Period." DB at 9. The Court should reject Defendants' attempt to find refuge through cherry-picking isolated allegations from the Complaint.

First, far from describing a problem only in the weeks leading up to Unity's May 2022 disclosure or prior to the Class Period, the CWs cite myriad technical problems with Audience Pinpointer, both before and during the Class Period. In fact, Defendants' own cited authority supports Plaintiffs' use of pre-class period allegations from CWs because "allegations detailing Defendants' pre-class period conduct are material to Plaintiff[s'] contention that Defendants[] knew the statements made during the class period were false." *See In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1065 n.1 (N.D. Cal. 2002) (cited in DB at 9); *see also In re Invision Techs., Inc. Sec. Litig.*, 2006 WL 538752, at *2, n.1 (N.D. Cal. Jan. 24, 2006) ("To the extent that these [pre-class period]

13

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

statements are used to demonstrate the truth or falsity of Class Period statements, they are relevant."). The Complaint cites reports from CWs 1-3 regarding technical problems and customer complaints regarding Audience Pinpointer:

| CW | Date | Audience Pinpointer Technical Problems/Customer Complaints (with cite to Complaint) |
|---|---|---|
| 1 | November 2020 | "CW-1 recalled that, in November 2020, and after speaking with internal stakeholders and reviewing issues, he identified problems within Unity's Operate segment including its ads business.  CW-1 described Unity's data in Operate as 'definitely unclean' and 'in such a bad way.'" ¶92. |
| 1 | November/December 2020 | "According to CW-1, in November or December 2020, he realized Operate did not have visibility into: (i) its sales pipeline; or (ii) a holistic view of revenue by customer across all Operate products." ¶100. |
| 1 | Summer 2021 | "CW-1's team presented to Defendant Lestiyo, Jules Shumaker, and approximately 100 employees on the Customer Success side an analysis they had prepared regarding cross-selling products within the Operate segment." ¶110. |
| 1 | May/June 2021 - September/October 2021 | "According to CW-1, he and his team had created a 'sentiment analysis' program for customers which showed 'significant' low customer sentiment 'for a while.'  Specifically, CW-1's team conducted a review of complaints in September or October 2021 that involved manually reviewing thousands of customer complaint tickets from approximately May or June 2021 through the following three months, to help train the machine learning portion of the ad tool." ¶111. |
| 2 | Rollout of Audience Pinpointer to all customers | "According to CW-2, his team was immediately seeing customer complaints that Audience Pinpointer was not working." ¶105. |
| 2 | Rollout of Audience Pinpointer to all customers | "CW-2 recalled a 'tonal shift' following the broader use of Audience Pinpointer.  According to CW-2, customer feedback previously contained a combination of positive and negative sentiment, but after Audience Pinpointer was launched more broadly customer feedback was exclusively negative.  CW-2 recalled issues coming from customers of all sizes, from SMB (small and medium-sized businesses) to Enterprise customers.  According to CW-2, Unity was witnessing a 'massive' increase in complaints which he recalled increased 'fivefold.'  CW-2 confirmed that profits were declining for ad solutions as customers complained about issues with the 'accuracy' of the Audience Pinpointer tool which was not working as intended." ¶106. |
| 3 | February 2021 | "CW-3 recalled hearing in February 2021 that Audience Pinpointer had problems.  CW-3 confirmed that in February 2021, he attended |

14

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

| CW | Date | Audience Pinpointer Technical Problems/Customer Complaints (with cite to Complaint) |
|---|---|---|
| | | an all-hands engineering team status meeting . . . during which the Audience Pinpointer problems were discussed[.]" ¶103.[7] |

Additionally, during the revelation of the fraud on May 10, 2022, Defendants Riccitiello and Lestiyo made admissions that underscored the two problems identified that day were not the only problems Audience Pinpointer encountered, as the CW accounts corroborate. First, Defendant Riccitiello revealed that Defendants had "spent a fairly substantial amount of time" addressing the Audience Pinpointer problems and disclosed that "one of the early signals [of trouble] we saw was we saw less revenue." ¶195. Defendant Lestiyo then added further detail, revealing the depths of Audience Pinpointer's problems went beyond the ingestion of bad data from a single customer because "it's a combination of different things that reduced the accuracy for our Audience Pinpointer" and that "we experienced [] several incidents that impacted our data set[.]" ¶196.

### 2. Defendants Had a Duty to Disclose Information About Audience Pinpointer's Flaws That Led to Reduced Accuracy When Defendants Spoke About the Features and Effectiveness of Audience Pinpointer

As detailed in the Complaint, Defendants made numerous statements claiming that Audience Pinpointer and Unity's "contextual" model helped its customers navigate mobile advertising following Apple's changes to IDFA, while omitting to disclose that Audience Pinpointer was experiencing a multitude of problems, therefore "significantly alter[ing] the total mix of information available for decision[-]making by a reasonable investor." *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021). For example, on August 10, 2021, Defendant Riccitiello touted the importance of Audience Pinpointer to Unity's ad customers:

> [W]e've got tools like Audience Pinpointer that allows advertisers to find what ROAS they'd like to target or based on retention or IAP or ad revenues, so they can get a

---

[7] Defendants argue that because CW-3 reported that one problem was resolved in two weeks, it cannot possibly show that their statements were false; however, this argument ignores Plaintiffs' allegations that many problems plagued Audience Pinpointer, and CW-3's February 2021 account is just one of many.

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

guaranteed return regardless of what's happening or changes in attribution. That's what we are delivering."

¶163 (Statement 17). That same day, Defendant Visoso also touted Audience Pinpointer's purported successful performance following the IDFA changes by attributing "really strong" "spending across our platform" to the tool, saying, "the reason for that is our contextual models, which actually do not rely on IDFA, [were] working very well." ¶164 (Statement 20).

Such statements were false and misleading, even if technically true, because they omitted any mention of the failures of Audience Pinpointer that prompted "thousands" (¶111) of customer complaints to flood Unity and become a drag on the Company's most important revenue stream. *See Crews*, 2023 WL 4361098, at *13 (finding statements misleading by omission where they "painted a misleading picture by misidentifying and omitting the most important factor" to a company's revenue generation).

As enumerated above, Plaintiffs' allegations are supported by the CW statements detailing problems with Audience Pinpointer <u>throughout the Class Period</u>, weakness in Unity's ad business following the Apple privacy changes to IDFA, and rafts of customer complaints regarding the problems plaguing their advertisements on the Unity platform. The CWs also detail recordkeeping, internal documentation, and presentations detailing the failures of Audience Pinpointer and its deleterious impact on Unity's ad business. This is similar to the statements the court found misleading by omission in *Homyk v. ChemoCentryx, Inc.*, where the defendants' omissions "would lead a reasonable investor to believe" there were not "particular concerns" with their product even though defendants had received notice of such concerns. 2023 WL 3579440, at *11 (N.D. Cal. Feb. 23, 2023).

When, as here, a complaint alleges a discrepancy between executives' positive statements and the internal truth, the requirement for alleging an actionable statement or omission is met. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1020 (9th Cir. 2005) ("Such discrepancy between what [company] executives reported and the allegedly true state of affairs . . . state[s] a claim under 10(b)."); *Turocy*, 2017 WL 3328543, at *10 ("[T]he known causes of the declines were brushed off, minimized, or omitted altogether."). In the Ninth Circuit, "once defendants choose to tout positive information to

16

the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information." *Schueneman*, 840 F.3d at 706; *see In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 797 (9th Cir. 2017) ("The . . . allegations suggest that, regrettably for the investors who bought [the] stock, [the company] hid the ball."). Accordingly, the Court should find that Plaintiffs have alleged facts sufficient to support their contention that at the time Defendants made their statements to investors that Audience Pinpointer – and therefore Unity as a whole – was performing well, despite ongoing technical flaws and customer complaints which were well documented internally, such statements created an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1042 (N.D. Cal. 2018); *see also ChemoCentryx*, 2023 WL 3579440, at *14 (finding a reasonable investor told that the benefit-risk or safety profile of a drug was favorable or stronger than another treatment would assume the trial design could support such analysis and the speaker's proposed interpretation had not been undermined by the regulator overseeing the trial).

Defendants argue that the alleged false and misleading statements were "not 'necessarily inconsistent' with the existence of technical flaws," in a section of their brief bereft of meaningful legal authority. DB at 11-17. Putting aside that Defendants advance no legal support for their flawed argument, Plaintiffs adequately allege the falsity of Defendants' statements regarding the effectiveness of Audience Pinpointer, the strength of Unity's business following implementation of the IDFA changes, Unity's preparations for the IDFA changes, and Unity's relationship with its customers because they omitted facts that rendered these statements "misleading to a reasonable person reading [or hearing] the statement fairly and in context." *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 779 (9th Cir. 2023). Defendants misstate that because Unity exceeded its revenue guidance and Operate's revenue grew at some points during the Class Period, during the period of alleged fraud, there must have been no cover-up of Audience Pinpointer's persistent failings. DB at 13. But as discussed above, Unity went on an acquisition spree during the Class Period, which also could have contributed to revenue growth as the Company became larger. Relying on a single and inapposite case, which concerned allegations that a company misled investors about the timeline for improvements to fix a ***publicly disclosed*** software bug in an advertising

17

software program (*see In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 881 (N.D. Cal. 2010)), Defendants ignore that their present tense misrepresentations of the strength of Unity's business, which was heavily dependent on the effectiveness of Audience Pinpointer, misled investors by failing to disclose the ongoing problems plaguing the tool and, by extension, threatening the Company's most significant source of revenue: advertisements in mobile apps.

### 3. Defendants' Boilerplate Arguments That Many Of The Alleged Misstatements Are Puffery, Vague, or Aspirational Fail

In the Ninth Circuit, "even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.,* 865 F.3d at 1143. Indeed, "taking a few of Plaintiffs' allegations out of context and labeling them as puffery is not sufficient to undermine Plaintiffs' detailed allegations." *In re BofI Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *9 (S.D. Cal. Sept. 27, 2016). "Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact." *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1054-55 (N.D. Cal. 2018) (Davila, J.) (declining to dismiss factual statements regarding certain aspects of defendant's business as nonactionable puffery). A court should "only grant Defendants' motion to dismiss on the ground that the statements are puffery only if it concludes that the statement is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014).

When viewed in context, the Defendants' statements about Unity's preparedness for the IDFA changes and the effectiveness of Audience Pinpointer's technical capabilities "went beyond feel good optimistic statements" and were important to investors. *See Quality Sys.*, 865 F.3d at 1144 (holding statements concerning growth pipeline were material). In fact, the alleged misstatements provided actionable "concrete descriptions of the past and present in the form of factual statements about" Audience Pinpointer's performance. *See ChemoCentryx*, 2023 WL 3579440, at *16; *see also In re BioMarin Pharms. Sec. Litig.*, 2022 WL 164299, at *12 (N.D. Cal. Jan. 6, 2022) (statements were not "empty opinions similar to puffery" where "they were undergirded by factual assertions"). Such statements are not "so obviously unimportant" as to warrant dismissal. *Mulligan*, 36 F. Supp. 3d at

18

966-67 (noting determination of "whether a given statement is material entails fact-intensive assessments that are more properly left to the jury").

For example, on August 10, 2021, Defendant Visoso stated that "[o]ur advanced analytics, context and insights are proving to be a competitive advantage" (¶161 (Statement 14)) even though Unity's quarter-over-quarter revenues had already started to fall and, as corroborated by the CWs, "thousands" (¶111) of customer complaints were coming into Unity regarding the failings of the ad monetization platform. That same day, Defendant Visoso declared that "spending across our platform was really strong" and "the reason for that is our contextual models, which actually do not rely on IDFA, [were] working very well." ¶164 (Statement 20). Similarly, on November 9, 2021, Defendant Riccitiello said of Unity's ad monetization platform: "Ours is a better way to monetize even absent the changes that were introduced by Apple with IDFA and choice [around] privacy." ¶172 (Statement 27). Additionally, Defendant Lestiyo also made demonstrably false statements regarding the effectiveness of Unity's contextual ad placement model, claiming on February 3, 2022 that "[w]e have deep, deep context about game play, what the players like to play, when and how they play the game. And in gaming, that has proven to be the most relevant data for advertising." ¶180 (Statement 34). Yet, by this time, customers had been complaining for nearly a year about the ineffectiveness of Unity's ad placement post-IDFA changes, as detailed by the CW accounts, and Unity's quarter-over-quarter revenue had been falling for four quarters and was negative.

Defendants broadly recast the preceding misstatements and many others as not "objectively verifiable." DB at 17-19. This is not so. Defendants' cited authority does not counsel otherwise as it is inapposite. For instance, Plaintiffs' allegations that it was false for Defendants to claim "our contextual model [*i.e.,* Audience Pinpointer] . . . is working well" (¶150 (Statement 1)) stands in stark contrast to the inactionable statement that the Company was "growing extremely well" in *In re Solarcity Corp. Sec. Litig.* because here the contextual model was critical to the performance of Unity following the IDFA changes. 274 F. Supp. 3d 972 (N.D. Cal. 2017). Similarly, Unity's statement regarding the "customer feedback we're getting is very strong" (¶152 (Statement 3)) is belied by the CW accounts of a flood of customer complaints about Audience Pinpointer after it was rolled out on the Unity platform, thereby distinguishing the facts here from those in *Wozniak v. Align Technology,*

19

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

*Inc.*, where a key fact for the court finding the statements inactionable was that the feedback was in response to a "pilot launch," "limited release," and "market study."  850 F. Supp. 2d 1029, 1036-37 (N.D. Cal. 2012).  Unity's rollout of Audience Pinpointer during the Class Period was far from a "limited release," as the Company claimed it was the key to successful ad monetization following Apple's changes to IDFA.  Finally, Defendants' statements are not corporate optimism like in *Brodsky v. Brodsky v. Yahoo! Inc.,* 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008) where the court found statements that the company "was well positioned to succeed" inactionable because, here, Defendants tied their prospects for success directly to Audience Pinpointer, so the statements were not general (*see, e.g.*, ¶150 ("our contextual model … is working well") (Statement 1)).

Additionally, the statements regarding Unity's preparedness for the IDFA changes stand in stark contrast to the statements that were found vague inactionable in *Alphabet,* which concerned compliance with wide-ranging European data protection laws pursuant to the GDPR.  1 F.4th at 708-709.  In this case, Defendants' misstatements concerned a specific and critical aspect of the mobile advertising industry – IDFA – and Unity's ability to assist its customers in overcoming the disadvantages Apple's IDFA changes ushered into mobile advertising for its customers.  Such statements regarding Unity's ability to assist its customers, when in fact it was not in a position to do so, are not vague or aspirational because they are objectively verifiable, unlike the vague statements in *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, which concerned the company's goals for its ethical conduct, an inherently unverifiable concept subject to reasonable debate.  845 F.3d 1268, 1278 (9th Cir. 2017).

### 4. Defendants' Revenue Guidance Statements Are Actionable

Defendants incorrectly argue that two of the alleged misstatements are not false because they are protected by the PSLRA's Safe Harbor (15 U.S.C. § 78u-5(c)(1)) for forward-looking statements and accompanied by meaningful cautionary language.  DB at 19 n.10 (Statement Nos. 10 and 28).  This argument is wrong on several fronts.

First, Defendants ignore that the two statements are "mixed" statements that include embedded representations of present fact, which are not protected.  *Quality Sys.*, 865 F.3d at 1142; *ChemoCentryx*, 2023 WL 3579440, at *17-18.  Defendants "may not transform non-forward-looking

20

statements into forward-looking statements . . . by combining non-forward-looking statements about past or current facts with forward-looking statements[.]" *Quality Sys.*, 865 F.3d at 1141.

The statement "our strong performance <u>gives us confidence</u>" (¶159 (Statement 10)) is a present tense statement. Similarly, Unity's "business momentum <u>coupled with</u> the quality of [its] innovation plans" (¶176 (Statement 28)) is also a present tense statement. These statements about the present are not protected by the PSLRA's Safe Harbor. *See ChemoCentryx*, 2023 WL 3579440, at *17 (finding "statements mix future-looking statements with concrete assertions regarding the results of the [drug] trial" and were actionable); *QuantumScape,* 580 F. Supp. 3d at 736-37 (a statement that "may seem to be forward-looking because it responds to a question about [] ***future sustainability advantage*** . . . in reality, [] contains an express or implied concrete assertion concerning a specific current or past fact").

Second, the forward-looking portions of these statements were not accompanied by meaningful cautionary language. DB at 19 n.10 (citing Defs.' Ex. 2, Defs.' Ex. 5). "To be adequate [], the caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to ***nil***.'" *QuantumScape*, 580 F. Supp. 3d at 737. Thus, "it must 'precise[ly]' and 'directly address' the alleged misrepresentations." *Id.* "Risk disclosures that speak entirely of as-yet-unrealized risks and contingencies, and do not alert the reader that some of these risks may already have come to fruition, can mislead reasonable investors" and are thus insufficient. *Alphabet*, 1 F.4th at 703. Here, none of the risk disclosures are "targeted or tailored" to the failure of Unity's contextual advertising model tool, Audience Pinpointer, but are "geared toward more general concerns[.]" *See BioMarin*, 2022 WL 164299, at *8. Accordingly, the cautionary language Defendants cite is not meaningful.

Finally, the Complaints pleads that Defendants had actual knowledge of information establishing falsity. Thus, the statements cannot qualify for protection under this prong. *See infra*, §III.B.1-3; *BioMarin*, 2022 WL 164299, at *8 (finding same). Accordingly, the Court should reject Defendants' argument that the PSLRA's Safe Harbor protects certain statements.

21

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

### 5.    Contemporaneous Analyst Reports Confirm Plaintiffs' Interpretation of Defendants' Statements

Plaintiffs detail contemporaneous reporting by analysts that demonstrate the market interpreted Defendants' alleged misstatements in the same manner that Plaintiffs allege in the Complaint. *See STEC*, 2011 WL 2669217, at *8 ("Particular statements made by analysts underscore the plausibility and reasonableness of the false impression that [p]laintiffs allege [d]efendants' statements conveyed."); *see also In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *12 n.10 (S.D.N.Y. Apr. 22, 2016) (statements more than corporate optimism where they "could and did mislead a number of reasonable investors, as evidenced by the comments of analysts").

For example, on May 12, 2021, following the implementation of Apple's IDFA changes and Unity's insistence it was well-positioned to succeed in a post-IDFA world, analysts at D.A. Davidson wrote that "[Unity] is doing a good job at mitigating the impact from IDFA deprecation[,]" while analysts at William Blair wrote that "Unity can more effectively generate value through outcome-based ad campaigns."    ¶¶155(a)-(b).    Furthermore, three months later, following similar representations from Unity, analysts at Credit Suisse declared that "Unity is emerging as a net beneficiary of IDFA," and D.A. Davidson wrote that Unity would "successfully navigat[e] the sea of uncertainty in the market that was created by the privacy changes in iOS." ¶¶167(a), (c).  Likewise, in February 2022, analysts continued to herald Unity's claims that its ad monetization business was not impacted by the IDFA changes because of its contextual ad tool, Audience Pinpointer, as BTIG wrote that "IDFA remains a tailwind with budget share shifting to Unity[,]" and D.A. Davidson dubbing Unity "a net winner in this post IDFA era." ¶¶181(c)-(e).

These analyst reports and others cited in the Complaint show that Defendants led investors believe that Unity's supposed competitive advantage following implementation of Apple's IDFA changes protected it from the monetization pressures its competitors faced, even as Defendants concealed ongoing technical flaws in Audience Pinpointer, received customer complaints about Audience Pinpointer's waning effectiveness, and pursued a merger with competitor ironSource.

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

### B.    Plaintiffs Have Adequately Alleged a Strong Inference of Scienter

Scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705.  In this Circuit, "[r]ecklessly turning a blind eye to impropriety is equally culpable conduct under Rule 10b-5." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012).  Said differently, one "is reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010).

When analyzing scienter, the court must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310; *see also S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("*Tellabs* counsels us to consider the totality of the circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."). The inference of scienter "need not be irrefutable . . . or even the most plausible." *Tellabs*, 551 U.S. at 324.  Nor must the inference of scienter be "of the smoking-gun genre." *Id*.  Rather, "it must be cogent and at least as compelling as any opposing inference." *Id.* at 314.  "In other words, the tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal Aug. 4, 2014).  And, because it is "rare that a wrongdoer will admit to the required state of mind," scienter "can be proven and pled through circumstantial evidence." *See In re Network Assocs., Inc., Sec. Litig.*, 2000 WL 33376577, at *8 (N.D. Cal. Sept. 5, 2000) ("PSLRA calls for a strong inference, not an outright confession or an airtight case at the pleading stage.").  The Complaint readily satisfies these standards and pleads Defendants' scienter based on many of "the same" facts that "show falsity," as discussed above. *QuantumScape*, 580 F. Supp. 3d at 741 ("falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts").

#### 1.    Defendants Had Access to Information That Rendered Their Public Statements Misleading

Defendants Riccitiello, Visoso, and Lestiyo had access to the undisclosed information that rendered their statements misleading, thereby raising a strong inference of scienter.  Defendant

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

Lestiyo participated in meetings that specifically discussed the ads business, Defendant Visoso was part of a task force tasked with responding to the loss of IDFA data, and Defendant Riccitiello frequently made statements about Audience Pinpointer and how it was able to work without IDFA data.  The Ninth Circuit instructs that "[t]he most direct way" to show scienter is through allegations of "contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004); *see also Quality Sys.*, 865 F.3d at 1145 ("[P]articularized allegations that defendants had actual *access* to the disputed information . . . raise a strong inference of scienter.") (ellipsis in original); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) ("[E]ven if [the CEO and Board Chairman] were not directly involved in these negotiations, they were either aware or should have been aware of this materially relevant business information.  And if for some reason they were not, . . . as leaders of the company, both [defendants] had access to it and could have sought it out.").  The CW accounts describe that the Audience Pinpointer problems were well known throughout the Company, which further supports an inference of scienter.  *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009) (finding inference of scienter where undisclosed practices "were well known throughout the Company").

Such allegations are precisely the sort that the Ninth Circuit has credited in finding a strong inference of scienter.  *See Nursing Home Pension Fund*, 380 F.3d at 1231 (finding allegations of former employees that defendants reviewed negative sales data, data showed "major slowdown in sales," and western business "went dead" adequately alleged scienter).  Meanwhile, courts in this District have repeatedly rejected defendants' demands that a plaintiff plead more granular data from internal reports at the motion to dismiss stage.  *See, e.g.*, *Shenwick v. Twitter*, 282 F. Supp. 3d 1115, 1137 (N.D. Cal. 2017); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *8 (N.D. Cal. Jan. 19, 2017); *In re Intuitive Surgical Sec. Litig.*, 2014 WL 7146215, at *5 (N.D. Cal. Dec. 15, 2014).  At a minimum, these allegations reflect deliberate recklessness, which is evidenced "if [a defendant] had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *See Oracle*, 627 F.3d at 390; *see also City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022

24

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

WL 4491093, at *10 (S.D. Cal. Sept. 27, 2022) (finding allegations that high level officers with "access to material information available to them but not to the public" supports an inference at the pleading stage that Defendants were aware of product's shortcomings despite touting its purported success).

### 2. The Specificity of Defendants' False Statements Supports Scienter

Defendants' specific misstatements about matters they purportedly knew about strongly supports an inference of scienter.

Indeed, Defendants made statements about Unity's ability to effectively earn revenue with its Audience Pinpointer ad monetization tool following Apple's IDFA changes. For example, on August 11, 2021, Defendant Riccitiello claimed, "we've got tools like Audience Pinpointer that allows advertisers to find what ROAS they'd like to target or based on retention or IAP or ad revenues, so they can get a guaranteed return regardless of what's happening or changes in attribution." ¶163 (Statement 17)). Similarly, that same day, Defendant Visoso said, "our contextual models, which actually do not rely on IDFA, [were] working very well." ¶164 (Statement 20). Likewise, Defendant Lestiyo touted her knowledge about the "deep, deep context" Unity gleaned about its users through its "contextual approach" (*i.e.*, Audience Pinpointer) that has "proven to be the most relevant data for advertising." ¶180 (Statement 34).

As the Ninth Circuit has explained, where defendants make misstatements about specific matters they purport to know, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [they] had access to [the] information [they] discussed publicly." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014). This is particularly true here. *See VeriFone*, 704 F.3d at 708 ("public statements celebrating the merger as an unprecedented success" support scienter); *ChemoCentryx*, 2023 WL 3579440, at *19 (scienter where CEO repeatedly discussed drug trials and data "in detail" with investors throughout the Class Period and "opin[ed] on the significance of particular data"); *Shenwick*, 282 F. Supp. 3d at 1147 (actual access inferred when defendants "referenc[ed] the data directly"); *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (defendants "boasted that GoPro closely tracked its inventory"). The Court should find that

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

Defendants' statements regarding their knowledge of Unity's contextual model and its purported success following the implementation of changes to the IDFA contribute to an inference of scienter.

As detailed above, the Individual Defendants were acutely aware of and well attuned to the impacts of Apple's IDFA changes and the waning effectiveness of Unity's Audience Pinpointer tool; yet, Defendants repeatedly assured investors that Audience Pinpointer was insulated from the post-IDFA changes and Unity's ad monetization business remained immune from those changes as they roiled competitors' such as Facebook and ironSource. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) ("[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate . . . is classic evidence of scienter."); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) ("denials demonstrate, at a minimum, extreme recklessness" amid contravening facts). That Defendants made these statements in direct response to analysts' questions about the impact of Apple's IDFA changes and the effectiveness of Unity's ad monetization tools, specifically Audience Pinpointer, further strengthens the inference of scienter. *See Finisar*, 2017 WL 1549485, at *7 (scienter found where "analysts had been speculating about the possibility of an inventory build-up for months, providing further incentive for Defendants to seek out and pay attention to such information"); *accord Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) ("Given the specificity and repetition of the analysts' questions, [defendant's] position as Chief Financial Officer, and the alleged state of Avaya's business at the time the questions were asked, there is a strong inference that [defendant's] behavior reached this threshold of recklessness.").

### 3.    The Complaint's CW Allegations Plead a Strong Inference of Scienter

A complaint establishes a strong inference of scienter through CW allegations by satisfying a two-part test: (1) the CWs "must be described with sufficient particularity to establish their reliability and personal knowledge;" (2) their "statements . . . must themselves be indicative of scienter." *Quality Sys.*, 865 F.3d at 1144-45. Here, the Complaint easily satisfies both prongs.

As an initial matter, "while the test for plausibility of confidential witness allegations is more demanding than general pleading standards, that does not mean it requires a mini-trial on the admissibility of the evidence." *BioMarin*, 2022 WL 164299, at *11 n.8. Accordingly, the Complaint

26

details each CW's job title, experience, responsibilities, and period of employment at Unity.  ¶¶81-85.  Thus, the CW statements are sufficiently reliable, plausible, and coherent.  *See Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019) (finding allegations attributed to CW were credible as they formed "a plausible and coherent narrative" and the CW was "in a position to be personally knowledgeable" of the stated facts).

Defendants do not meaningfully challenge the plausibility of the five (5) CWs having access to information supporting their statements, nor whether the statements are coherent.  Rather, Defendants argue in their Motion that the CW statements are hearsay and cannot be relied upon.  DB at 20.  However, Defendants' hearsay argument falls flat in light of contrary law from the Ninth Circuit: "the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus.  Instead, we examine a confidential witness's hearsay report to determine if it is sufficiently reliable, plausible, or coherent."  *LifeLock*, 780 F. App'x at 484 n.5.  *See also Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (scienter where defendants had "access to minutes, documents, and emails evidencing negative customer feedback due to integration failures"); *Fitbit*, 2017 WL 219673, at *5-6 (scienter where CW prepared report his superior presented to defendant); *Amgen*, 2014 WL 12585809, at *17 (scienter where defendant had "access to an internal document questioning" statements, even though complaint did not allege he "actually saw the report"); *Commc'ns Workers of Am. Plan for Emps.' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1124 (D. Ariz. 2007) (strong inference of scienter from CW reports though "somewhat lacking in detail").

Furthermore, the CW accounts in the Complaint are reliable because their allegations regarding the technical flaws in Audience Pinpointer are in line with other allegations in the Complaint and with what Unity executives publicly admitted after Audience Pinpointer failed.  *See BioMarin*, 2022 WL 164299, at *11.  Additionally, all this "aligns with the allegations that analysts and investors were shocked at the news" Audience Pinpointer had failures and was a significant drag on Unity's revenues when Defendants' belatedly revealed that information to the market, "especially in light of the positive image [of Audience Pinpointer and Unity's success post-IDFA] that [Defendants] had previously portrayed."  *Id.*

27

Defendants also incorrectly suggests that the CWs must have directly interacted with the Individual Defendants to support scienter; yet, there is no such requirement. *See LifeLock,* 780 F. App'x at 485 (scienter where CW stated his superior provided reports to defendant undermining statements); *Zuora*, 2020 WL 2042244, at *10-11 (scienter where defendants had "access to minutes, documents, and emails evidencing negative customer feedback due to integration failures").

**4.    The Importance of Audience Pinpointer to Unity's Ad Monetization Business After Apple's IDFA Changes Supports Scienter**

The importance of Audience Pinpointer to Unity's ad monetization business, which was the most critical component of Unity's Operate Segment which accounted for 65% of Unity's revenue during the Class Period, supports a strong inference of scienter. ¶¶3, 42. The Ninth Circuit has repeatedly explained that "it may be inferred that facts critical to a business's core operations . . . are known to key company officers . . . where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2*, 542 F.3d at 781, 786. *See also Berson*, 527 F.3d at 988-89 (it would be "absurd to suggest" defendant was unaware of issue with largest contract); *Reese*, 747 F.3d at 569 (similar).

Core operations allegations – that Audience Pinpoint generated a vast majority of Unity's revenue and thus was "critical" to its "financial success" – further support scienter. *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1162-63 (N.D. Cal. 2015) (finding scienter where misstatements concerned "a critical product for AMD's financial success"). *See also ChemoCentryx*, 2023 WL 3579440, at *18 ("implausible" CEO would have been aware of progress of company's most promising drug); *BioMarin*, 2022 WL 164229, at *14 ("notable" allegation that a drug "was going to be significant and lucrative product" and provide a majority of company's revenue contributed to finding of scienter); *Shenwick*, 282 F. Supp. 3d at 1145-46 (it would be "absurd" for defendants not to know of integral trends); *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *19 (N.D. Cal. Sep. 27, 2012) ("knowledge of facts critical to a business's core operations or an important transaction" may be "impute[d] to a company's key officers").

Given the importance of Audience Pinpointer to Unity's bottom line, which Defendants effectively concede, here "it would be absurd to suggest [that] management was without knowledge"

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

of Audience Pinpointer's challenges, even absent other scienter allegations. *See Reese*, 747 F.3d at 577; *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045 (N.D. Cal. 2016) (issue "was of such a fundamental nature that [executive awareness] can be inferred"); *Mulligan*, 36 F. Supp. 3d at 970 ("[I]t is absurd to think that the CEO and CFO [] would be unaware" of issues "at the heart of a company"). Further, CWs confirm that the Defendants closely monitored and received information regarding the performance issues with Audience Pinpointer. ¶231. *S. Ferry LP, No. 2*, 542 F.3d at 785 (core operations facts support scienter when combined with "specific allegations about management's exposure to factual information").[8]

Furthermore, Unity's quarter-over-quarter revenue growth plunged from 25% to 1% in July 2021, mere months after the introduction of Apple's privacy changes, exposing the weakness of Audience Pinpointer in the new ad placement environment. ¶221. By the first quarter of 2022, Audience Pinpointer's failure to address the challenges of the loss of IDFA in mobile advertising caused negative revenue growth for Unity of 5%. *Id.* By the end of the Class Period, Unity's revenue growth had collapsed to negative 14%. *Id.* Given the importance of Operate revenues to the Company's success and the massive decline in revenue growth in that segment during the Class Period, Defendants knew of or recklessly disregarded the problems with their ad monetization tool.

**5.     Defendants' Suspicious and Unusually Timed Insider Sales Support Scienter**

The Individual Defendants' suspiciously timed and unusual stock sales during the Class Period "weigh ***heavily*** in favor of [] scienter." *Tellabs*, 551 U.S. at 325.[9] When analyzing insider trading, courts look to "(1) the amount and percentage of sales sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Weston v.*

---

[8] As a result, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (*see* DB at 20) is inapposite because, in that case, the complaint was missing "allegations linking specific reports and their contents to the executives[.]"

[9] However, because "motive is not required" to plead scienter, *id.*, Defendants' argument regarding the lack of insider trading for Visoso (DB at 23) fails.

29

*DocuSign, Inc.*, 2023 WL 3000583, at *22 (N.D. Cal. Apr. 18, 2023); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 2013 WL 6441843, at *13 (N.D. Cal. Dec. 9, 2013); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1024 (S.D. Cal. 2011) ("unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter").

The Complaint alleges that each of the Individual Defendants' Class Period sales were unusual and suspicious as measured by: (i) the total amount of shares sold (¶¶234-40); (ii) the percentage of shares sold compared to the number of total shares available for sale during the Class Period (*id.*); (iii) the contrast with these Individual Defendants' own pre and post Class Period trading history (¶¶241-46); and (iv) the timing of the sales (¶¶247-48).

Specifically, the Complaint alleges that the Individual Defendants collectively reaped in over $250 million in proceeds from their stock sales during the Class Period. ¶236.  Riccitiello sold 1,834,506 Unity shares for $232 million in proceeds (¶238), Lestiyo sold 105,924 Unity shares for $14.1 million in proceeds (¶239), and Visoso sold 52,314 Unity shares for $5.8 million in proceeds (¶240).  These large Class Period sales were dramatically out of line with their prior (and post Class Period) trading.  ¶¶241-248.  In fact, Visoso sold *zero* shares of stock during the Preceding Period.[10]

---

[10] The "Preceding Period" begins on the IPO date of September 18, 2020 and ends on May 10, 2021. ¶235.  Defendants argue that there can be no meaningful trading history because "there are only 235 days between September 18, 2020, the date of Unity's IPO, and May 10, 2021, the day preceding the start of the 365-day Class Period." DB at 22.  However, the caselaw cited by Defendants is distinguishable because Plaintiffs' Complaint provides meaningful context for the Individual Defendants' Post Class Period sales in addition to sales executed during the Preceding Period.  ¶235 n.48.  And even if the Court is inclined to ignore the meaningful context provided by the Individual Defendants' sales during the Preceding Period, the Court may still find that the Class Period sales are suspicious.  *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164,

Footnote continued on next page

30

¶242.  Similarly, Lestiyo sold only 23,270 Unity shares during the Preceding Period, meaning her total stock sales increased by approximately 355%.  ¶243.  As for Riccitiello, he began unloading Unity shares right when Apple announced the IDFA changes in June 2020 and continued to unload shares throughout the Class Period.  Conveniently, Riccitiello slashed his trading volume after the May 10, 2022 corrective disclosure decreased Unity's share price by 37%.  ¶244.

Moreover, the percentages of the Individual Defendants' holdings sold were suspicious: Riccitiello sold 38% (¶238), Lestiyo sold 34% (¶239), and Visoso sold 15% (¶240).  *See, e.g.*, *Nursing Home Pension Fund,* 380 F.3d at 1232 (deeming massive dollar amount reaped suspicious even if it was only 2.1% of the insider's total stock holdings); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (sale of 20% of holdings supported scienter); *DocuSign, Inc.*, 2023 WL 3000583, at *22 (sale of almost 24% of holdings supports scienter); *Azar v. Yelp, Inc*, 2018 WL 6182756, at *18-19 (N.D. Cal. Nov. 27, 2018) (sale of approximately 20% of holdings supported scienter); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14 (C.D. Cal. July 1, 2008) (sales of 7% of holdings support an inference of scienter); *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1199-200 (C.D. Cal. 2004) (sale of 18% of holdings supports scienter inference).

Defendants contend that Plaintiffs "distort[ed] the percentage of sales" for the Individual Defendants.  DB at 23.  Not so.  Plaintiffs calculated each Individual Defendants' holdings pursuant to the number of securities beneficially owned as reported within their respective SEC Forms 4 filings during the Class Period.  Further, the Court need not resolve the parties' dispute as to the calculation of sales as a percentage of holdings at this stage of the case.  *See McCasland v. FormFactor Inc.*, 2009 WL 2086168, at *2 n.2 (N.D. Cal. July 14, 2009) ("Defendants dispute the percentage calculation of [a defendant's] sales. This factual dispute is irrelevant to resolving the present motion.").  Indeed, courts have found that complaints without allegations specifying the percentages of shares sold support an inference of scienter where, as here, the amount of stock sold is "substantial."  *See Acadia*, 2022 WL 4491093, at *13.

_____

1186–87 (C.D. Cal. 2007) (finding failure to plead pre-class period sales moot in light of statute of limitations).

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

Defendants argue that Riccitiello's stock sales during the Class Period were not suspicious because they were made pursuant to a Rule 10b5-1 plan. DB at 21-23. First, that Riccitiello's trades were made pursuant to 10b5-1 plans (DB at 21) does not "nullify[]" the scienter inference – particularly where, as here, the plans themselves were entered into at suspicious times during the Class Period. *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009); *see also BioMarin*, 2022 WL 164299, at *14 (rejecting argument that "trades were nondiscretionary and pre-planned" because "concealing the negative information before the sale and setting the sale to occur prior to [the corrective disclosure] *were* discretionary choices") (emphasis original). In the absence of rebuttal information from the 10b5-1 plans regarding when Defendants entered into those plans, such allegations sufficiently support an inference of scienter. *See Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *10 (N.D. Cal. Mar. 31, 2023) (Davila, J.); *see also Yelp*, 2018 WL 6182756, at *18 (finding scienter sufficiently alleged through stock trading where "nothing before the [c]ourt establishes when precisely the trading plan was adopted").

Second, Defendants ignore allegations that they delayed the release of negative news about Unity's Audience Pinpointer technical flaws in order to circumvent their trading plans and offload their stock at a favorable price. ¶¶250-51; *see, e.g., Yelp*, 2018 WL 6182756, at *18 (Rule 10b5-1 plan did not insulate defendant who withheld unfavorable news to keep share prices steady); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) ("10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales"); *UTStarcom*, 617 F. Supp. 2d at 976 n.16 (defense based on Rule 10b5-1 plan was premature).[11]

---

[11] *See also* Allan Horwich, *The Origin, Application, Validity, and Potential Misuse of Rule 10b5-1*, 62 Bus. Law. 913, 949-950 (2007) ("If an executive knows that his or her Plan will result in a sale of company stock on a particular date, he or she may be able to cause delay in the disclosure of unfavorable news so that the expected stock price decline is deferred until after the sale, thereby producing larger proceeds.").

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

Third, Defendant Riccitiello appears to have had multiple trading plans in effect during the Class Period, including one entered into on November 18, 2020 (days after the release of Unity's Q3 2020 financial results and five months after Apple announced its anticipated privacy changes) and another trading plan entered into on February 9, 2021 (days after the release of Unity's Q4/FY 2020 financial results and two months before Apple's privacy changes went into effect).  ¶251 n.51.  Some of Defendant Lestiyo's many trades during the Class Period appear to have been made pursuant to a trading plan.  *Id.* But for most of Lestiyo's Class Period trades, Plaintiffs were not able to locate a Report on Form 144 indicating the date upon which the trading plan was entered into.  *Id.*  Defendant Visoso's sales do not appear to have been made pursuant to any pre-arranged trading plan.  *Id.*

While Plaintiffs lack specific information about Individual Defendants' trading plans at this time, the circumstances of their sales are sufficiently suspicious to overwhelm any exculpatory inference that might otherwise have been available to pre-planned sales based on 10b5-1 plans. ¶251; *see BioMarin*, 2022 WL 164299, at *14.  For example, the Individual Defendants' stock sales were suspicious because they sold a vast number of shares ***after*** learning of material non-public information about serious problems with Unity's Audience Pinpointer platform, ***but before*** the public disclosure of that same adverse information on May 10, 2022.  ¶247.[12]

Moreover, the Individual Defendants' stock sales were timed such that they sold at prices as high as $180 per share — nearly six times Unity's share price after Defendants' fraud was revealed on May 10, 2022.  ¶248.

---

[12] The fact that Riccitiello substantially curbed his insider sales after the truth was revealed suggests that he terminated his 10b5-1 plan.  Compare ¶236 with ¶¶245-46.  This supports Plaintiffs' allegations that Riccitiello's Class Period sales were suspicious because his trading practices were calculated to maximize the personal benefit from undisclosed insider information. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1188 (C.D. Cal. 2008) (amending 10b5-1 plans defeats the very purpose of the plans).

33

Accordingly, the Individual Defendants' unusual and suspicious stock sales support the inference of scienter.[13]

### 6.    The Complaint Pleads Corporate Scienter

In the Ninth Circuit, the "scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of §10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority." *Alphabet*, 1 F.4th at 705.  Here, at all relevant times, Defendant Riccitiello was Unity's CEO and Chairman of Unity's Board of Directors (¶26), Defendant Visoso was a member of Unity's Board of Directors until April 2021, when he became Unity's CFO (¶27), and Defendant Lestiyo was the SVP of Unity's Operate Solutions segment, which generated the lion's share of Unity's revenue (¶28).

The Individual Defendants' positions suffice to impute their scienter to Unity.  *See Ferris v. Wynn Resorts Ltd.*, 2021 WL 3216462, at *17 (D. Nev. July 28, 2021) (finding corporate scienter through defendants who held titles including CEO, CFO, and SVP because these "senior positions are adequate to impute the scienter of these defendants to the Company").  Defendants are wrong to suggest that *Glazer Capital Management, LP v. Magistri* (DB at 19 n.11) counsels otherwise, as that case involved only three alleged misstatements in a single merger agreement and, therefore, "given the limited nature and unique context of the alleged misstatements in this case," the Ninth Circuit held that the issue of pleading corporate scienter was "not before us" and noted "it might be possible to plead scienter under a collective theory."  549 F.3d 736, 745 (9th Cir. 2008).

---

[13] Even if the Court is inclined to find that the Individual Defendants' insider sales are not unusual or suspicious, the Complaint's additional and independent allegations are sufficient to raise a strong inference of scienter.  *Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075, 1089 (C.D. Cal. 2022) ("the absence of any allegations regarding insider stock sales does not negate the inference of scienter established by other allegations in the [complaint].").

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

**7.      Viewing Plaintiffs' Allegations Holistically, Defendants' Opposing Inference of Scienter Is Not Compelling**

The Complaint's allegations raise an inference of scienter that is at least as cogent as any opposing inference Defendants proffer.  Defendants offer no competing inference based on the allegations in the Complaint (*Tellabs*, 551 U.S. at 314 (competing inferences must be "rationally drawn *from the facts alleged*")) that is *more* compelling than a finding that Defendants were at least deliberately reckless in: (1) failing to disclose the ongoing technical problems with Audience Pinpointer and customer complaints about the ineffectiveness of the tool; and (2) continuing to tout Unity's ability to achieve results for its clients in mobile advertising following implementation of the IDFA changes even though Audience Pinpointer was not functioning the way Defendants said it would as they learned in a multitude of meetings and reports during the Class Period.  At most, Defendants' proffered opposing inference presents "a close question," which at this stage, must be resolved in Plaintiffs' favor.  *See Scheller v. Nutanix*, 2020 WL 5500422, at *9 (N.D. Cal. Sept. 11, 2020); *Amgen*, 2014 WL 12585809, at *8 (when courts weight competing inferences, "the tie goes to the Plaintiff").

**C.      Plaintiffs Adequately Plead Control Person Claims**

Section 20(a) of the Securities Exchange Act codifies derivative liability for those persons who "control" a primary violator of the Securities Exchange Act.  15 U.S.C. §78t.  According to the Ninth Circuit, Congress enacted Section 20(a) control person liability "to prevent evasion of the law by organizing dummies who will undertake the actual things forbidden."  *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990).[14]  "By holding persons who were able, directly or indirectly, to exert influence on the policy and decision-making process of others liable, Congress sought to hold accountable the [person] who stands behind the scenes and controls the [securities

_____

[14] The Eleventh Circuit Court of Appeals explained in *Laperrier v. Vesta Insurance Group, Inc.* that Congress, during hearings preceding the passage of Section 20(a) "referred to correcting the dangerous and unreliable system of depending upon dummy directors that lacked any accountability or responsibility."  526 F.3d 715, 721 (11th Cir. 2008).

35

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

violator] who is in a nominal position of authority." *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at \*20 (S.D. Cal. May 23, 2017). Therefore, a defendant need not be liable under Section 10(b), or any other security law, in order to be liable under Section 20(a).

Under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities law; and (2) that the defendant exercised actual power or control over the primary violator. *See BofI Holding*, 2017 WL 2257980, at \*21.

Section 20(a) is remedial in nature and is to be construed liberally. *Immune Response*, 375 F. Supp. 2d at 1032. Importantly, especially at the motion to dismiss stage where all inferences are in Plaintiffs' favor, the issue of control is a complex and fact-intensive question. The statute "has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable." *See Immune Response,* 375 F. Supp. 2d at 1032 (S.D. Cal. 2005); *see also Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, 2017 WL 3187688, at \*22 (C.D. Cal. Jan. 17, 2017) (same). Courts in this Circuit have that the "traditional indicia of control[]" is "having a seat on the board." *Am. W. Holding Corp.*, 320 F.3d at 945.

Control also is sufficiently pled where the complaint alleges defendant's "high level position[] and the fact that the false statements alleged could be found in company press releases or financial statements." *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at \*17 (C.D. Cal. July 13, 2015); *see also Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987), *overruled on other grounds* ("[W]here, as here, the corporate officers are a narrowly defined group charged with the day-to-day operations of a public corporation, it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violation."). Indeed, status as "an officer or director does not create any *presumption* of control," but "it is a sort of red light." *Arthur Child.'s Tr. v. Keim*, 994 F.2d 1390, 1397 (9th Cir. 1993) (citing 3 Loss & Seligman, *Securities Regulation* 1724 (1990)) (emphasis in original). Furthermore, it is not "not uncommon for control 'to rest with a group of persons, such as the members of the corporation's management.'" *Arthur*, 994 F.2d at 1396-97.

Importantly, especially at the motion to dismiss stage where all inferences are in Plaintiffs' favor, the issue of control is a complex and fact-intensive question. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *BofI Holding*, 2017 WL 2257980, at *21.

### 1. The Complaint Pleads Section 20(a) Claims Against the Individual Defendants, Who Do Not Meaningfully Contest Those Claims

The Complaint adequately pleads control claims pursuant to Section 20(a) against Defendants Riccitiello, Visoso, and Lestiyo. ¶¶283-85, 291-92. In response, the Individual Defendants weakly argue that the Section 20(a) claims against them should be dismissed because Plaintiffs have failed to plead a Section 10(b) violation (Plaintiffs have done so). DB at 25.

First, throughout the Class Period, Defendant Riccitiello was Unity's CEO and Executive Chairman of the Unity Board of Directors, publicly representing the company on earnings calls with analysts and investors, at conferences, and in media interviews. ¶26. Second, Defendant Visoso joined the Unity Board of Directors in September 2020 and became Unity's CFO in April 2021, just as the drastic changes to IDFA were being implemented, and also spoke on earnings call and participated as a member of Unity's task force dedicated to addressing the then-forthcoming changes to IDFA when Apple announced them in June 2020. ¶27, 55. Third, Defendant Lestiyo served as SVP of Unity's most profitable segment, Operate, throughout the Class Period and was intimately involved in the Company's mobile advertising business, including attending meetings where Audience Pinpointer's failures and customer complaints were raised. ¶28, 225, 231. All three Individual Defendants also interacted with lower-level employees at the Company, exhibiting their day-to-day involvement in the Company. *BofI Holding,* 2017 WL 2257980, at *25.

Allegations describing similar executive and managerial responsibility and activities have been sufficient for Section 20(a) liability at the motion to dismiss stage. *See In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001) (holding that allegation that defendants "by virtue of their executive and managerial positions had the power to control and influence [the Company], which they exercised" sufficient to state a control claim against the defendants); *see also Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1192 (S.D. Cal. 2009) (holding control person allegations sufficiently pleaded based upon the executives' "positions and their power to control public

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

statements about [the Company]" and that defendants had access to confidential information concerning the Company); *In re New Century*, 588 F. Supp. 2d 1206, 1233 (C.D. Cal. 2008) (holding that control personal liability was sufficiently pleaded because complaint "alleges that the Officer Defendants controlled the operation of [the Company], and that this caused it to violate Section 10(b) and Rule 10(b)(5)"); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1087 (W.D. Wash. 2003) (concluding that plaintiffs had "sufficiently pled that Defendants ... exercised actual power or control over any primary violators based on their positions as CEO and CFO").

Because the Plaintiffs have adequately pled a Section 10(b) claim against the Individual Defendants and alleged facts showing that they exercised control over Unity, the Court should find Plaintiffs have adequately pled a Section 20(a) claim against Defendants Riccitiello, Visoso, and Lestiyo.

### 2.　The Complaint Pleads Section 20(a) Claims Against the Sequoia Defendants and Silver Lake

The Complaint also adequately pleads control claims pursuant to Section 20(a) against the Sequoia Defendants and Defendant Silver Lake. ¶¶286-92. In separate briefs,[15] the Sequoia Defendants and Defendant Silver Lake advance nearly identical arguments. First, they contend that Plaintiffs purportedly fail to adequately plead a primary violation of Section 10(b) (they have not) and have not pled that the Private Equity Defendants exercised actual power or control over the primary violators. SeqB at 4; SLB at 4. Then, citing almost the same exact cases, the Private Equity Defendants argue that their stock holding percentages, hand-picked Board members, and those hand-picked Board members' signatures on Unity's 2021 Form 10-K, which contains many of the statements alleged to be false in the Complaint, do not amount to control for purposes of Section 20(a). SeqB at 5-7; SLB at 5-6. The Sequoia Defendants also argue that they could not have exercised control as a "group," despite Plaintiffs' allegations that they could. SeqB at 7-8. In all respects, the Private Equity Defendants advance incorrect arguments.

---

[15] The Sequoia Defendants' brief is cited as (SeqB at __) and the Silver Lake brief is cited as (SLB at __).

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

First, a key allegation against both Sequoia and Silver Lake as control persons is that their hand-picked designees on the Board of Directors signed the financial statements containing false and misleading statements. *See Magnachip*, 167 F. Supp. 3d at 1048-49 (finding shareholder board designees singing of documents containing false statement contributed to finding of control); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 542 (S.D.N.Y. 2016) ("if . . . officer or director has signed financial statements containing materially false or misleading statements, courts have held that control as to the financial statements is sufficiently pled"); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) ("persuasive authority indicates that an officer or director who has signed financial statements containing materially false or misleading statements qualifies as a control person."); *Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 974-76 (D. Ariz. 2010); *Hayley v. Parker*, 2002 WL 925322, at *10 (C.D. Cal. Mar. 15, 2002) (plaintiffs stated a valid Section 20(a) claim against outside director defendants despite lack of "allegations of day-to-day oversight," where those defendants, *inter alia,* allegedly "signed the 10–K form that allegedly reflects fraudulent accounting practices[;]" and they had "access to non-public information ... essential to th[e] case[ ]"). In fact, a case the Private Equity Defendants both cite in their brief stands clearly for the proposition that directors who signed financial statements containing materially false or misleading statements, "control as to the financial statements is sufficiently pled." *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 263 (S.D.N.Y. 2020).

Courts in this District have routinely held that such allegations of signing documents containing false and misleading statements contribute to a finding of control liability for shareholders holding board seats, and the Court found the same here. *See Magnachip*, 167 F. Supp. 3d at 1049; *In re Am. Apparel, Inc. S'hareholder Litig.*, 2013 WL 10914316, at *36–37 (C.D. Cal. Aug. 8, 2013); *UTStarcom*, 617 F. Supp. 2d at 979–80.

Second, the Private Equity Defendants claim that their holdings do not amount to a percentage giving them control of Unity either individually or as a group on Unity's board of directors. SeqB. at 5-6; SLB at 5-6. However, this argument is mistaken, as courts in this Circuit routinely find that, even at summary judgment, minority stock ownership combined with presence on the board of

39

directors suffices to allege control. *See Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 946–47 (S.D. Cal. 2019) (finding control alleged against minority shareholder financial firm where stock ownership fluctuated between 42.8% and 22.6% during the Class Period and firm held board seats); *Shepherd v. S3 Partners, LLC*, 2011 WL 4831194, at *5 (N.D. Cal. Oct. 12, 2011) (denying summary judgment on Section 20(a) claim based on one third ownership); *In re Allstate Life Ins. Co. Litig.*, 2013 WL 789106, at *4 (D. Ariz. Mar. 1, 2013) (holding that the defendant failed to meet his summary judgment burden of showing there is no material issue of fact that he did not control the company where he owned 9% of the stock and held a seat on the board of directors). As such, at the motion to dismiss stage, the Court should find that the Private Equity Defendants' individual holdings and board seats sufficiently support a claim for control under Section 20(a).

The cases the Sequoia Defendants and Defendant Silver Lake cite in support of their arguments against control are inapposite. For example, *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996) was decided at summary judgment. Next, *Bao v. SolarCity Corp.*, 2015 WL 1906105, at *5 (N.D. Cal. Apr. 27, 2015), dismissed a Section 20(a) claim against a board chairman (a single individual, unlike Sequoia or Silver Lake) absent factual allegations as to his decision-making powers, which are pled in detail here. Also, *In re Gupta Corp. Securities Litigation*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994) dismissed Section 20(a) claims because plaintiffs failed to plead *any* specific circumstances or instances indicative of control. Further, Defendants' cases stand merely for the proposition, which no one here disputes, that a party with a minority share of the company does not, by virtue of that fact alone, possess "control" over that company. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 273–74 (S.D.N.Y. 2004); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29. 2000); *Gupta*, 900 F. Supp. at 1243.

Here, it suffices at the motion to dismiss stage for the "intensely factual question" as to whether Plaintiffs have pled control as to the Sequoia Defendants and Defendant Silver Lake that the Complaint alleges that these Defendants each: (1) had substantial holdings in Unity; (2) placed designees on the Unity board of directors; and (3) the designees signed the documents alleged to contain false and misleading statements. Based on these facts, the Court should find the Plaintiffs

40

have adequately pled a Section 20(a) claim against the Sequoia Defendants and Defendant Silver Lake Defendant. *Magnachip*, 167 F. Supp. 3d at 1048; *Am. Apparel*, 2013 WL 10914316, at *36–37; *UTStarcom*, 617 F. Supp. 2d at 979–80.

**D.     Plaintiffs Request Leave to Replead If the Court Is Inclined to Grant Defendants' Motions**

There is a presumption in favor of granting leave to amend, *In re BofI Holding, Inc. Shareholder Litigation*, 848 F. App'x 234, 237 (9th Cir. 2021), that "is 'to be applied with extreme liberality.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). Securities fraud cases involve fact issues, like falsity and scienter here, that amendment can cure. *See In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1035 (N.D. Cal. 2020) (Davila, J.).

**IV.     CONCLUSION**

The Court should deny Defendants' motions to dismiss in their entirety.

41

LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 5:22-cv-03962-EJD

Dated: July 26, 2023

Respectfully submitted,

**LABATON SUCHAROW LLP**

*[signature: Christine M. Fox]*

Christine M. Fox (*pro hac vice*)
James M. Fee (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cfox@labaton.com
jfee@labaton.com

*Lead Counsel for Lead Plaintiffs Oklahoma
Firefighters Pension and Retirement System
and Indiana Public Retirement System and the
Proposed Class*

**HAGENS BERMAN SOBOL
SHAPIRO LLP**
Reed R. Kathrein (Bar. No. 139304)
Lucas E. Gilmore (Bar No. 250893)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Liaison Counsel for the Class*

42