UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ISHITA DAS,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITY SOFTWARE INC., et al.,<br><br>        Defendants. | Case No.   5:22-cv-03962-EJD<br><br>**ORDER GRANTING MOTIONS TO DISMISS**<br><br>Re: ECF Nos. 101, 102, 103 |

Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System and Indiana Public Retirement System ("Lead Plaintiffs"), bring this federal securities class action against three groups of defendants: (1) Defendant Unity Software Inc. ("Unity") and Unity's individual officers and directors John S. Riccitiello, Luis Felipe Visoso, and Ingrid Lestiyo (collectively, "Unity Defendants"); (2) Defendant Silver Lake Group, LLC ("Silver Lake"); and (3) Defendants SC US SSF 2013 (TTGP), LLC and Sequoia Capital Operations, LLC (collectively, "Sequoia Defendants") (all together, "Defendants") alleging that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated by the U.S. Securities and Exchange Commission ("SEC"). Am. Compl., ECF No. 71. Before the Court are three motions to dismiss filed by Unity Defendants, Sequoia Defendants, and Silver Lake. Unity Mot., ECF No. 103; Sequoia Mot., ECF No. 102; Silver Lake Mot., ECF No. 101. Lead Plaintiffs filed an omnibus opposition to all three motions, and Defendants filed individual replies. Opp'n, ECF No. 107; Unity Reply, ECF No. 109; Silver Lake Reply, ECF No. 110; Sequoia Reply, ECF No. 112.

Having carefully reviewed the relevant documents, the Court finds these motions suitable

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
1

for decision without oral argument pursuant to Civil Local Rule 7-1(b). For the reasons discussed below, the Court **GRANTS** Defendants' motions to dismiss with leave to amend.

## I. BACKGROUND

### A. Parties

Court-appointed Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System provide retirement, disability, and survivor benefits to its members. Am. Compl. ¶¶ 23, 24. Lead Plaintiffs allege to have purchased or otherwise acquired Unity common stock during the Class Period and suffered a loss. *Id.* ¶ 1. Lead Plaintiffs bring this class action on behalf of all persons or entities who purchased or otherwise acquired Unity's publicly traded common stock or exchange-traded call options or sold Unity's exchange-traded put options between May 11, 2021 and May 10, 2022 ("Class Period") and suffered a loss. *Id.*

Unity is a Delaware corporation with its principal office in San Francisco whose common stock trades on the New York Stock Exchange ("NYSE"). *Id.* ¶¶ 25, 35. Unity in part creates and operates a 3D content platform for software developers who create video games for mobile phones, computers, and game consoles so that software developers can create and monetize their games and content. *Id.* ¶ 36. Many of the video games that are developed on Unity's platform are played on devices that use Apple's iOS operating system. *Id.* Defendant John Riccitiello has served as Unity's Chief Executive Officer since October 2014. *Id.* ¶ 26. Defendant Luis Felipe Visoso has served as Unity's Chief Financial Officer since April 2021. *Id.* ¶ 27. Defendant Ingrid Lestiyo has served as Senior Vice President & General Manager of Operate Solutions at Unity since August 2020. *Id.* ¶ 28.

Sequoia Defendants and Silver Lake are two of Unity's largest shareholders.[1] *Id.* ¶ 2. Sequoia Defendants are part of a venture capital firm headquartered in Menlo Park, California specializing in investments in technology sector companies. *Id.* ¶ 30. Sequoia Defendants began

---

[1] Lead Plaintiffs also name another investment company, OTEE 2020 ApA ("OTEE"), as a defendant, but Lead Plaintiffs have been unable to serve OTEE as of the date of their opposition. *See* Opp'n 1.

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS

2

United States District Court
Northern District of California

investing in Unity in 2009 and owned approximately 13.2% of Unity's outstanding common stock by 2022. *Id.* ¶ 30. Silver Lake is a private equity firm headquartered in Menlo Park, California. Silver Lake began investing in Unity in 2017 and owned approximately 14.6% of Unity's outstanding common stock by 2021. *Id.* ¶ 31. Sequoia Defendants and Silver Lake continued to be some of Unity's largest stockholders as of April 2022. *Id.* ¶ 34.

### B. Factual Background

This case arises from Lead Plaintiffs' allegations that Defendants made material misstatements and omissions to investors regarding Unity's Audience Pinpointer ad monetization tool and Unity's ability to effectively serve its ad customers following Apple, Inc.'s changes to privacy settings in April 2021. The Court will briefly summarize Lead Plaintiffs' allegations regarding Unity's structure and advertising business generally, changes in Apple, Inc.'s privacy policies that led to the broader rollout of Audience Pinpointer, customer complaints regarding Audience Pinpointer, Unity's subsequent revenue loss and acquisitions, and the statements made during earnings calls and in publications which Lead Plaintiffs allege were misleading and omitted material information regarding the issues with Audience Pinpointer.[2]

#### 1. Unity's Structure and Advertising Business During the Class Period

Unity provides software developers with a platform to create and monetize their video games for mobile phones, computers, and game consoles, with a significant number of Unity-developed games operating on Apple's "iOS" operating system. *Id.* ¶ 36.

During the Class Period, Unity reported that it derived its revenues primarily from two business segments: Create Solutions ("Create"), which generated approximately 30% of Unity's revenue through subscription fees; and Operate Solutions ("Operate"), which generated approximately 65% of Unity's revenue through ad placement within developers' games and revenue-sharing contracts with the developers. *Id.* ¶¶ 42, 224. To generate Operate revenue through ad placements, Unity relied on two tools: (1) Unified Auction, and (2) Audience

---

[2] The Court will only address facts relevant to the Court's analysis in this Order.

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
3

Pinpointer. *Id.* ¶ 42. Unified Auction allows advertisers to submit competing bids to place ads on games developed on Unity's platform. *Id.* ¶ 44. Unity splits the advertising fee from the highest bidder with the developer whose game displayed the ad. *Id.* Audience Pinpointer tracks users' activity to predict which users had a high probability of engaging with an ad. *Id.* ¶ 46. Working in tandem with Unified Auction, Audience Pinpointer provides data on users who played the games on Unity's platform, and that data is used to inform advertisers which games attracted users who were likely to engage with their ads. *Id.* ¶¶ 46, 47. This data generally results in increased advertisement bids on certain games on Unity's platform and, in turn, increased revenue for Unity. *Id.*

Using both tools, Unity is able to collect costs for the installation of an application and costs for the impression of an advertisement. *Id.* ¶ 43. In other words, Unity generates revenue each time an end user installs an application after viewing an advertisement and each time an advertisement starts to play. *Id.*

### 2. Apple's Privacy Changes Prior to Class Period Increased the Importance of the New Audience Pinpointer Tool

On September 18, 2020, Unity conducted its initial public offering ("IPO"), after which time it became worth approximately $13.7 billion and traded on the NYSE. *Id.* ¶ 37.

Three months before Unity's public offering, Apple announced new data privacy features that would be rolled out in its future software updates in 2021, which was expected to disrupt Unity's advertising business. *Id.* ¶ 52.

Prior to the Class Period, Operate primarily segment tracked user data to supply to advertisement bidders through Apple's Identifier for Advertisers ("IDFA"). *Id.* ¶ 5. IDFA assigned a unique, anonymous identifier to each mobile device to provide data to advertisers to use when placing ads by analyzing in-app events, showing whether users clicked on ads or not. *Id.* In June 2020, Apple announced that new data privacy features would be included in a version of iOS in 2021, which would allow Apple device users to prohibit companies like Unity from tracking their data that had previously been obtained through IDFA. *Id.* This privacy change was expected

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS

4

to negatively impact the monetization of user advertising data across the industry—for example Facebook announced that advertisers would lose approximately 50% of their review without personalized targeting and optimization. *Id.* ¶ 54.

In response to this anticipated change, years prior to Apple's announcement, Unity assembled a team to prepare for the loss of IDFA data. Lead Plaintiffs allege that this team led to the broader rollout of Audience Pinpointer. *Id.* ¶ 255. Unlike acquiring data through IDFA, in general terms, the Audience Pinpointer tool tracked and analyzed users' behavior rather than their clicks. *Id.* ¶¶ 4, 76, 253.

### 3. Unity Rolls Out Audience Pinpointer Tool After Apple Announcement

Upon Apple's privacy change announcement, Unity informed investors that it had been prepared for the IDFA change and indicated that the privacy change would actually give Unity a "competitive advantage" because of the development of Audience Pinpointer. *Id.* ¶¶ 64, 161. Audience Pinpointer had been available since 2018 only to a few of Unity's ad clients prior to Apple's announcement, *id.* ¶ 87, but following Apple's announcement, Unity marketed Audience Pinpointer more broadly, *id.* ¶ 5.

### 4. Audience Pinpointer Brings Widespread Customer Complaints

Lead Plaintiffs allege that five confidential former Unity employees ("confidential witnesses" or "CW") have come forward to reveal that the platform-wide introduction of Audience Pinpointer was rushed, as the tool had only been in beta testing and had no opportunity to be pressure tested, and Audience Pinpointer quickly brought in large amounts of negative customer complaints.

CW-1[3] was a Senior Business Intelligence Manager at Unity throughout the Class Period. *Id.* ¶ 81. CW-1 helped build out Unity's resources to assess its customer data. *Id.* CW-2 was a Senior Manager in the Product Research department from May 2020 through August 2022. *Id.* ¶ 82. CW-2 focused on customer experience and tracking the customer journey. *Id.* CW-3 was a

---

[3] Confidential witnesses are referred to in the Amended Complaint as "CW-[number]" to reference confidential witnesses numbered one through five.

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
5

Senior Software Engineer from pre-Class Period through January 2022. *Id.* ¶ 83. CW-3 worked in the division where the engineers responsible for Audience Pinpointer and Unified Auction worked. *Id.* CW-4 worked in Operate for more than 70% of the Class Period. *Id.* ¶ 84. CW-5 was formerly employed at Unity as a Software Engineer from pre-Class Period through September 2021. *Id.* ¶ 85.

While CW-4 and CW-5 only provide general information in the Amended Complaint regarding how Unity's ad products work, the development of Audience Pinpointer, and the impact of Apple's announcement in the ad field, *see* Opp'n 14; Am. Compl. ¶¶ 86–88, 94, 96, 97, 101, 102, Lead Plaintiffs allege that CW-1, CW-2, and CW-3's observations support their allegation that Audience Pinpointer was experiencing issues during the class period which Defendants had a duty to disclose. In their opposition, Lead Plaintiffs summarize the CWs' observations using the table below. *See* Opp'n 14–15.

| CW | Date | Audience Pinpointer Technical Problems/Customer Complaints |
|---|---|---|
| 1 | November 2020 | "CW-1 recalled that, in November 2020, and after speaking with internal stakeholders and reviewing issues, he identified problems within Unity's Operate segment including its ads business. CW-1 described Unity's data in Operate as 'definitely unclean' and 'in such a bad way.'" Am. Compl. ¶ 92. |
| 1 | November/ December 2020 | "According to CW-1, in November or December 2020, he realized Operate did not have visibility into: (i) its sales pipeline; or (ii) a holistic view of revenue by customer across all Operate products." *Id.* ¶ 100. |
| 1 | Summer 2021 | "CW-1's team presented to Defendant Lestiyo, Jules Shumaker, and approximately 100 employees on the Customer Success side an analysis they had prepared regarding cross-selling products within the Operate segment." *Id.* ¶ 110. |
| 1 | May/June 2021 - September/October 2021 | "According to CW-1, he and his team had created a 'sentiment analysis' program for customers which showed 'significant' low customer sentiment 'for a while.' Specifically, CW-1's team conducted a review of complaints in September or October 2021 that involved manually reviewing thousands of customer complaint tickets from approximately May or June 2021 through the following three months, to help train the machine learning portion of the ad tool." *Id.* ¶ 111. |
| 2 | Broader Audience Pinpointer Rollout | "According to CW-2, his team was immediately seeing customer complaints that Audience Pinpointer was not working." *Id.* ¶ 105. |

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
6

| 2 | Broader Audience Pinpointer Rollout | "CW-2 recalled a 'tonal shift' following the broader use of Audience Pinpointer. According to CW-2, customer feedback previously contained a combination of positive and negative sentiment, but after Audience Pinpointer was launched more broadly customer feedback was exclusively negative. CW-2 recalled issues coming from customers of all sizes, from SMB (small and medium-sized businesses) to Enterprise customers. According to CW-2, Unity was witnessing a 'massive' increase in complaints which he recalled increased 'fivefold.' CW-2 confirmed that profits were declining for ad solutions as customers complained about issues with the 'accuracy' of the Audience Pinpointer tool which was not working as intended." *Id.* ¶ 106. |
| --- | --- | --- |
| 3 | February 2021 | "CW-3 recalled hearing in February 2021 that Audience Pinpointer had problems. CW-3 confirmed that in February 2021, he attended an all-hands engineering team status meeting . . . during which the Audience Pinpointer problems were discussed, and where it was discussed that Pinpointer's engineers needed to 're-route' certain data which would take approximately two weeks to analyze and fix. CW-3 indicated that his understanding was that Audience Pinpointer was having problems with its ability to gather and transmit data for analysis and that to fix it, the engineers needed to disconnect the data pipeline from one point and reconnect it to another point which they ultimately were able to do." *Id.* ¶ 103. |

#### 5. Revenue Loss and Acquisitions

CW-1 confirmed that Unity was seeing "a lot" of ads clients move to Unity's competitors, though the timeline CW-1 references is unclear. *Id.* ¶ 124. According to CW-2, "it was 'impossible' that Unity was not aware of the declining revenue growth in the Operate segment starting in the summer of 2021," but Unity focused on acquiring companies during that time to "get [Unity's] share [price] up." *Id.* ¶¶ 82, 125. During the Class Period, Unity expended over $2.1 billion on acquisitions with software solutions companies and intelligence services. *Id.* ¶¶ 133–40. Unity also closed a $4.4 billion all-stock agreement to merge with an advertising monetization technology company in November 2022. *Id.* ¶¶ 141, 146.

#### 6. Misleading Statements

Lead Plaintiffs allege that, throughout the Class Period, Defendants made materially false and misleading representations during various earnings calls and publications by failing to disclose known, adverse facts—namely, that Audience Pinpointer was losing customers and losing revenue. *Id.* ¶¶ 158, 169. While Defendants challenge forty statements from the Amended Complaint, to illustrate for purposes of this Order, a small sample of these statements include the

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
7

following:

> [O]ur contextual model, which very importantly does not rely on IDFA, is working well.  Am. Compl. ¶ 150.
>
> [T]he customer feedback we're getting is very strong."  *Id.* ¶¶ 151–52.
>
> We believe that the ability to analyze this data positions us very well in the industry.  *Id.* ¶ 152.
>
> There is a shift towards ROI-based campaigns on our platform through Audience Pinpointer . . . .  *Id.* ¶ 152.
>
> So IDFA will most likely impact the ads industry, but we believe that our data and analytics advantage plus this advanced preparation that I was mentioning, position us very well to manage the IDFA.  *Id.* ¶ 152.
>
> Literally, in every country in the world, minute to minute, our data understanding is huge.  *Id.* ¶ 153.
>
> And I'm highly confident in our monetization platform as part of Operate is going to continue to win.  *Id.* ¶ 154.
>
> There are precious few companies anywhere with our sophistication around advertising and data.  And those are skills that we want to apply more broadly and will.  *Id.* ¶ 163.
>
> Ours is a better way to monetize even absent the changes that were introduced by Apple with IDFA and choice [around] on privacy.  And on a relative basis, we gained advantage to all those who use identity, individual identity, they know you and your brother, whose birthday it is that became relatively weaker, and we became relatively stronger and we have the single largest data insight based on the largest MAU count for anybody in our world.  *Id.* ¶ 172.
>
> The business momentum coupled with the quality of our innovation plans gives us confidence to guide to a revenue growth range of 34% to 36% in 2022 as we continue to improve margins.  *Id.* ¶ 176.
>
> We also saw strong performance from our sophisticated analytics tools and products such as Audience Pinpointer that deliver strong return on investment to our customers without manual guesswork.  *Id.* ¶ 178.
>
> As a result, a large number of our advertisers have open spending limits with us as they can clearly measure the positive return on their spend.  *Id.* ¶ 185.

### 7. Audience Pinpointer Deficiencies Revealed

On May 10, 2022, in a press release announcing Unity's Q1 2022 financial results, Unity

reported revenue of $320.1 million, missing analysts' consensus estimate of $321.5 million. *Id.* ¶ 193. Unity also reduced Q2 2022 guidance to almost twenty percent below the consensus estimates of $361 million and lowered its full-year 2022 revenue guidance to a range of $1.35 and $1.425 billion from its earlier estimate of $1.50 billion. *Id.* The press release stated, in relevant part: "Unity delivered record quarterly revenue in the first quarter of 2022, the highest in the company's history, up 36% compared with the first quarter of 2021, with Create over-performing at 65% year-on-year growth, offset by slower growth in Operate . . . . [W]e are laser-focused on accelerating growth in Operate." *Id.* During the earnings call that same day, Unity Defendants explained the loss in more depth, revealing that Operate started the year strong in January, but then significantly slowed down in February and March due in part to issues with Audience Pinpointer's accuracy. *Id.* ¶ 194.

Approximately two months after the May 10, 2022, announcement, Lead Plaintiffs filed the present suit seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Exchange Act sections 10(b) and 20(a) and SEC Rule 10b-5.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead each claim with enough specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). A bare recital of the elements of a claim, supported only with conclusory allegations, is inadequate. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, the complaint must contain sufficient factual allegations to allow a court to reasonably infer that the defendant is liable. *Id.*

Securities fraud cases must also meet the higher bar set by the particularity requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Rule 9(b) requires a plaintiff alleging fraud to plead with particularity the circumstances constituting fraud. Fed. R. Civ. P. 9(b). Specifically, a plaintiff must plead the "who, what, when, where, and how" of the alleged fraud. *Kearns v.*

1  *Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation omitted).  The PSLRA demands
2  even more, requiring a plaintiff "to state with particularity both the facts constituting the alleged
3  violation and the facts evidencing scienter." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869,
4  876 (9th Cir. 2012).  To plead falsity, a securities plaintiff must "specify each statement alleged to
5  have been misleading [and] the reason or reasons why the statement is misleading." *Id.* at 877
6  (quoting 15 U.S.C. § 78u4(b)(1)).  To plead scienter, the plaintiff must "state with particularity
7  facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*
8  (quoting 15 U.S.C. § 78u4(b)(2)(A)).  An inference of scienter must be more than plausible, it
9  must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."
10  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

If the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted).

### III.    DISCUSSION

#### A.    Incorporation by Reference and Judicial Notice

As an initial matter, Unity Defendants request that the Court consider seventeen documents referenced in their motion to dismiss under the doctrines of incorporation by reference and judicial notice.  Req. for Consideration and Judicial Notice ("Req."), ECF No. 104.  Silver Lake and Sequoia Defendants join in this request.  Joinder, ECF No. 113.  Lead Plaintiffs filed an opposition, and Defendants filed a reply.  Opp'n to Req., ECF No. 108; Brief re Req. ("Reply"), ECF No. 111.

As a general rule, a court may not consider any material outside the pleadings in ruling on a Rule 12(b)(6) motion.  *United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011). There are two exceptions to this rule: when the complaint necessarily relies on the documents (incorporation by reference), and when the documents are "matters of public record" under Fed. R. Evid. 201(b).  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

Case No.:   5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
10

1    Notably, however, the Ninth Circuit prohibits courts from considering facts in incorporated
2    documents or taking judicial notice of facts in documents that are being used as a basis to resolve
3    genuine factual disputes in a complaint, warning that the "overuse and improper application of
4    judicial notice and the incorporation-by-reference doctrine . . . can lead to unintended and harmful
5    results." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018).  The Ninth
6    Circuit in *Khoja* recognized the "alluring temptation to pile on numerous documents to their
7    motions to dismiss to undermine the complaint, and hopefully dismiss the case at an early stage,"
8    but cautioned that "the unscrupulous use of extrinsic documents to resolve competing theories
9    against the complaint risks premature dismissals of plausible claims that may turn out to be valid
10   after discovery." *Id.*

11   The Court will address Defendants' requests for incorporation by reference and judicial
12   notice in turn.

### 1. Incorporation by Reference

14   The incorporation by reference doctrine allows for the consideration of material that is
15   attached to the complaint, as well as the consideration of "unattached evidence on which the
16   complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is
17   central to plaintiff's claim; and (3) no party questions the authenticity of the document."
18   *Corinthian Colleges*, 655 F.3d at 999.  The complaint must go beyond merely mentioning the
19   existence of a document—rather, a defendant may only seek to incorporate a document into the
20   complaint "if the plaintiff refers extensively to the document or the document forms the basis of
21   the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).

22    If the court deems a document incorporated by reference, "the entire document is assumed
23   to be true for purposes of a motion to dismiss, and both parties—and the Court—are free to refer
24   to any of its contents." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014)
25   (internal quotations omitted) (quoting *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963
26   F.Supp.2d 1092, 1107 (E.D. Wash. 2013)).  However, as discussed above, it is improper to assume
27   the truth of everything in an incorporated document for the sole purpose of "resolv[ing] factual

Case No.:   5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
11

disputes against the plaintiff's well-pled allegations in the complaint." *Khoja*, 899 F.3d at 1014. As the Ninth Circuit has recently emphasized, "[t]he incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage." *Id.*

Defendants request that the Court consider the following documents under the incorporation by reference doctrine:

- Ex. 1: Transcript of Unity's May 11, 2021, earnings call regarding Q1 2021
- Ex. 2: Unity Press Release, attached to SEC Form 8-K filed on August 10, 2021
- Ex. 3: Transcript of Unity's August 10, 2021, earnings regarding Q2 2021
- Ex. 4: Transcript of Unity's November 9, 2021, earnings call regarding Q3 2021
- Ex. 5: Unity Press Release, attached to SEC Form 8-K filed on February 3, 2022
- Ex. 6: Transcript of Unity's February 3, 2022, earnings call regarding Q4 2021
- Ex. 7: Unity's 2021 Annual Report, filed on SEC Form 10-K on February 22, 2022
- Ex. 8: Unity Press Release, attached to SEC Form 8-K filed on May 10, 2022
- Ex. 9: Transcript of Unity's May 10, 2022 earnings call regarding Q1 2022
- Ex. 12: Unity Press Release, attached to SEC Form 8-K filed on May 11, 2021
- Ex. 13: Unity Press Release, attached to SEC Form 8-K filed on November 9, 2021
- Ex. 14: Unity's Schedule 14A as filed with the SEC on April 28, 2021

The Court will consider Exhibits 1–9 and 12–14 as incorporated by reference, as the Amended Complaint necessarily relies on statements in these documents as the basis for their claims. *See* Am. Compl. ¶¶ 150–89 (pulling alleged material misrepresentations and omissions from statements in Exhibits 1–7), 148 (alleging that the press release in Exhibit 12 initiated the Class Period), 171 (quoting statements from Exhibit 13), 30–31 (relying on proxy statement in Exhibit 14 to plead claims against Sequoia Defendants and Silver Lake). However, the Court declines Unity's request to use the statements in these documents to resolve genuine factual disputes at this stage. *See, e.g.,* Mot. 13 (arguing that Defendants' statements regarding the strength of the Company's platform and product were not false because the Exhibits show that

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
12

1   Operate revenue "grew throughout the Class Period"), 4 (arguing the Exhibits show that Unity's

2   reach to active end-users also grew in line with Unity's statements throughout the class period).

### 2.      Judicial Notice

A court may take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Courts have taken judicial notice of SEC filings as publicly available documents whose accuracy cannot reasonably be questioned; however, courts generally consider SEC filings "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Troy Grp., Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005); *see also, e.g., Lee,* 250 F.3d at 689 (9th Cir. 2001) ("A court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment. But a court may not take judicial notice of a fact that is subject to reasonable dispute.") (internal quotation marks omitted) (citing *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986)); *In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *8 (C.D. Cal. Mar. 25, 2019) (granting request for judicial notice of SEC filings only to the extent the filings "contained certain disclosures" and denying request all other respects); *Shapiro v. Hasbro, Inc.*, 2016 WL 9176559, at *4 n.10 (C.D. Cal. Aug. 23, 2016) (taking judicial notice of SEC filings to show that a statement was made, but not for the truth of the statement).

Defendants request that the Court take judicial notice of the following documents:

- Ex. 10: Unity's 2020 Annual Report filed on SEC Form 10-K on March 5, 2021
- Ex. 11: Unity Press Release, attached to SEC Form 8-K filed on February 4, 2021
- Ex. 15: Riccitiello's SEC Form 4 filings reflecting stock sales during Class Period
- Ex. 16: Lestiyo's SEC Form 4 filings reflecting stock sales during Class Period
- Ex. 17: Visoso's SEC Form 4 filings reflecting stock sales during Class Period

The Court will take judicial notice of these SEC filings as public documents whose

Case No.:   5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS

13

accuracy cannot reasonably be questioned. However, the Court will not consider the truth of the statements within the filings or, as discussed above, use the filings to resolve any factual disputes at this stage.

### B. Exchange Act Section 10(b) and SEC Rule 10b-5

Moving to the merits of Defendants' motions, to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)).

The PSLRA requires a plaintiff proceeding with a misrepresentation theory to plead the falsity of an alleged misstatement with particularity. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009). This is an "exacting requirement[]," necessitating "'specific facts indicating why' the statements at issue were false." *Kipling*, 2020 WL 2793463, at *14 (quoting *Metzler*, 540 F.3d at 1070). The particularized facts must be "necessarily inconsistent" with the challenged statements. *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir. 2003). This requires pleading "contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality." *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, No. 15-cv-02938-HSG, 2016 WL 7475555, at *3 (N.D. Cal., Dec. 29, 2016). To plead an omissions theory, a plaintiff must plead facts showing that a statement "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Though, federal securities laws "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Statements are not actionable merely because they are incomplete, and "[o]ften, a statement will not mislead even if it is incomplete or does not include all relevant facts." *Brody*, 280 F.3d at 1006.

As a threshold issue, Defendants argue that Lead Plaintiffs have failed to plead with

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
14

particularity facts showing that the alleged statements are false or misleading because Lead Plaintiffs have failed to allege that Audience Pinpointer had serious known technical flaws during the Class Period. Unity Mot. 9. The Court agrees.

Lead Plaintiffs rely on five confidential witnesses to show that Unity was experiencing significant challenges with Audience Pinpointer during the Class Period. However, most of the confidential witnesses' observations occurred pre-Class Period. To reiterate, the Class Period is alleged to be from May 11, 2021, through May 10, 2022. Am. Compl. ¶ 1. CW-1 recounts facts from November/December 2020, such as "identif[ying] problems within Unity's Operate segment including its ads business," "describ[ing] Unity's data in Operate as 'definitely unclean' and 'in such a bad way,'" and "realiz[ing] Operate did not have visibility into: (i) its sales pipeline; or (ii) a holistic view of revenue by customer across all Operate products." *Id.* ¶¶ 92, 100. CW-3 recounts facts from February 2021, such as hearing "that Audience Pinpointer had problems" whereby "engineers needed to 're-route' certain data which would take approximately two weeks," and attending an all-hands engineering team status meeting "during which the Audience Pinpointer problems were discussed." *Id.* ¶ 103. CW-3's statement indicates that this specific problem was in fact resolved in two weeks. *Id.* CW-2 recounts facts occurring during the "[r]ollout of Audience Pinpointer to all customers," which Lead Plaintiffs allege began following Apple's announcement in mid-2020. *Id.* ¶¶ 5, 105–06. CW-2's recollections include "immediately seeing customer complaints that Audience Pinpointer was not working," recalling a "massive" "five-fold" increase in complaints following the broader use of Audience Pinpointer, and confirming that "profits were declining for ad solutions as customers complained about issues with the accuracy of the Audience Pinpointer tool which was not working as intend." *Id.* ¶¶ 105–06. Finally, CW-4 and CW-5 do not speak to any technical challenges with Audience Pinpointer, instead providing background information on the product. *See Id.* ¶¶ 86–88, 94, 96–97, 101–02.

The only facts regarding Audience Pinpointer's functionality during the Class Period derive from CW-1. CW-1 stated that in Summer 2021, his team presented to Defendant Lestiyo, Jules Shumaker, and other employees "an analysis they prepared regarding cross-selling products

1   within the Operate segment." *Id.* ¶ 110.  CW-1 also provides that in "May/June 2021–September
2   /October 2021," his team created a customer program which showed significant low customer
3   sentiment "for a while," and included a review of thousands of customer complaint tickets from
4   approximately May or June 2021 through the following three months.  *Id.* ¶ 111.  However, the
5   Court agrees with Defendants' characterization of these statements—"[v]ague complaints from an
6   unspecified number of unknown customers that a product was not working as intended at some
7   unspecified time does not show that any Challenged Statement was false when made." Unity Mot.
8   9.  Lead Plaintiffs have failed to satisfy the "exacting" pleading requirement imposed by the
9   PSLRA necessitating "specific" and "contemporaneous" facts indicating when and how Audience
10  Pinpointer experienced the issues which Lead Plaintiffs allege made Defendants' statements false.
11  *Kipling*, 2020 WL 2793463, at *14; *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d at 848; *Norfolk*,
12  2016 WL 7475555, at *3.

13  It is true, as Lead Plaintiffs highlight, that issues with Audience Pinpointer prior to the
14  Class Period could be useful to show that these issues continued into the Class Period or that
15  Defendants knew the statements made during the Class Period were false.  Opp'n 133.  However,
16  Lead Plaintiffs' pre-Class Period allegations here do not establish the falsity of the statements
17  made during the Class Period.  Without more, "any inference that pre-Class Period practices
18  continued during the Class Period amounts to unsubstantiated speculation." *Johnson v. Costco*
19  *Wholesale Corp.*, No. 18-cv-1611-TSZ, 2019 WL 6327580, at *7 (W.D. Wash. Nov. 26, 2019);
20  *see also In re Downey Sec. Litig.*, No. 08-cv-3261-JFW, 2009 WL 2767670, at *10 (C.D. Cal.
21  Aug. 21, 2009) (rejecting CW allegations that occurred outside of the class period).

22  Accordingly, the Court **GRANTS** Defendants' motion to dismiss the Section 10(b) and
23  Rule 10b-5 claims.  Because the Court dismisses on the threshold issue that Lead Plaintiffs have
24  failed to plead with particularity facts to show a falsity, the Court will not address Defendants'
25  remaining arguments at this time.

26  **C.  Exchange Act Section 20(a)**
27  Unity Defendants, Silver Lake, and Sequoia Defendants all separately move to dismiss

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
16

1  Lead Plaintiffs Section 20(a) claims against them for failure to state a claim.  Unity Mot.; Silver
2  Lake Mot; Sequoia Mot.
3  Section 20(a) of the Securities Exchange Act provides that "[e]very person who, directly or
4  indirectly, controls any person liable under any provision of [the Securities Exchange Act] shall
5  also be liable jointly and severally with and to the same extent as such controlled person to any
6  person to whom such controlled person is liable." 15 U.S.C. § 78t(a).  A plaintiff alleging a
7  violation of Section 20(a) must demonstrate: "(1) a primary violation of federal securities laws and
8  (2) that the defendant exercised actual power or control over the primary violator." *Webb v.*
9  *Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018) (quotations and citation omitted).

10  The primary federal securities law violations upon which Lead Plaintiffs rely are the
11  Section 10(b) and Rule 10b-5 claims dismissed above.  Am. Compl. ¶ 292.  Because the Court
12  finds Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims insufficiently pled, their Section 20(a)
13  claim necessarily fails at the first step.  The Court therefore need not address Defendants'
14  arguments regarding the second step at this time.
15  Accordingly, the Court **GRANTS** Defendants' motion to dismiss the Section 20(a) claims
16  for failure to state a claim of a primary violation of the securities laws.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motions to dismiss with leave to amend.  Lead Plaintiffs may file an amended complaint if they choose by April 5, 2024.

**IT IS SO ORDERED.**

Dated: March 15, 2024

EDWARD J. DAVILA
United States District Judge

Case No.: 5:22-cv-03962-EJD
ORDER GRANTING MOTIONS TO DISMISS
17