UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE UNITY SOFTWARE INC. SECURITIES LITIGATION, | Case No. 22-cv-03962-EKL<br><br>**ORDER GRANTING MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 131, 132, 133 |

In this federal securities class action, Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System and Indiana Public Retirement System (collectively, "Plaintiffs") allege that Defendant Unity Software Inc. ("Unity"), its individual officers and directors, and two of its largest shareholders made false and misleading statements to investors in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, promulgated by the U.S. Securities and Exchange Commission ("SEC"). Second Am. Compl. ("SAC"), ECF No. 129.

Before the Court are three motions to dismiss the second amended complaint. The Court reviewed the parties' briefs and heard oral argument on February 5, 2025. For the reasons discussed herein, the Court GRANTS Defendants' motions without leave to amend, and dismisses the second amended complaint with prejudice.

I.  **BACKGROUND**

The parties and the relevant factual background are described more completely in the prior order of Judge Edward J. Davila granting Defendants' motions to dismiss the consolidated amended class action complaint. Order Granting Mot. to Dismiss at 2-9 ("MTD Order" or "prior order"), ECF No. 124. The Court summarizes the relevant facts and discusses new allegations in

the second amended complaint to the extent they bear on the Court's analysis.[1]

### A. The Parties

Unity is a Delaware corporation whose common stock trades on the New York Stock Exchange ("NYSE"). SAC ¶ 26. Defendants John Riccitiello, Luis Felipe Visoso, and Ingrid Lestiyo are current or former corporate officers or directors of Unity.[2] *Id.* ¶¶ 27-29. Defendants SC Us SSF 2013 (TTGP), LLC and Sequoia Capital Operations, LLC (collectively, "Sequoia Defendants") and Defendant Silver Lake, LLC ("Silver Lake") are two of Unity's largest shareholders of outstanding common stock.[3] *Id.* ¶¶ 31, 32, 34, 35.

Plaintiffs bring this class action on behalf of all persons or entities who purchased or otherwise acquired Unity's publicly-traded common stock or exchange-traded call options, or who sold Unity's exchange-traded put options, between May 11, 2021 and May 10, 2022 (the "Class Period"), and suffered a loss.

### B. Factual Background

In this case, Plaintiffs allege that Defendants made material misstatements to investors regarding Unity's Audience Pinpointer tool, and Unity's ability to serve its advertising customers effectively after Apple made changes to its privacy settings in April 2021. The Court summarizes Plaintiffs' allegations regarding Unity's business, the rollout of Audience Pinpointer, subsequent customer complaints, and public statements made by Unity in earnings calls and public filings. Plaintiffs allege these statements were false and misleading, and that they omitted key information regarding issues with Audience Pinpointer.

#### 1. Unity's Platform and Tools

Unity provides software developers with a platform to create and monetize video games for use on mobile phones, computers, and game consoles, many of which are played on devices

---

[1] The facts are taken from the complaint and assumed to be true for purposes of these motions.

[2] The Court refers to Unity, Riccitiello, Visoso, and Lestiyo collectively as the "Unity Defendants."

[3] Plaintiffs also named Unity founder and Board Member David Helgason as a controlling shareholder Defendant. Helgason has not yet appeared in this action and is not a party to the motions now before the Court.

using Apple's iOS operating system. *Id.* ¶ 38. Unity generates about 65% of its revenue through its "Operate Solutions" segment ("Operate" or "Operate segment"). *Id.* ¶¶ 42-44. The Operate segment generates revenue by placing ads within games. *Id.* ¶ 44. To generate revenue through ad placements, Unity relies on its Unified Auction tool. *Id.* ¶ 45.

Through Unified Auction, advertisers submit competing bids to place ads within games; when the winning bidder's ad displays in the game, Unity splits the advertising fee with the game developer. *Id.* ¶ 46. Advertisers seek a high return on investment ("ROI") for their advertisements, which is measured by user clicks and product purchases. *Id.* ¶ 47. Accurate tracking of user activity allows advertisers to pay a sensible price for ads that target specific users who will likely click on an ad, and purchase the advertiser's products. *Id.* Before the Class Period, Operate tracked user data through Apple's Identifier for Advertisers ("IDFA"), which assigned a unique identifier to each Apple device in order to target the user's online clicking activity for marketing and advertising purposes. *Id.* ¶¶ 50, 53.

### 2. Rollout of Audience Pinpointer Following Apple's Privacy Changes

Unity recognized that the ability to target specific users was a key feature for advertisers using the Unified Auction. For that reason, Unity assembled a team to develop alternative user identification solutions in the event that Apple ever decided to discontinue or modify its IDFA tool – for example, to address privacy concerns. *Id.* ¶ 57.

Unity's primary solution was Audience Pinpointer, a contextual model that did not rely on IDFA. *Id.* ¶ 59. Through Audience Pinpointer's machine-learning algorithm, Unity tracks users' activity within games, analyzes the data, assigns each user a real-time lifetime value ("LTV"), and sets a bid for specific users based on their individual valuations. *Id.* ¶ 48. Advertisers use the LTV to make informed decisions about how much to bid for ad displays through the Unified Auction. *Id.* Before the Class Period, Audience Pinpointer was in beta testing, with a small number of Unified Auction customers using it. *Id.* ¶¶ 59, 91.

In June 2020, three months before Unity's initial public offering, Apple announced that it would roll out new data privacy features in 2021. *Id.* ¶ 54. The new privacy features would allow users to prohibit companies like Unity from tracking the specific user data that it had previously

3

obtained through IDFA.[4]  *Id.*  The IDFA changes, which forced companies to develop alternative tools to target user activity for ad monetization, were expected to negatively impact ad revenue across the digital advertising industry.  *Id.* ¶ 56.

In response to Apple's announcement that it was discontinuing IDFA, Unity rolled out Audience Pinpointer to a larger segment of its Operate ad customers.  *Id.*  Plaintiffs allege that the April 2021 rollout of Audience Pinpointer was rushed and that Unity began receiving a large volume of customer complaints shortly thereafter.  *Id.* ¶¶ 9, 81, 114.  To provide factual support for these allegations, Plaintiffs rely on the statements and observations of former Unity employees identified in the second amended complaint as confidential witnesses ("CWs").[5]

For example, CW-3 recalled hearing in February 2021 that Audience Pinpointer "had problems" and attended an all-hands meeting where the "problems were discussed."  *Id.* ¶ 107.  CW-1 stated that in September and October of 2021, his team conducted a "sentiment analysis" of Unity customers by manually reviewing thousands of customer complaints from May and June 2021 which showed "significant" low customer sentiment "for a while."  *Id.* ¶ 119.  CW-2 recalled that during the broader rollout of Audience Pinpointer there was a "tonal shift" from both positive and negative comments to "exclusively negative" feedback after Audience Pinpointer.  *Id.* ¶ 110.  CW-2 further recalled "issues coming from customers of all sizes, from SMB (small and medium-sized business) to Enterprise customers."  *Id.* ¶ 112.  CW-2 stated that Unity "witness[ed] a 'massive' increase in customer complaints that increased 'fivefold,'" and that profits were declining for ad solutions as customers complained about issues with Audience Pinpointer's

---

[4] Apple's iOS version 14.5 required app users to opt in to data sharing instead of opting out.  SAC ¶ 60.

[5] The amended complaint identified five confidential witnesses (CW-1 through CW-5).  The second amended complaint adds statements and observations by two additional confidential witnesses, CW-6 and CW-7.  The Court adopts the prior order's description of the positions held by CW-1, CW-2, CW-3, CW-4, and CW-5 at Unity.  MTD Order at 5-6.  CW-6 was employed at Unity from May 2018 through February 2024; his most recent role was Senior Program Manager from March 2022 through February 2024.  Before that, he was Senior Partner Manager in the Operate Segment from November 2020 through April 2022, where he worked under Unity's "Operate umbrella, which provided tools for game developers to monetize existing apps with ad revenues.  SAC ¶ 88.  CW-7 was employed by Unity as a Product Manager from April 2022 through the end of the Class Period (May 10, 2022).  *Id.* ¶ 89.  Defendants do not dispute the CWs' personal knowledge of the facts alleged.

4

"accuracy." *Id*. ¶ 113.

### 3. The Alleged False and Misleading Statements

Plaintiffs allege that throughout the Class Period, Defendants made materially false and misleading statements in earnings calls and publications by failing to disclose that Audience Pinpointer was losing customers, and that revenue was declining. SAC ¶ 6. Defendants specifically challenge the forty statements, identified in the second amended complaint, that were made in earnings calls and SEC filings.[6] The Court does not list all of the statements here, but includes the following illustrative examples:

- "[O]ur contextual model, which very importantly does not rely on IDFA, is working well." *Id*. ¶ 165.
- "[Unity] understand[s] the LTV of our customers." *Id*. ¶¶ 163, 166.
- "We believe that the ability to analyze this data positions us very well in the industry." *Id*. ¶ 165.
- "[T]he customer feedback we're getting is very strong." *Id*.
- "So IDFA will most likely impact the ads industry, but we believe that our data and analytics advantage plus this advanced preparation . . . position us very well to manage the IDFA." *Id*.
- "[O]ur data understanding is huge." *Id*. ¶ 166.
- "While our strong performance is broad based, we are particularly proud of the performance from our Operate Solutions group that expanded market share in a tough environment." *Id*. ¶ 172.
- "[Audience Pinpointer was] proving to be a competitive advantage." *Id*. ¶ 175.
- "[W]e have the goal of maximizing revenue for publishers." *Id*. ¶ 176.
- "There are precious few companies anywhere with our sophistication around advertising and data. And those are skills that we want to apply more broadly and

---

[6] The parties agree regarding which statements are at issue. *See* Unity Mot. App. A, ECF No. 133-1; *see also* Opp. App. A, ECF No. 139-2.

5

will." *Id.*

- "The business momentum coupled with the quality of our innovation plans gives us confidence to guide to a revenue growth range of 34% to 36% in 2022 as we continue to improve margins." *Id.* ¶ 189.

- "We also saw strong performance from our sophisticated analytics tools and products such as Audience Pinpointer that deliver strong return on investment to our customers without manual guesswork." *Id.* ¶ 191.

### 4. Unity's May 2022 Disclosures

In a May 10, 2022 press release announcing its Q1 2022 financial results, Unity reported revenue of $320.1 million, missing analysts' consensus estimate of $321.5 million. *Id.* ¶ 206. Unity also reduced its Q2 2022 guidance to 20% below the consensus estimates of $361 million, and lowered its full-year 2022 revenue guidance to a range of $1.35 to $1.425 billion, down from the earlier estimate of $1.50 billion. *Id.* During an earnings call on the same day, Unity explained the loss by revealing that Operate had "started the year strong in January," but growth slowed down significantly in February and March due in part to issues with Audience Pinpointer's accuracy. *Id.* ¶ 207.

### C. Procedural Background

On July 6, 2022, approximately two months after the May 10, 2022 announcement, Plaintiffs filed this putative class action to recover damages caused by Defendants' alleged violations of federal securities laws. ECF No. 1. On March 15, 2024, the Court granted Defendants' motions to dismiss the amended consolidated complaint with leave to amend. ECF No. 124. On April 12, 2024, Plaintiffs filed the second amended complaint. ECF No. 129. On May 22, 2024, the Unity Defendants, Sequoia Defendants, and Silver Lake filed three separate motions to dismiss the second amended complaint. Unity Mot. to Dismiss ("Unity Mot."), ECF No. 133; Sequoia Mot. to Dismiss ("Sequoia Mot."), ECF No. 131; Silver Lake Mot. to Dismiss ("Silver Lake Mot."), ECF No. 132.

## II. DISCUSSION

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To avoid dismissal, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded facts allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of a Rule 12(b)(6) motion, the court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).

When ruling on a motion to dismiss in a Section 10(b) action, courts must "accept all factual allegations in the complaint as true," and "must consider the complaint in its entirety, as well as other sources courts ordinarily examined when ruling on a motion to dismiss[.]" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Other sources include "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.*

If dismissal is warranted, the court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). By contrast, "[a] district court's discretion to deny leave to amend is 'particularly broad' where the plaintiff has previously amended." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (citation omitted). The failure to correct deficiencies in an amended complaint is "a strong indication" that the plaintiff has no additional facts to plead. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009), *as amended* (Feb. 10, 2009)

1  (internal quotation mark and citation omitted).

### B.  Requests for Incorporation by Reference and Judicial Notice

The Unity Defendants request that the Court consider thirteen exhibits pursuant to the doctrine of incorporation by reference or by judicial notice. Req. for Consid. and Jud. Notice ("Unity RJN"), ECF No. 134. Silver Lake asks the Court to consider five exhibits.[7] Req. for Jud. Notice ("Silver Lake RJN"), ECF No. 132-1. Plaintiffs oppose both requests, arguing that Defendants improperly offer the exhibits to demonstrate alternative versions of the facts and to dispute well-pled allegations. Opp. to Unity RJN, ECF No. 140; Opp. to Silver Lake RJN, ECF No. 139-3. The Court GRANTS both requests pursuant to the limitations discussed below.

#### 1.  Incorporation by Reference

In ruling on a Rule 12(b)(6) motion, the court generally does not consider material outside the pleadings. *United States v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2011). However, Courts may consider "documents incorporated in the complaint by reference[.]" *Tellabs*, 551 U.S. at 322. Incorporation by reference "treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "[A] defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).

The Unity Defendants' Exhibits 1 through 10 consist of transcripts of earnings calls (Exs. 1, 3, 4, 6, and 8), SEC filings (or portions of them) (Exs. 7 and 9), press releases attached to SEC filings (Exs. 2 and 5), and an interview of Defendant Riccitiello (Ex. 10). Unity RJN at 2-4. Plaintiffs extensively referenced and relied on these documents in support of their claims.[8] *See*

---

[7] Silver Lake's Exhibits A and D concern the same documents as Unity Defendants' Exhibits 7 and 9.

[8] The Court previously granted a similar request to incorporate Unity's Exhibits 1 through 9 by reference in the amended complaint. Exhibit 10 was not included in the prior request. MTD Order at 12-14.

SAC ¶¶ 163-202 (referencing alleged misrepresentations and omissions from statements in Exhibits 1 through 7), 207-211 (alleging disclosure of monetization challenges and slowed growth based on statements in Exhibit 8), 31-33 (relying on proxy statement in Exhibit 9 to plead claims against Silver Lake and Sequoia Defendants), 223 (alleging that Riccitiello interview in Exhibit 10 "sparked almost immediate backlash" from gaming community). Accordingly, the Court finds that Exhibits 1 through 10 are incorporated by reference in the second amended complaint.

Silver Lake's Exhibits A through D similarly consist of SEC filings that are extensively referenced in the second amended complaint in support of Plaintiffs' claims. Silver Lake RJN at 3; *see also* Sec. Am. Comp. ¶¶ 31-33, 40, 197-202, 251, 278. Accordingly, the Court finds that Exhibits A through D are also incorporated by reference.

Although the exhibits are incorporated in the second amended complaint, the Court does not assume the truth of their contents "if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003. Thus, to the extent that the Unity or Silver Lake Defendants present the exhibits to resolve factual disputes, the Court declines to consider them for that purpose.

### 2. Judicial Notice

In ruling on a Rule 12(b)(6) motion, the court may also consider "matters of public record." Fed. R. Evid. 201(b). The Unity Defendants request that the Court take judicial notice of Exhibits 11, 12, and 13, consisting of SEC filings. Unity RJN at 4-6. Silver Lake asks the Court to take judicial notice of Exhibit E, an SEC filing for Unity dated February 29, 2024. Silver Lake RJN at 4-5.

The Court may take judicial notice of SEC filings because they are publicly available documents whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *see also In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1066-67 (N.D. Cal. 2010) ("The court is . . . permitted to take judicial notice of the content of relevant public disclosure documents required to be filed with the SEC."). The Court therefore grants the requests for judicial notice as to Unity's Exhibits 11, 12, and 13 and Silver Lake's Exhibit E. But the Court considers SEC filings "only for the purpose of determining what statements the documents contain, not to prove the truth

of the documents' contents." *Troy Grp., Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005).

### C. Claims Based on Section 10(b) and SEC Rule 10b-5

The Court turns to the merits of Defendants' motions. Defendants argue that the Court must dismiss the second amended complaint with prejudice because Plaintiffs have again failed to plead particularized facts showing that Defendants made materially false or misleading statements.

To state a claim for damages under Section 10(b) and Rule 10b-5, Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

Securities fraud cases must meet the "higher, exacting pleading standards" of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Oregon Pub. Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 604 (9th Cir. 2014). Rule 9 requires plaintiffs alleging fraud to "state with particularity the circumstances constituting fraud or mistake," *id.* (quoting Fed. R. Civ. P. 9(b)), meaning that plaintiffs must allege the "'who, what, when, where, and how' of the misconduct charged," *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). The PSLRA requires the complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading[.]" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133 (N.D. Cal. 2017) (quoting 15 U.S.C. § 78u–4(b)(2)(A)). "If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint." *Id.* (citing 15 U.S.C. § 78u–4(b)(3)(A)).

#### 1. The Prior Complaint Failed to Plead Falsity with Particularity

The Court previously dismissed the amended complaint for failure to allege that the forty challenged statements were false or misleading because Plaintiffs "failed to allege that Audience Pinpointer had serious known technical flaws during the Class Period." MTD Order at 15. The Court noted that "most of the confidential witnesses' observations [regarding Audience

10

Pinpointer] occurred pre-Class Period." *Id.* These pre-Class Period allegations did "not establish the falsity of the statements made during the Class period. Without more, 'any inference that pre-Class Period practices continued during the Class Period amounts to unsubstantiated speculation.'" *Id.* (quoting *Johnson v. Costco Wholesale Corp.*, No. 18-cv-1611-TSZ, 2019 WL 6327580, at *7 (W.D. Wash. Nov. 26, 2019)).

The Court also observed that the few allegations that described problems with Audience Pinpointer's functionality *during* the Class Period derived from two observations by CW-1, and those allegations were too vague to show that any of the challenged statements were false when made. *Id.* at 16. The Court granted leave to amend the complaint to address these pleading deficiencies.[9] *Id.*

### 2. Plaintiffs' New Allegations Do Not Plead Falsity with Particularity.

Plaintiffs' theory of falsity remains the same in the second amended complaint, i.e., that because the April 2021 rollout of Audience Pinpointer was rushed, Unity began receiving a large volume of customer complaints, and that instead of disclosing these problems to investors, Unity made false and misleading statements throughout the Class Period. Id. ¶ 9. The second amended complaint relies on the same confidential witness statements and observations that the Court previously discussed, considered, and deemed inadequate to satisfy the heightened pleading standard under the PSLRA. *See* SAC ¶¶ 96, 104, 107, 109, 110, 118, 119. To attempt to cure the deficiencies, Plaintiffs included new allegations by CW-2, CW-6, and CW-7. In their opposition brief, Plaintiffs specifically directed the Court's attention to these new allegations as Plaintiffs' strongest support for their claims of falsity, *see* Opp. at 14-16, and the Court addresses these allegations below. Other than pointing the Court to these new allegations, however, Plaintiffs' opposition brief was largely taken verbatim from their prior opposition to Defendants' motion to dismiss the amended complaint. Plaintiffs' opposition does not meaningfully explain how the new allegations demonstrate falsity, despite the Court's direction to address this issue in the second

---

[9] The Court also dismissed Plaintiffs' Section 20(a) claims for failure to state a primary violation of the securities laws. MTD Order at 17.

11

amended complaint.

The new allegations address the timing concerns raised in the prior order because they state that Unity received a large volume of customer complaints beginning in April 2021 and continuing through the Class Period. *See, e.g.*, SAC ¶ 109 (stating that Unity began receiving customer complaints "upon the introduction of Apple's IDFA changes in April 2021[.]"). Plaintiffs' new allegations do not address the other fundamental shortcomings identified in the prior order: specifically, that the allegations are too vague and generalized, and do not specifically identify technical problems and customer complaints related to Audience Pinpointer that would render Unity's statements false. MTD Order at 14-16.

For example, Plaintiffs added a statement by CW-2 explaining that "the complaints regarding Audience Pinpointer that began in April 2021 were received in varying increments based on the source of the information throughout the remainder of his tenure in August 2022." SAC ¶ 109. This allegation does not reflect falsity because the reference to "varying increments" of complaints does not inform the Court as to the number or content of complaints received, whether the complaints increased over time, or whether the volume of complaints was unusual based on Unity's expectations and experience with other products and services. CW-2 further observed that "his team was composed of multiple researchers speaking with clients, and that information regarding complaints also came from 'second parties,' meaning other teams within Unity." *Id*. But CW-2 does not explain why the fact that "information regarding complaints" was received from "other teams within Unity" renders any of Unity's public statements false.

CW-2 further observed:

> [A]fter spiking sharply after the rollout of Audience Pinpointer in April 2021, the volume of complaints regarding Audience Pinpointer remained consistent throughout his 2021 and 2022, and that they did not improve over the course of his tenure. According to CW-2, he spoke with members of other internal teams at Unity, such as those in Sales, Customer Success, Product, other researchers, and Technical Account Managers regarding Audience Pinpointer complaints. CW-2 and his team communicated with these other Unity employees using an internal network to exchange information about Customers in order to compile information to be eventually passed along to leadership.

*Id.* ¶ 113. Although the above statement reflects that the volume of complaints increased

"sharply" after Audience Pinpointer was rolled out, it provides no particularized information regarding the nature of the complaints, and thus also fails to support Plaintiffs' falsity allegations. Notably, Plaintiffs have not alleged any baseline facts regarding the volume (or nature) of customer complaints that Unity received before the rollout, making it impossible to ascertain the significance of the increase in complaints. The remaining part of this new statement concerning the internal exchange of information "regarding Audience Pinpointer complaints" also fails to add substantive information in support of Plaintiffs' falsity claim.

CW-2 also stated that in regular meetings with Defendant Lestiyo and senior executive Jules Shumaker, which were "primarily" about "the ads business," there was "a lot of stress throughout the Class Period about Audience Pinpointer's problems (and a variety of other topics.)" *Id.* ¶ 115. Again, this allegation provides no new information about the nature of the "problems" with Audience Pinpointer. Nor do Plaintiffs explain how the "stress" experienced by Unity employees after the rollout of Audience Pinpointer has any bearing on the falsity of Unity's statements, or how this stress differed from the experience of releasing *any* new tool or product.

CW-2's other new statement that his team "sent emails detailing customer complaints, including Audience Pinpointer," to Lestiyo and Shumaker, *id.* ¶ 116, does not contribute any new information either.

CW-6 confirmed that he was "aware of the problems" on the ads side during his time as Senior Program Manager in Operate, and explained that "there was a 'big discrepancy' between the Company's public statements regarding its expected ad revenues and the revenues which were actually brought in." CW-6 states that he learned of this "discrepancy" during regular all-hands meetings for Operate, and asserts that the "problems with Audience Pinpointer" were "bought up more than once at meetings." *Id.* ¶ 141. The statements of CW-6 suffer from the same problems, as they are vague and fail to explain what the nature of the "discrepancy" was that made the public statements false or misleading.

At hearing, when asked where the new allegations regarding falsity were found in the second amended complaint, Plaintiffs repeatedly directed the Court to paragraphs 113, 114, 120, and 121, specifically emphasizing CW-2's statements in paragraph 113. *See* Hr'g Tr. at 8, 10, 11,

19, 20, 34. As discussed above, paragraph 113 did not provide any specific information to support Plaintiffs' falsity claim. Although paragraphs 114, 120, and 121 did not include any new allegations, the Court follows Plaintiffs' lead and looks to those portions of the second amended complaint for substantive additions or whether the allegations are now sufficient when considered as a whole. *See Tellabs*, 551 U.S. at 322 (requiring courts to "consider the complaint in its entirety" when ruling on a motion to dismiss in a Section 10(b) action).[10]

In paragraph 114, CW-2 observed that Audience Pinpointer was "'absolutely rushed' to market," and "reiterated that when you 'rush' technology to market and do not 'pressure test' it, problems like what happened to Audience Pinpointer will occur." *Id.* ¶ 114. This allegation provides characterizations of the product launch without supplying any *factual content* to establish that Audience Pinpointer had technical flaws. CW-2's vague references to "problems like what happened to Audience Pinpointer," *see id.*, underscores the need for more specific facts to demonstrate that Unity's statements were false.

In paragraph 120, CW-1 explained that the "sentiment analysis" program conducted by his team in September and October 2021 (discussed in the preceding paragraph), where it reviewed customer complaints from "approximately May or June 2021," found "low sentiment and customer complaints across all Operate products, including within the ads business." *Id.* ¶ 120. CW-1 does not specify whether any of the "low sentiment" or "customer complaints" were specifically directed at Audience Pinpointer, or pertained generally to "all Operate products." *Id.*

Plaintiffs contend that the new allegations establish falsity because "they tell us that Audience Pinpointer wasn't working correctly, they tell us why it wasn't working correctly and that Unity was receiving a massive number of customer complaints." Hr'g Tr. at 12. At hearing, Plaintiffs cited *Shenwick v. Twitter, Inc.* and *Oklahoma Firefighters Pension and Retirement*

---

[10] The Court notes that Plaintiffs did not address the new allegations concerning CW-7's statement in their opposition brief. CW-7 stated that he learned of the "Audience Pinpointer problems" during a July or August 2022 "town hall" meeting. SAC ¶ 144. His "general understanding of the problem" was that Unity "tried to use Audience Pinpointer to replace [IDFA] but the tool did not work the way it was supposed to in order to analyze personalized data to target ads." *Id.* These allegations do not support Plaintiffs' falsity claims either because they are equally vague, and appear to concern the information disclosed by Unity at the end of the Class Period in May 2022.

14

*System v. Snap Inc*. in support of their falsity argument.  Hr'g Tr. at 13-14, 18-19.  Neither case supports Plaintiffs' position that the second amended complaint adequately pleads falsity.

In *Shenwick*, the plaintiffs alleged that company executives knowingly misrepresented and failed to disclose user engagement metrics that were its primary method of measuring user growth, and that their actions resulted in an inflated share price, which dropped when the true user engagement metrics came to light.  *Shenwick*, 282 F. Supp. 3d at 1135-45.  The court found that plaintiffs plausibly alleged that Twitter's omission of daily active user ("DAU") metrics from its public statements was misleading because DAU was Twitter's "primary user engagement metric," and the omission of the DAU metrics while highlighting monthly active user ("MAU") trends "deprived investors of the ability to understand that the MAU statements were unrealistic."  *Id*. at 1138.  Here, in contrast, Plaintiffs have not identified specific facts that show a discrepancy between the confidential witness allegations and the challenged statements.  Rather, the allegations reflect generally that Unity was receiving customer complaints "about issues with the 'accuracy' of the Audience Pinpointer tool, which was not working as intended."  SAC ¶ 113.  Plaintiffs have not explained how these allegations, if true, render false statements like "[W]e're performing very strongly in this environment," SAC ¶ 177 (Statement 22), or "We have a defensible platform that adds significant value to our customers and keeps on getting better, *id*. ¶ 190 (Statement 30).

In *Oklahoma Firefighters Pension and Retirement System v. Snap Inc*., the plaintiffs alleged that Snap's then-Chief Business Officer, Jeremi Gorman, misled investors by stating during an earnings call that advertisers representing a majority of Snap's principal revenue source had successfully implemented Apple's post-IDFA tool, "SKAN."  No. 23-3932, 2024 WL 5182634, at *2 (9th Cir. Dec. 20, 2024).  There, the complaint contained "extensive allegations" and "particularized facts" that were inconsistent with Gorman's statement, such as statements by a confidential witness that there were "very few adoptees" of SKAN at the time of the statement; and that adoptees experienced issues "including the loss of legacy IDFA data, significant delays in receiving new data, and the inability to obtain data such as the size of a user's purchase after clicking on an ad."  *Id*.  The plaintiffs alleged further that "CW 2, a data scientist tasked with revenue forecasting for Snap, stated that Snap 'had barely begun working with its advertisers on

15

SKAN' in April 2021 and that, in August 2021, another data scientist showed her a spreadsheet indicating that most of the company's DR advertisers had not yet begun to opt into SKAN." *Id*. Thus, the plaintiffs' allegations provided specific details regarding the technical problems with SKAN and directly contradicted Gorman's statement that a "majority" of advertisers had "successfully implemented [SKAN]." Here, in contrast, the second amended complaint lacks any specificity and only identifies general "problems" and "complaints" about Audience Pinpointer.

In sum, Plaintiffs' new allegations are too general and vague to establish falsity. Plaintiffs have not alleged specific problems or complaints regarding Audience Pinpointer, and the generalized complaints they reference do not contradict Unity's public statements.

### 3. Plaintiffs Fail to Allege that the Challenged Statements Were Misleading in Light of Serious Technical Problems with Audience Pinpointer During the Class Period.

Having concluded that Plaintiffs fail to plausibly allege falsity, the Court turns to whether Plaintiffs have demonstrated that any of Unity's public statements were misleading. "In setting forth the reasons why they contend that each challenged statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b-5(b)). "Under Rule 10b-5, an affirmative misrepresentation is an 'untrue statement of a material fact,' and a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Id*. (quoting 17 C.F.R. § 240.10b-5(b)). That is, to be misleading, an omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Plaintiffs argue that statements regarding Audience Pinpointer's features and effectiveness were misleading due to Unity's omission of information regarding the volume of customer complaints after the rollout. Opp. at 16-19. Plaintiffs further contend that the statements were actionable because a "discrepancy" existed between Unity's positive statements during the Class Period and the "internal truth" at Unity. *Id*.

It is useful to look to the types of statements at issue to determine whether Plaintiffs have

met their burden. One category of public statements (Statements 5, 17, 22, and 31) specifically referenced Audience Pinpointer. Mot. App. A, ECF No. 133-1. For example, during the Q1 2021 earnings call, Visoso stated, "There is a shift towards ROI-based campaigns on our platform through Audience Pinpointer, which this is when advertisers determine the outcome that they want from the campaign, and we determine the right channels and price for them to achieve their [Key Performance Indicators ("KPIs")]." SAC ¶ 165 (Statement 5). During the Q2 2021 earnings call, Riccitiello stated, "Now our view is advertisers, publishers are going to continue to spend as long as they're getting quality payers at a positive ROI, that's what we do. In fact, we've got tools like Audience Pinpointer that allows advertisers to find what [Return on Ad Spend ("ROAS")] they'd like to target or based on retention or IAP or ad revenues, so they can get a guaranteed return regardless of what's happening or changes in attribution. That's what we are delivering." *Id*. ¶ 176 (Statement 17).

A second category of statements (Statements 6, 14, 18, 20, 24, 26 and 27) concerned Unity's preparation for Apple's IDFA privacy changes. Mot. App. A. For example, during the Q1 2021 earnings call, Visoso stated, "So IDFA will most likely impact the ads industry, but we believe that our data and analytics advantage plus this advanced preparation that I was mentioning, position us very well to manage the IDFA." SAC ¶ 165 (Statement 6). And during the Q2 2021 earnings call, Visoso stated, "[W]e were well prepared for the Apple's privacy changes. And as a result of excellence in execution, we build market share this quarter. We're proud to help customers thrive during the uncertainties of our platform change. Our advanced analytics, context and insights are proving to be a competitive advantage." *Id*. ¶ 174 (Statement 14). During the same call, Visoso also stated "And really, the reason for that is our contextual models, which actually do not rely on IDFA, [were] working very well." *Id*. ¶ 177 (Statement 20).

A third category of statements (Statements 1, 4, 7, 9-13, 15, 19, 23, 25, 28, 30 and 33-40) concerned Unity's business or the strength of its products or position. Mot. App. A. For example, during the Q1 2021 earnings call, Visoso stated, "[O]ur contextual model, which very importantly

17

does not rely on IDFA, is working well."[11] *Id*. ¶ 163 (Statement 1). During the same call, Visoso stated, "We believe that the ability to analyze this data positions us very well in the industry." *Id*. ¶ 165 (Statement 4). During the Q2 2021 earnings call, Visoso stated, "As I mentioned last quarter, we were well prepared for the [sic] Apple's privacy changes. And as a result of excellence in execution, we build market share this quarter." *Id*. ¶ 166 (Statement 14).

Finally, Category 4 statements (Statements 2, 3, 8, 16, 21, 29 and 32) concerned Unity's relationships with its customers. Mot. App. A. For example, during the Q1 2021 earnings call, Riccitiello stated, "We understand the LTV of our customers." *Id*. ¶¶ 163, 166 (Statement 2). During the same call, Visoso stated, "[T]he customer feedback we're getting is very strong." *Id*. ¶¶ 164, 165 (Statement 3).

Plaintiffs do not point to specific facts showing how the public statements were misleading due to omission, or inconsistent due to a "big discrepancy" with the truth. *Id.* ¶ 141 (alleging that CW-6 observed a "big discrepancy" between Unity's public statements regarding expected ad revenues and the revenues that were actually brought in). In support of their argument that a "discrepancy" rendered Unity's public statements misleading, Plaintiffs cite to *In re Daou Sys., Inc*. In *Daou*, the defendant's public statement that "attrition within the technical ranks of employees was only 6.8%," and the plaintiffs' allegations that employee turnover among engineers exceeded 40%, created a "discrepancy between what Daou executives reported and the allegedly true state of affairs" that was "adequately misleading to state a claim under 10(b)." 411 F.3d 1006, 1020 (9th Cir. 2005). Plaintiffs identify no similarly specific facts to show a discrepancy between Unity's statements and the true state of affairs. Further, Plaintiffs do not explain how their vague and generalized allegations referencing "problems" or "complaints" about Audience Pinpointer made any of Unity's public statements misleading under Section 10(b).

The second amended complaint does not plead falsity with particularity as required by the PSLRA, and Plaintiffs have not identified allegations that render the challenged statements

---

[11] According to Plaintiffs, references to Unity's "contextual model" also pertained to Audience Pinpointer. Hr'g Tr. at 15.

1  misleading. The Court therefore grants Defendants' motions to dismiss Plaintiffs' claims under

2  Section 10(b) and Rule 10b-5. Because Plaintiffs have not met the threshold issue to plead falsity

3  with particularity, the Court again declines to address Defendants' remaining arguments regarding

4  scienter. *See* MTD Order at 16.

### D. Section 20(a) Claims

Defendants move separately to dismiss Plaintiffs' claims under Section 20(a) of the Exchange Act. Unity Not. of Mot. at iii; Sequoia Not. of Mot. at 1; Silver Lake Not. of Mot. at 1. Section 20(a) states: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable[.]" 15 U.S.C. § 78t(a). To state a claim for control person liability under Section 20(a), plaintiffs must allege "(1) a primary violation of federal securities law . . .; and (2) that the defendant exercised actual power or control over the primary violator[.]" *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "If Plaintiffs fail to plead a claim for securities fraud under [Section] 10(b) and Rule 10b-5, the [Section] 20(a) claim fails as well." *Mulligan v. Impax Laboratories, Inc*., 36 F. Supp. 3d 942, 956 (N.D. Cal. 2014).

Because the Court finds that Plaintiffs fail to state a claim under Section 10(b) and Rule 10b-5, their Section 20(a) claims necessarily fail, and the Court therefore declines to address Defendants' arguments regarding those claims. Defendants' motions to dismiss the Section 20(a) claims for failure to state a primary violation of securities laws are GRANTED.

### E. Leave to Amend

"A district court's discretion to deny leave to amend is 'particularly broad' where the plaintiff has previously amended." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013); *see also Kampe v. Volta Inc*., No. 22-CV-02055-JST, 2024 WL 4534732, at *15 (N.D. Cal. Oct. 21, 2024) (dismissing second amended securities class action complaint with prejudice where plaintiffs failed to add factual allegations demonstrating falsity). Here, the Court previously dismissed the first amended complaint without prejudice and gave Plaintiffs leave to amend to include any additional factual allegations that demonstrate falsity. MTD Order at 16. Plaintiffs

19

failed to add specific allegations that satisfy the heightened pleading standard under the PSLRA. When, at hearing, the Court asked what facts Plaintiffs could add if given leave to amend, Plaintiffs did not specify what allegations they would add to cure the deficiency, stating only that if the Court gave leave to amend they would "endeavor to get" more detail. Hr'g Tr. at 20-21. Plaintiffs have had ample opportunity to properly plead a claim under Section 10(b) of the Exchange Act, and have failed to do so, despite locating two new confidential witnesses and adding their statements and observations to the second amended complaint in an effort to bolster their claims.

Plaintiffs' failure to correct the deficiencies in their second amended complaint is "a strong indication" that they have no additional facts to plead. *Zucco Partners, LLC*, 552 F.3d at 1007. This indication, coupled with Plaintiffs' failure to indicate at hearing what facts they would add to cure the deficiencies, leads the Court to conclude that any further leave to amend would be futile.

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss without leave to amend and dismisses the second amended complaint with prejudice.

**IT IS SO ORDERED.**

Dated: March 12, 2025

Eumi K. Lee
United States District Judge

20